## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ZAFTR INC. n/k/a SVELLA FINANCIAL CORP. 2500, 500 4 Avenue Southwest, Calgary, Alberta, Canada | : : : : : | CIVIL ACTION  NO. |
| Plaintiff, v. | : : : : | JURY TRIAL DEMANDED |
| KEVIN JAMESON LAWRENCE, ESQUIRE 2023 N. 2nd St., Suite 301 Harrisburg, PA 17102; | : : : : : | |
| BVFR & ASSOCIATES, LLC 2023 N. 2nd St., Suite 301 Harrisburg, PA 17102; | : : : : | |
| JOHN KIRK, ESQUIRE 225 Wilmington-West Chester Pike Suite 200 Chadds Ford, PA 19317; and | : : : : : | |
| KIRK LAW PLLC 225 Wilmington-West Chester Pike Suite 200 Chadds Ford, PA 19317 | : : : : : | |
| Defendants. | : : | |

## <u>COMPLAINT</u>

Plaintiff Zaftr Inc., n/k/a Svella Financial Corp. ("Plaintiff" or "Zaftr"), by and through its undersigned counsel, hereby files this Complaint against Defendants Kevin Jameson Lawrence, Esquire, BVFR & Associates, LLC, John Kirk, Esquire, and Kirk Law PLLC (collectively "Defendants") and in support thereof, avers as follows:

1

## INTRODUCTION

1.      This matter arises out of a scheme to defraud Plaintiff out of millions of dollars through a series of sham transactions for the sale of Bitcoin (BTC).  Defendant Kevin Jameson Lawrence approached Zaftr, claiming he had previously brokered successful agreements for the sale and purchase of BTC.  Lawrence claimed he had a relationship with a third-party BTC seller, James Smith, and represented he was appointed as mandate with the authority to act and negotiate a deal on behalf of the seller.  To assist and add an air of legitimacy to the transaction, Lawrence, an attorney himself, involved attorney John Kirk as counsel for Lawrence and BVFR.  Together, they presented a purchase agreement under which Zaftr would send the purchase funds to Kirk, who would hold the funds in escrow.  Kirk would notify Lawrence that the funds were received, and Lawrence would in turn notify Smith that he could send Zaftr the BTC.  Once the BTC was delivered, Kirk would release the funds to Lawrence, who would pay Smith.

2.      To ensure Zaftr would participate in the agreement, Lawrence claimed he had worked with Smith before and had thoroughly vetted him.  Although he would not allow Zaftr to have any direct contact with Smith, Lawrence provided Zaftr with a copy of Smith's passport and attested to the validity of such copy and its accurate representation of Smith.

3.      Once the agreement was signed, Zaftr sent the required funds to Kirk and awaited delivery of the BTC.  Lawrence and Kirk offered explanations and excuses for the delay, but the BTC never came.  Thus began a string of further fraudulent misrepresentations giving rise to new agreements that Lawrence and Kirk would offer up in an effort to continue to defraud Zaftr.  Their scheme grew to include international banks and another escrow attorney, whose credentials were also falsified.  As a result of Defendants' escalating fraud, Zaftr lost not only millions of dollars in funds paid to Defendants to purchase BTC that Zaftr never received, but millions of dollars more

2

in hedging losses, lost business opportunities and profit.  Consequently, Plaintiff has been damaged in an amount in excess of $32,826,500.00.  Plaintiff therefore brings this action against Defendants to recover the damages it has sustained due to Defendants' wrongful conduct and their breaches of the parties' Agreements.

## PARTIES

4.     Plaintiff Zaftr Inc. is a company incorporated in Canada located at 2500, 500 4 Avenue Southwest, Calgary, Alberta, Canada.

5.     Defendant Kevin Jameson Lawrence, Esquire ("Lawrence") is an attorney licensed to practice law in the Commonwealth of Pennsylvania, with an address of 2023 N. 2nd St., Suite 301, Harrisburg, PA 17102.

6.     Defendant BVFR & Associates, LLC ("BVFR") is a Pennsylvania Limited Liability Company with an address of 2023 N. 2nd St., Suite 301, Harrisburg, PA 17102. Defendant Lawrence is the CEO & Managing Member of Defendant BVFR.

7.     Defendant John Kirk, Esquire ("Kirk") is an attorney licensed to practice law in the Commonwealth of Pennsylvania, with an address of 225 Wilmington-West Chester Pike, Suite 200, Chadds Ford, PA 19317.  Defendant Kirk is the Founding Shareholder of Defendant Kirk Law PLLC d/b/a Distributed Law Group ("Kirk Law").

8.     Defendant Kirk Law is a law firm organized as a Pennsylvania Limited Liability Company, located at 225 Wilmington-West Chester Pike, Suite 200, Chadds Ford, PA 19317.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because Plaintiff's federal claims, pursuant to 18 U.S.C. § 1962, arise under the Constitution and laws of the United States.  This Court has supplemental

jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367(a), which provides that supplemental jurisdiction exists "over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

10.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), based upon the diversity of the parties and because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

11.     This Court has personal jurisdiction over Defendants because they regularly conduct business within the Commonwealth of Pennsylvania, the transactions and occurrences out of which this dispute arose transpired within the Commonwealth of Pennsylvania, and the Agreements giving rise to this dispute were entered into and centered within the Commonwealth of Pennsylvania.  This Court also has personal jurisdiction over Defendants because they have had sufficient contacts with the Commonwealth of Pennsylvania in relation to the events giving rise to this dispute to subject them to personal jurisdiction and, moreover, Defendants knowingly and intentionally caused significant harm to Plaintiff within the Commonwealth of Pennsylvania.

12.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this lawsuit occurred in this District, and Defendants consented to venue in this District as set forth in the parties' Agreements.  Additionally, venue is proper under 28 U.S.C. § 1391 because Defendants Kirk and Kirk Law reside in this District for purposes of venue.

## FACTUAL ALLEGATIONS

### I.     The Sale and Purchase Agreement

13.     On August 25, 2020, Zaftr Inc., Bulk Bitcoin Trader Limited ("BBT"), BVFR, and Kirk Law entered into a Sales Purchase Agreement to Deliver Bitcoins (the "Purchase

4

Agreement").[1]  Under the Purchase Agreement, Zaftr would purchase an aggregate of 10,000 BTC from BBT in tranches, with a minimum of 200 BTC per tranche.

14.     As a registered and regulated digital asset company in Canada, Zaftr's business involves the buying and selling of BTC on margin for its own behalf.  The deal under the Purchase Agreement was structured by and presented to Zaftr by Lawrence.

15.     Under the terms of the Purchase Agreement, BBT, represented by its director James Smith ("Smith"), would sell 200 BTC to Zaftr as the first tranche.

16.     The Purchase Agreement required that Zaftr would send payment to Kirk as BBT's mandate counsel.  BVFR, acting through Lawrence, was BBT's Mandate, and Kirk was BBT's Mandate Counsel (*i.e.*, he was counsel to BVFR). The funds were to be sent to Kirk as escrow counsel and held in escrow with Kirk until the BTC was delivered.

17.     The Purchase Agreement further stipulated that Kirk would not release payment to BBT until Zaftr received the BTC. Additionally, under the Purchase Agreement each party agreed to a non-performance fee of 10% of the tranche amount if any party defaulted in its respective payment obligations under the Purchase Agreement (the "Non-Performance Fee").

18.     The parties further executed an escrow agreement on August 25, 2020 (the "Escrow Agreement").[2] The Escrow Agreement affirmed that Lawrence on behalf of BVFR had engaged Kirk to represent Lawrence and BVFR in the transaction.

19.     Kirk would receive the funds from Zaftr and would retain a one-percent fee for acting as Lawrence's and BVFR's counsel. Pursuant to the Escrow Agreement, the funds from Zaftr were not to be released to the Seller unless and until 6 block confirmations had occurred for the delivery of the BTC to Zaftr's wallet ("Delivery").

---

[1] A true and correct copy of the Purchase Agreement is attached hereto as Exhibit A.
[2] A true and correct copy of the Escrow Agreement is attached hereto as Exhibit B.

20.     Kirk Law, BVFR, and Zaftr also entered into an addendum to the Escrow Agreement (the "BVFR Side Letter")[3] pursuant to which Kirk Law would be permitted to deliver the Mandate Fee to BVFR before Delivery occurred, provided that BVFR would promptly return all such amounts to Zaftr within one business day if Delivery did not occur within 24 hours of Zaftr's funds being received into the designated Kirk Law IOLTA bank account.

21.     Concurrent with the signing of the Purchase Agreement, the Escrow Agreement and the BVFR Side Letter, Lawrence, through Kirk, provided Zaftr with a copy of Smith's passport as part of Zaftr's due diligence.  BVFR and Zaftr entered into a limited purpose agency agreement (the "ID Verification Agreement")[4], pursuant to which Lawrence personally validated and verified that the passport copy was legitimate and accurately represented Smith, and Lawrence confirmed that BVFR had direct personal knowledge and business dealings with Smith for the past several years.

22.     Throughout the parties' entire course of dealings, Zaftr's communications with Smith and BBT were exclusively through Lawrence and BVFR, as agent for Smith and BBT.

23.     Smith and BBT did not communicate directly with Zaftr, and Zaftr was not provided with contact details for BBT, other than through Lawrence and BVFR.

## II.     The First Attempted Transaction for Bitcoin in August 2020

24.     On August 25, 2020, Lawrence, on behalf of Smith and BBT, fixed the purchase price for the first tranche of 200 BTC at $2,254,514 (the "August Tranche").

25.     Pursuant to the Purchase Agreement and the Escrow Agreement, Zaftr sent $2,254,514 to Kirk Law, and Kirk confirmed receipt of the funds.

26.     BBT, however, did not deliver the 200 BTC.  Instead, Kirk and Lawrence explained

---

[3] A true and correct copy of the BVFR Side Letter is attached hereto as Exhibit C.
[4] A true and correct copy of the ID Verification Agreement is attached hereto as Exhibit D.

that the failure to provide the Bitcoin was purportedly the result of a timing issue with another party in a separate transaction.

27.     On or around September 1, 2020, BVFR and Lawrence advised Zaftr that BBT would complete the agreed upon transaction if a different procedure were utilized.   A new procedure proposed by Defendants involved a law firm in Malaysia: Sabarudin, Othman & Ho ("SOH"), represented by Kenneth Gomes ("Gomes").

28.     Under the new procedure proposed by Defendants, SOH would act as an escrow intermediary.   Lawrence advised Zaftr that Lawrence and BVFR had previously worked with Gomes, as well as Gomes' Bitcoin miner.

29.     To convince Zaftr of the legitimacy of the transaction, Lawrence advised Zaftr that he had vetted the SOH bank account "years ago" and that Gomes was the signatory on the account as well as the managing partner of SOH. All contact information for Gomes was provided through Lawrence, and Lawrence instructed Plaintiff that Lawrence would manage all communication involving Gomes.

30.     On September 4, 2020, Kirk Law returned $1,886,977.60 to Zaftr from the failed August Tranche.  The remaining $367,536.40 was retained by Lawrence and BVFR, subject to the anticipated successful completion of the parties' contemplated transaction involving the first tranche of 200 BTC.

### III.     The Proposed September 2020 Tranche of Bitcoin

31.     On September 23, 2020, Zaftr, BBT, SOH, and Kirk Law entered into another agreement (the "Second Escrow Agreement").[5]  SOH agreed to act as the escrow attorney using its account at Hong Leong Bank as the escrow account.

---

[5] A true and correct copy of the Second Escrow Agreement is attached hereto as Exhibit E.

32.     Under this new arrangement, Smith would send Zaftr 205 BTC upon receipt of payment for a new tranche in the amount of $2,051,479.08 (the "September Tranche"). This represented 200 BTC for the first tranche, plus an additional 5 BTC towards the Non-Performance Fee for BBT's failure to close the August Tranche.  Three additional payments of 5 BTC each were promised to be delivered to Zaftr with the following three tranches.

33.     The same day, Zaftr sent $1,683,942.68 to the SOH account.  This agreed-upon amount was the fixed value of the BTC for the September Tranche, less the $367,536.40 BVFR had kept in connection with the August Tranche.

34.     Between September 23, 2020 and October 23, 2020, Gomes claimed he needed additional documents to complete the transaction and that he purportedly had a brother who worked at Hong Leong Bank who would assist in the transaction. Lawrence advised Zaftr to comply with Gomes's requests as the BTC would be delivered immediately upon the funds' clearing.

35.     On October 14, 2020, Plaintiff received a telephone call from a woman purporting to be "Sabrina" from the Anti-Money Laundering/Compliance Department of Hong Leong Bank, asking questions about the transfer of funds related to the first transaction.

36.     Plaintiff complied with "Sabrina's" requests and provided the requested information regarding the transaction during this call. "Sabrina" then stated that the payment would clear within seventy-two hours.

**IV.     The Proposed October 2020 Tranche of Bitcoin**

37.     On October 16, 2020, BVFR told Zaftr that BBT had proposed yet another adjustment to the plan.  Defendants told Plaintiff that if Plaintiff would lock-in and send funds for a *further* tranche of 305 BTC (including 5 BTC towards the August Tranche Non-Performance

8

Fee), BBT would then deliver the full 510 BTC immediately upon the funds arriving at the bank and without the requirement for the funds to clear.

38.     Lawrence told Plaintiff that this would expedite the transaction, as the payment for the second tranche supposedly would not require clearance for the first set of funds that was already purportedly on hold.

39.     On October 20, 2020, Lawrence advised Plaintiff that Gomes purportedly required that the payment should be sent to the bank account of Conjoin Win International (H.K.) Co., Limited at OCBC Singapore.  Lawrence advised Plaintiff that Gomes purportedly had control over the account and that the funds would be held in escrow pending delivery of the BTC.

40.     Gomes advised Plaintiff that Gomes' client, Mr. Soo Lee, would purportedly allow Gomes to use some form of credit line in Lee's name to pay the BTC seller.  Defendants advised Plaintiff that this would ensure that there would be no further delay in waiting for the funds to clear and that BBT would deliver the BTC immediately upon the funds arriving at OCBC Singapore.

41.     Based upon these representations by Defendants, Plaintiff agreed to proceed with the new proposed transaction, and, on October 21, 2020, Zaftr, Kirk Law, BVFR, and SOH executed an Addendum to the Second Escrow Agreement (the "Addendum").[6]

42.     Gomes provided Plaintiff with corporate documentation regarding the accountholder and a notarized solicitor's undertaking that Gomes controlled the account and that the BTC would be delivered to Plaintiff.

43.     On October 23, 2020, Lawrence set the price of the second tranche of BTC at $3,668,745.00.  Zaftr sent the funds to Kirk Law pursuant to the parties' new agreement.

---

[6] A true and correct copy of the Addendum is attached hereto as Exhibit F.

9

44.     Kirk wired $3,095,120.70 to the OCBC account from the Chase bank account of Kirk Law.   Defendants retained $573,624.30 of these funds as their payment for the new transaction subject to the new transaction's closing successfully.

45.     On October 23, 2020, Kirk advised that Chase requested confirmation regarding the wire beneficiary name in order to effect the payment, and shortly thereafter Kirk provided the same.

46.     On October 26, 2020, Kirk advised that Kirk received confirmation from Chase Bank that OCBC had received the funds.  Lawrence claimed he provided this verification to Gomes and requested that BBT send the BTC to Zaftr immediately.

47.     On October 27, 2020, Gomes claimed the funds had not yet posted and, notwithstanding the agreement for BTC to be delivered upon the funds being received by OCBC, Gomes would not advise BBT to release the BTC.

48.     Between October 27, 2020 and November 5, 2020, Plaintiff sent numerous communications to Lawrence and Gomes requesting immediate delivery of the 510 BTC.

49.     On November 5, 2020, Gomes sent an email to Plaintiff stating that the funds had posted at OCBC, but that he had an argument with the Bitcoin miner who was to provide the BTC to BBT for the sale, Dr. Ali Akhbar ("Akhbar"). Gomes advised that Akhbar claimed that he did not believe the funds had cleared, and refused to deliver the BTC.

50.     Gomes requested payment from Plaintiff of $1,000,000, so that the funds could be sent to Akhbar without waiting for release of the funds at Hong Leong Bank.

51.     At this point, Plaintiff stated that no additional funds would be sent, and requested immediate delivery of the BTC pursuant to the parties' agreements.

52.     Plaintiff continued to engage Gomes by messaging and email in an attempt to

10

resolve the matter, requesting that Gomes either release the BTC or return the funds to Plaintiff.

53.     At the same time, Kirk advised Plaintiff that he had never communicated directly with Smith or BBT.  But Kirk confirmed that Kirk supposedly had been involved in a prior transaction where Smith had allegedly delivered BTC on short notice.

54.     On November 9, 2020, Plaintiff again received a call from someone claiming to be from Hong Leong Bank. This person identified herself as "Sabrina" and asked additional questions about the transaction.

55.     "Sabrina" advised Montgomery that, if there were any issues with the transaction, it would remain on hold for ninety days.

56.     On November 11 and 13, 2020, Lawrence arranged a call with Akhbar and Plaintiff to discuss the delivery of the BTC and the issues with Gomes.  Akhbar advised that Plaintiff's issue was supposedly with Gomes, and no delivery would occur unless Gomes (or Plaintiff) sent Akhbar additional funds.

57.     Prior to this call, Lawrence deflected Plaintiff's questions as to why BBT was not directly involved in any of the conversations.

58.     On November 14, 2020, Plaintiff requested that Defendants return the $941,160.70 that was delivered to Kirk Law but which was not sent to Gomes.  Kirk returned only $36,687.45 to Plaintiff and advised that all other funds had either been delivered to BVFR or were held for the benefit of BVFR.  BVFR has refused to return any of the funds, claiming that the problems associated with the transactions purportedly involve only Gomes.

59.     On November 19, 2020, Gomes sent Zaftr an email asking for an additional $1,600,000 to close the deal.  Gomes also stated that the transactions were private, that the agreements purportedly only involved him, and that his law firm was not and should not be

involved.

60.     In November 2020, Lawrence advised that his wife required surgery and that it was a challenging time for him.  Nevertheless, publicly available photographs on Lawrence's wife's Facebook page show Lawrence and his wife out during the period in which Lawrence's wife supposedly was experiencing significant health issues.

61.     On December 3, 2020, James Smith, the alleged President and CEO of BBT, contacted Plaintiff via LinkedIn and WhatsApp. Smith stated that Lawrence would not be pleased that Smith and Plaintiff were communicating directly.  Smith further explained that he was told the funds Plaintiff had sent for the BTC were supposedly "incomplete."

62.     Plaintiff has subsequently learned that the passport Lawrence provided to Plaintiff as proof of Smith's identity was, in fact, fraudulent; the James Smith represented in the passport does not exist; and the photograph of the individual represented in the passport has been used in other fraudulent activity, namely online dating scams. Further, BBT was dissolved from the UK companies' registry on November 3, 2020.

63.     Plaintiff also learned that Gomes is not, in fact, the managing partner of SOH, nor a partner at that law firm at all. His title is "Legal Assistant" at SOH, even though he has been an active lawyer with the Malaysia bar since 1987.

64.     Lawrence's misrepresentations to Plaintiff were further revealed when, on December 3, 2020, Hong Leong Bank confirmed that the payment for the first tranche, $1,683,942.68, had, in fact, been released to SOH.

65.     As a result of Defendants' fraudulent schemes, Plaintiff paid $5,683,536.63 for BTC that was never delivered to Plaintiff.  Defendants have further refused to return these funds to Plaintiff.  Defendants also have tried to force Plaintiff to pay millions of dollars more to

Defendants in order to obtain the BTC that Defendants have failed to provide under the parties' agreements.

66.     Further, under Plaintiff's business model, Zaftr is able to draw from one of its shareholders a Bitcoin line of credit (the "LOC"). Under this LOC, Zaftr borrows BTC from its shareholder and liquidates them in order fund any new purchases of BTC. Zaftr then replenishes the LOC from the new BTC received from the seller, and profits from the difference in the purchase price of the new BTC and the sale proceeds of the BTC from the LOC.

67.     As a result of Defendants' wrongful actions and fraudulent schemes as pleaded herein, Plaintiff has been deprived of the 510 BTC that it paid for but never received from Defendants under the parties' Agreements.  As a result of Defendants' wrongful actions and fraudulent schemes as pleaded herein, Plaintiff has also been deprived of an additional 71 BTC that it was entitled to receive as the Non-Performance Fee for Defendants' failures to perform under the parties' Agreements regarding the August, September, and October Tranches.  Plaintiff has therefore been deprived of a total of 581 BTC by Defendants.  As of the filing of this Complaint, one Bitcoin is worth approximately $56,500.  Thus, the current market value of the 581 BTC to which Plaintiff was entitled but never received from Defendants is approximately $32,826,500.00.  As set forth below, Plaintiff is entitled to recover damages arising from the 581 BTC that Defendants never provided to Plaintiff as well as damages arising from the losses Plaintiff has sustained due to Plaintiff's inability to fully carry out its normal business operations due to Defendants' misconduct and breaches of the parties' Agreements, together with treble damages, attorneys' fees, punitive damages, prejudgment interest and post-judgment interest, an award of costs of suit, and all other damages recoverable under the law.

13

## COUNT I – BREACH OF CONTRACT
### (Purchase Agreement, BVFR Side Letter,
### ID Verification Agreement, and Escrow Agreement)

68.     Plaintiff incorporates by reference paragraphs 1-67 as if fully set forth herein.

69.     Defendants are bound by the terms of the Purchase Agreement, BVFR Side Letter, ID Verification Agreement, and Escrow Agreement, which are valid and binding contracts between the parties.

70.     Pursuant to the Escrow Agreement, the parties agreed that: "Buyer and Seller each explicitly accept and consent to the exclusive jurisdiction the State and Federal Courts of the Commonwealth of Pennsylvania, Delaware County, USA in such state and federal courts which preside and exercise jurisdiction in and for Delaware County, Pennsylvania, for any and all claims by either Buyer or Seller against Mandate Counsel, and Seller's Mandate under both this AGREEMENT and the Sale's Purchase Agreement."  Exhibit B, Escrow Agreement, ¶ R6.

71.     Pursuant to the Escrow Agreement, the parties further agreed that: "this Agreement shall exclusively be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles."  Exhibit B, Escrow Agreement, ¶ R6.

72.     Pursuant to the Escrow Agreement, the parties also agreed: "that the prevailing party in any such action brought against either Mandate Counsel, or Seller's Mandate shall be entitled to recover its reasonable costs and attorney's fees for enforcement of this AGREEMENT or incurred in defense of this Agreement, upon any order, decree, or award of judgment."  Exhibit B, Escrow Agreement, ¶ R6.

73.     The signatories to the Escrow Agreement included Plaintiff, Defendant Kirk on behalf of Defendant Kirk Law and as counsel and agent for Defendants Lawrence and BVFR, and James Smith on behalf of BBT.  The signatories to the Purchase Agreement included Plaintiff, and

James Smith on behalf of BBT, although Defendant Lawrence is identified as BBT's agent for the transaction and Defendant Kirk Law is identified as Lawrence's counsel through which the funds for the purchase of the BTC were required to be sent.

74.     Pursuant to the ID Verification Agreement (Exhibit D hereto) between Defendant BVFR and Plaintiff, Defendant Lawrence personally validated and verified that the passport of Smith that BVFR provided to Zaftr was legitimate and accurately represented Smith.  Lawrence further represented that BVFR had direct personal knowledge and business dealings with Smith for the past several years.  The representations made by Defendants BVFR and Lawrence in the ID Verification Agreement were patently false, and induced Plaintiff into entering into the BTC transactions with Defendants.

75.     Pursuant to the Purchase Agreement (Exhibit A hereto) and the Escrow Agreement (Exhibit B hereto), Defendants agreed to deliver 200 BTC to Plaintiff once Plaintiff made payment to Defendants under the Agreements.  *See* Exhibit A, Purchase Agreement at 5; Exhibit B, Escrow Agreement at 1.

76.     Pursuant to the Purchase Agreement and the Escrow Agreement, Plaintiff paid $2,254,514.00 to Defendant Kirk under the August Tranche. Plaintiff, however, never received the BTC as required by the Purchase Agreement and the Escrow Agreement.

77.     Although Defendant Kirk returned $1,886,977.60 to Zaftr from the failed August Tranche, the remaining $367,536.40 was improperly retained by Lawrence and BVFR in violation of the parties' Agreements.

78.     Defendants have breached their obligations under the Purchase Agreement by failing to deliver any of the required BTC and by failing to return all of the funds paid by Plaintiff to Defendants in connection with the parties' transactions.

160603.00601/125786042v.3

79.     As a result of Defendants' breaches of the Purchase Agreement and the Escrow Agreement, Plaintiff has suffered direct damages in the loss of the funds it paid to SOH in the amount of $1,683,942.68 with respect to the September Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

80.     As a result of Defendants' breaches of the Purchase Agreement and the Escrow Agreement, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $3,668,745.00 with respect to the October Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

81.     Further, pursuant to the BVFR Side Letter (attached hereto as Exhibit C), BVFR was required to promptly return to Zaftr all amounts paid by Zaftr within one business day if Delivery of the BTC did not occur within 24 hours of Zaftr's funds being received into the designated Kirk Law IOLTA bank account.  BVFR did not return the $904,473.25 received by Defendants, which was not otherwise transferred out in connection with the transactions.

82.     Although Defendant Kirk returned a very small portion of the funds to Plaintiff after each of the tranches failed, Defendants never delivered any of the BTC to Plaintiff as required under the parties' Agreements. Defendants also failed to return the vast majority of the funds that Plaintiff paid to Defendants in connection with the parties' transactions, despite Defendants' total failure to provide any of the BTC as required under the parties' Agreements.

83.     As a result of Defendants' breaches of the Purchase Agreement and the Escrow Agreement, Plaintiff is entitled to all of its attorney's fees and costs incurred in connection with bringing this action.  *See* Exhibit B, Escrow Agreement, ¶ R6.

84.     As a result of Defendants' breaches of the Purchase Agreement and the Escrow Agreement, Plaintiff also has sustained further damages arising as the natural and foreseeable consequence of Defendants' breaches of the parties' Agreements.

85.     Under Plaintiff's business model, Plaintiff is able to draw from one of its shareholders a Bitcoin line of credit (the "LOC").  Under this LOC, Plaintiff borrows BTC from its shareholder and liquidates the BTC in order to fund new purchases of BTC. Plaintiff then replenishes the LOC from the new BTC received from the seller, and profits from the difference in the purchase price of the new BTC and the sale proceeds of the BTC from the LOC. This allows Plaintiff to hedge its position, as the sale price of the borrowed BTC and the purchase price of the new BTC are locked in at the same time.

86.     For Plaintiff's purchase of 510 BTC under the September Tranche and the October Tranche pursuant to the Purchase Agreement, Plaintiff drew on the LOC to obtain 487.88 BTC. These 487.88 BTC from the LOC were liquidated and the sale proceeds were used to send the funds for the purchase of the August, September and October Tranches of BTC.  The expected profit for Plaintiff from the transactions was 22.12 BTC.  However, Defendants never provided Plaintiff with any of the 510 BTC that Plaintiff paid for under the parties' Agreements.  Further, Defendants failed to return nearly any of the funds that Plaintiff sent them in connection with the parties' transactions.  Consequently, Plaintiff never received either the 510 BTC that Defendants promised to provide, nor the return of the funds that Plaintiff paid to Defendants.  As of the filing of this Complaint, one Bitcoin is worth approximately $56,500.  Thus, the current market value of the 510 BTC that Plaintiff paid for but never received from Defendants is worth approximately $28,815,000.   Plaintiff has therefore sustained damages in the amount of approximately $28,815,000, reflecting the loss of 510 BTC at the current market price of $56,500 per BTC.

160603.00601/125786042v.3

87.     Plaintiff is also contractually entitled to receive the Non-Performance Fee set forth in the Purchase Agreement due to Defendants' failures to perform their obligations under the parties' Agreements. The Non-Performance Fee for the August, September, and October Tranches is 71 BTC, which has a current market value of $4,011,500.00.  Between the 510 BTC that Plaintiff paid for but never received, and the 71 BTC comprising the Non-Performance Fee for the August, September, and October Tranches, Plaintiff is entitled to receive a total of 581 BTC from Defendants, which has a current market value of $32,826,500.00.  Accordingly, due to Defendants' breaches of the parties' Agreements, Plaintiff has sustained damages in the amount of approximately $32,826,500.00, reflecting the loss of 581 BTC at the current market price of $56,500 per BTC.  Additionally, as a result of Plaintiff's loss of BTC to replenish its LOC, Plaintiff has suffered severe and ongoing disruptions to its business operations.  Plaintiff is entitled to recover the losses it has sustained as a result of the severe and ongoing disruptions to its business operations, which arose as the natural and foreseeable result of Defendants' breaches of the parties' Agreements.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT II – BREACH OF CONTRACT
### (Second Escrow Agreement and Addendum)

88.     Plaintiff incorporates by reference paragraphs 1-88 as if fully set forth herein.

89.     Defendants are bound by the terms of the Second Escrow Agreement and Addendum, which is a valid and binding contract between the parties.

160603.00601/125786042v.3

90.     The signatories to the Second Escrow Agreement included Plaintiff, Defendant Kirk on behalf of Defendant Kirk Law and as counsel and agent for Defendants Lawrence and BVFR, and James Smith on behalf of BBT.  Defendant Lawrence is also identified in the Second Escrow Agreement as BBT's agent for the transaction and Defendant Kirk Law is identified as Lawrence's counsel through which the funds for the purchase of the BTC were required to be sent.

91.     The signatories to the Addendum to the Second Escrow Agreement included Plaintiff, Defendant Kirk on behalf of Defendant Kirk Law and as counsel and agent for Defendants Lawrence and BVFR, Defendant Lawrence as CEO and Managing Member of BVFR, and James Smith on behalf of BBT.

92.     Pursuant to the Second Escrow Agreement, the parties agreed that they: "all explicitly accept and consent to the exclusive jurisdiction the State and Federal Courts of the Commonwealth of Pennsylvania, Delaware County, USA in such state and federal courts which preside and exercise jurisdiction in and for Delaware County, Pennsylvania, for any and all claims by either Buyer, Seller, or Escrow Counsel, against Mandate Counsel or Seller's Mandate under both this AGREEMENT and the Sale's Purchase Agreement."   Exhibit E, Second Escrow Agreement ¶ R6.

93.     Pursuant to the Second Escrow Agreement, the parties further agreed that "any interpretation of this Agreement in regard to Escrow Counsel or Mandate Counsel shall exclusively be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles."  Exhibit E, Second Escrow Agreement ¶ R6.

94.     Pursuant to the Second Escrow Agreement, the parties also agreed that "the prevailing party in any such action brought against either Mandate Counsel, or Seller's Mandate shall be entitled to recover its reasonable costs and attorney's fees for enforcement of this

160603.00601/125786042v.3

AGREEMENT or incurred in defense of this Agreement, upon any order, decree, or award of judgment." Exhibit E, Second Escrow Agreement ¶ R6.

95.     Pursuant to the Second Escrow Agreement, Defendants agreed to deliver 205 BTC to Plaintiff after Plaintiff submitted payment to Defendants. Exhibit E, Second Escrow Agreement at 2.

96.     Pursuant to the Second Escrow Agreement, Plaintiff paid $1,683,942.68 to Defendant Kirk and the amount of $367,536.40 that was retained by Defendants was to be credited for such September Tranche for a total purchase amount of $2,051,479.08. Plaintiff never received the BTC as required under the Second Escrow Agreement.

97.     Defendants have therefore breached their obligations under the Second Escrow Agreement by failing to deliver any of the required BTC due under the Second Escrow Agreement, and by failing to return the entire balance paid by Plaintiff.

98.     Pursuant to the Addendum to the Second Escrow Agreement, the parties agreed that the Second Escrow Agreement was "amended to reflect five-hundred-and-ten (510) units to be transferred by Seller to Buyer (the 'Revised Units'), and Buyer and Seller further agree that the two-hundred-and-five (205) units referenced in Prior Documents have been paid for in full to Seller's Counsel to hold in trust as a fiduciary of Buyer." Exhibit F, Addendum ¶ 1.

99.     While Plaintiff paid in full the amount due under the Addendum, Defendants breached their obligations under the Addendum by failing to deliver any of the required BTC due under the Addendum, and by failing to return the entire balance paid by Plaintiff.

100.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of

$1,683,942.68 with respect to the September Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

101.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $3,668,745.00 with respect to the October Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

102.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff is entitled to all of its attorney's fees and costs incurred in connection with bringing this action.  *See* Exhibit E, Second Escrow Agreement, ¶ R6.

103.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has also sustained further damages arising as the natural and foreseeable consequence of Defendants' breaches of the parties' Agreements.

104.    Under Plaintiff's business model, Plaintiff is able to draw from one of its shareholders an LOC.  Under the LOC, Plaintiff borrows BTC from its shareholder and liquidates the BTC in order to fund new purchases of BTC.  Plaintiff then replenishes the LOC from the new BTC received from the seller, and profits from the difference in the purchase price of the new BTC and the sale proceeds of the BTC from the LOC.  This allows Plaintiff to hedge its position, as the sale price of the borrowed BTC and the purchase price of the new BTC are locked in at the same time.

105.    For Plaintiff's purchase of 510 BTC under the September Tranche and the October Tranche pursuant to the Purchase Agreement, Plaintiff drew on the LOC to obtain 487.88 BTC. These 487.88 BTC from the LOC were liquidated and the sale proceeds were used to send the funds for the purchase of the August, September and October Tranches of BTC.  The expected

21

profit for Plaintiff from the transactions was 22.12 BTC.  However, Defendants never provided Plaintiff with any of the 510 BTC that Plaintiff paid for under the parties' Agreements.  Further, Defendants failed to return nearly any of the funds that Plaintiff sent them in connection with the parties' transactions.  Consequently, Plaintiff never received either the 510 BTC that Defendants promised to provide, nor the return of the funds that Plaintiff paid to Defendants.  As of the filing of this Complaint, one Bitcoin is worth approximately $56,500.  Thus, the current market value of the 510 BTC that Plaintiff paid for but never received from Defendants is worth approximately $28,815,000.  Plaintiff has therefore sustained damages in the amount of approximately $28,815,000, reflecting the loss of 510 BTC at the current market price of $56,500 per BTC.

106.    Plaintiff is also contractually entitled to receive the Non-Performance Fee set forth in the Purchase Agreement due to Defendants' failures to perform their obligations under the parties' Agreements. The Non-Performance Fee for the August, September, and October Tranches is 71 BTC, which has a current market value of $4,011,500.00.  Between the 510 BTC that Plaintiff paid for but never received, and the 71 BTC comprising the Non-Performance Fee for the August, September, and October Tranches, Plaintiff is entitled to receive a total of 581 BTC from Defendants, which has a current market value of $32,826,500.00.  Accordingly, due to Defendants' breaches of the parties' Agreements, Plaintiff has sustained damages in the amount of approximately $32,826,500.00, reflecting the loss of 581 BTC at the current market price of $56,500 per BTC.  Additionally, as a result of Plaintiff's loss of BTC to replenish its LOC, Plaintiff has suffered severe and ongoing disruptions to its business operations.  Plaintiff is entitled to recover the losses it has sustained as a result of the severe and ongoing disruptions to its business operations, which arose as the natural and foreseeable result of Defendants' breaches of the parties' Agreements.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT III – UNJUST ENRICHMENT

107.    Plaintiff incorporates by reference Paragraphs 1-106 as if set forth fully herein.

108.    Plaintiff conferred a benefit on Defendants by paying them for BTC as set forth in the Purchase Agreement, Escrow Agreement, Addendum and Second Escrow Agreement.

109.    Defendants appreciated the benefit of the funds that Plaintiff paid to Defendants.

110.    Defendants improperly have maintained possession of these funds, despite failing to deliver any of the required BTC under the parties' Agreements.

111.    In particular, Plaintiff paid Defendants the amount of $2,254,514.00 with respect to the August Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements. Of that amount, only $1,885,977.60 was returned to Plaintiff and $367,536.40 was retained by Defendants.

112.    Plaintiff also paid SOH the amount of $1,683,942.68 with respect to the September Tranche as directed in the Agreements as payment for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

113.    Plaintiff further paid Defendants the amount of $3,668,745.00 with respect to the October Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

114.    It would be unjust and inequitable to allow Defendants to retain these funds while having utterly failed to provide any of the BTC that Plaintiff was owed under the parties'

Agreements. It would be further unjust and inequitable to allow Defendants to retain the 581 BTC that Plaintiff was entitled to receive from Defendants under the parties' Agreements, which has a current market value of $32,826,500.00.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT IV- CONVERSION

115.    Plaintiff incorporates by reference Paragraphs 1-114 as if set forth fully herein.

116.    Defendants have wrongfully exercised dominion and control over property belonging to Plaintiff.

117.    In particular, Plaintiff paid Defendants the amount of $2,254,514.00 with respect to the August Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements. Of that amount, only $1,885,977.60 was returned to Plaintiff and $367,536.40 was retained by Defendants.

118.    Plaintiff also paid SOH the amount of $1,683,942.68 with respect to the September Tranche as directed in the Agreements as payment for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

119.    Plaintiff also paid Defendants the amount of $3,668,745.00 with respect to the October Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

120.    Plaintiff has therefore suffered, and will continue to suffer, damages including the loss of the converted property and its inability to use said property in the ordinary course of

24

business.  Such damages also include the 581 BTC that Plaintiff was entitled to receive from Defendants under the parties' Agreements, which has a current market value of $32,826,500.00. Such damages further include the losses Plaintiff has sustained as a result of the severe and ongoing disruptions to its business operations, which arose as the natural and foreseeable result of Defendants' deprivation of Plaintiffs' property.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT V - FRAUDULENT MISREPRESENTATION / FRAUDULENT OMISSION

121.    Plaintiff incorporates by reference Paragraphs 1-120 as if set forth fully herein.

122.    Defendant Lawrence, in presenting Smith's fraudulent passport and purporting to guarantee Smith's credentials, misrepresented Smith's identity and Smith's ability to perform under the agreements.

123.    This misrepresentation was material to Zaftr's participation in the Purchase Agreement, Escrow Agreement, and Second Escrow Agreement, because the participation of a known and reliable seller was a necessary condition of the agreement.

124.    Defendant Lawrence's misrepresentations were false in that the passport presented as belonging to Smith was fraudulent, and there is no evidence that the person Defendant Lawrence purported was Smith had ever successfully delivered BTC in a prior transaction.

125.    Defendant Lawrence knew or believed that the information he represented about Smith was false and that the passport he provided was fraudulent.

25

126.    Defendant Lawrence made further misrepresentations about Gomes to induce Plaintiff to participate in the Second Escrow Agreement. Defendant Lawrence represented that he had fully vetted Gomes and the law firm he worked for, represented to Plaintiff that Gomes was a managing partner at his firm, and that Gomes was the signatory on his firm bank account.

127.    Defendant Lawrence knew or believed that this information about Gomes was fraudulent.

128.    Defendant Lawrence intentionally worked a fraud on Zaftr which, as a party to the Purchase and Escrow Agreements, had reason to rely on Defendant Lawrence's representations, and Defendant Lawrence knew that Zaftr would act in reasonable reliance on his misrepresentations.

129.    Defendants were aware that Smith was not the individual he was purported to be, and that Defendants lacked a seller of BTC who could perform under the parties' Agreements.

130.    Defendants were aware that Plaintiff would be providing millions of dollars to them to purchase BTC that would never be provided to Plaintiff under the parties' Agreements.

131.    Defendants' fraudulent misrepresentations and/or fraudulent omissions induced Plaintiff to enter into the parties' Agreements and to pay millions of dollars to Defendants to purchase BTC, which Defendants never provided or had any intention or ability to provide.

132.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $367,536.40, which were not returned in connection with the August Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

133.    As a direct and proximate result of Defendants' fraudulent misrepresentations and fraudulent omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to

26

Defendants in the amount of $1,683,942.68 with respect to the September Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

134.    As a direct and proximate result of Defendants' fraudulent misrepresentations and fraudulent omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $3,668,745.00 with respect to the October Tranche of BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

135.    As a direct and proximate result of Defendants' fraudulent misrepresentations and fraudulent omissions, Plaintiff has also sustained damages arising as the natural and foreseeable consequence of Defendants' misconduct.

136.    For Plaintiff's purchase of 510 BTC under the September Tranche and the October Tranche pursuant to the Purchase Agreement, Plaintiff drew on the LOC to obtain 487.88 BTC. These 487.88 BTC from the LOC were liquidated and the sale proceeds were used to send the funds for the purchase of the August, September and October Tranches of BTC.  The expected profit for Plaintiff from the transactions was 22.12 BTC.  However, Defendants never provided Plaintiff with any of the 510 BTC that Plaintiff paid for under the parties' Agreements.  Further, Defendants failed to return nearly any of the funds that Plaintiff sent them in connection with the parties' transactions.  Consequently, Plaintiff never received either the 510 BTC that Defendants promised to provide, nor the return of the funds that Plaintiff paid to Defendants.  As of the filing of this Complaint, one Bitcoin is worth approximately $56,500.  Thus, the current market value of the 510 BTC that Plaintiff paid for but never received from Defendants is worth approximately $28,815,000.   Plaintiff has therefore sustained damages in the amount of approximately $28,815,000, reflecting the loss of 510 BTC at the current market price of $56,500 per BTC. Plaintiff has also sustained damages arising from the 71 BTC that it was entitled to receive

comprising the Non-Performance Fee for the August, September, and October Tranches, which has a current market value of $4,011,500.00.

137.    As a direct and proximate result of Defendants' fraudulent misrepresentations and fraudulent omissions, Plaintiff has sustained damages in an amount in excess of $32,826,500.00.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with punitive damages, prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

### COUNT VI - NEGLIGENT MISREPRESENTATION / NONDISCLOSURE

138.    Plaintiff incorporates by reference Paragraphs 1-137 as if set forth fully herein.

139.    Defendant Lawrence, in presenting Smith's fraudulent passport, confirming the veracity of said passport and purporting to guarantee Smith's credentials, misrepresented Smith's identity and Smith's ability to perform under the agreements.

140.    This misrepresentation was material to Zaftr's participation in the Purchase Agreement, Escrow Agreement, and Second Escrow Agreement because the participation of a known and reliable seller was a necessary condition of the agreement.

141.    Defendant Lawrence's misrepresentations were false in that the passport presented as belonging to Smith was fraudulent, and there is no evidence that the person Defendant Lawrence purported was Smith had ever successfully delivered BTC in a prior transaction.

142.    Defendant Lawrence knew or should have known that the information he represented about Smith was false and that the passport he provided was fraudulent.

143.    Defendant Lawrence made further misrepresentations about Gomes to induce Plaintiff to participate in the Second Escrow Agreement. Defendant Lawrence represented that he

had fully vetted Gomes and the law firm he worked for, represented to Plaintiff that Gomes was a managing partner at his firm, that Gomes was the signatory on his firm bank account, and that Lawrence had worked with Gomes and Gomes' Bitcoin miner before.

144.    Defendant Lawrence knew or should have known that this information about Gomes was fraudulent.

145.    Defendant Lawrence knew or should have known that Zaftr, as a party to the Purchase and Escrow Agreements, had reason to rely on Defendant Lawrence's representations, and Defendant Lawrence knew or should have known that Zaftr would act in reasonable reliance on his misrepresentations.

146.    Defendants were aware or should have been aware that Smith was not who we purported to be and that Defendants lacked a seller of BTC who could perform under the parties' Agreements.

147.    Defendants were aware or should have been aware that Plaintiff would be providing millions of dollars to them to purchase BTC that would never be provided to Plaintiff under the parties' agreements.

148.    Defendants' misrepresentations and omissions induced Plaintiff to enter into the parties' Agreements and to pay millions of dollars to Defendants to purchase BTC, which Defendants never provided to Plaintiff.

149.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $367,536.40, which were not returned in connection with the August Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

150.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to SOH in the amount of $1,683,942.68 with respect to the September Tranche for BTC that Defendants never delivered to Plaintiff, as promised under the parties' Agreements.

151.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $3,668,745.00 with respect to the October Tranche for BTC that Defendants never delivered to Plaintiff, as promised under the parties' Agreements.

152.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff also has sustained damages arising as the natural and foreseeable consequence of Defendants' misconduct.

153.    For Plaintiff's purchase of 510 BTC under the September Tranche and the October Tranche pursuant to the Purchase Agreement, Plaintiff drew on the LOC to obtain 487.88 BTC. These 487.88 BTC from the LOC were liquidated and the sale proceeds were used to send the funds for the purchase of the August, September and October Tranches of BTC.  The expected profit for Plaintiff from the transactions was 22.12 BTC.  However, Defendants never provided Plaintiff with any of the 510 BTC that Plaintiff paid for under the parties' Agreements.  Further, Defendants failed to return nearly any of the funds that Plaintiff sent them in connection with the parties' transactions.  Consequently, Plaintiff never received either the 510 BTC that Defendants promised to provide, nor the return of the funds that Plaintiff paid to Defendants.  As of the filing of this Complaint, one Bitcoin is worth approximately $56,500.  Thus, the current market value of the 510 BTC that Plaintiff paid for but never received from Defendants is worth approximately $28,815,000.    Plaintiff has therefore sustained damages in the amount of approximately

$28,815,000, reflecting the loss of 510 BTC at the current market price of $56,500 per BTC. Plaintiff has also sustained damages arising from the 71 BTC that it was entitled to receive comprising the Non-Performance Fee for the August, September, and October Tranches, which has a current market value of $4,011,500.00.

154.     As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has sustained damages in an amount in excess of $32,826,500.00.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with punitive damages, prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT VII - CIVIL CONSPIRACY

155.     Zaftr incorporates by reference Paragraphs 1-154 as if set forth fully herein.

156.     Defendants acted with a common purpose to induce Zaftr to enter into a series of agreements while Defendants had neither the intention nor the ability to perform under the parties' Agreements.

157.     Defendants acted intentionally and with the improper purpose of inducing Zaftr to contract for the purchase of BTC in a series of escalating agreements, without ever delivering any of the required BTC.

158.     Defendant Lawrence together with Defendant BVFR acted intentionally and with the improper purpose of providing false information about Defendant Lawrence's prior experiences with Smith.

159.     Defendant Lawrence together with BVFR also acted intentionally and with the improper purpose of providing false information by providing a fraudulent passport to Plaintiff to

purportedly verify Smith's identity and by confirming the veracity of the passport and purporting to verify the identity and likeness of Smith.

160.    The transmissions of these false representations and a copy of the fraudulent passport constitute overt acts done in furtherance of this common purpose.

161.    Defendant Kirk together with Defendant Kirk Law intentionally joined and participated in the aforementioned conspiracy to induce Zaftr to contract for the purchase of BTC when Kirk and his law firm agreed to act as "mandate counsel" for Defendant Lawrence and Defendant BVFR.

162.    Defendant Kirk together with Defendant Kirk Law also furthered their involvement in the conspiracy when they retained Zaftr's funds for the benefit of Defendant Lawrence and Defendant BVFR, despite Defendants' repeated non-performance under the Parties' agreements.

163.    These acts by Defendant Kirk and Defendant Kirk Law constitute overt acts done in furtherance of Defendants' common purpose.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $32,826,500.00, together with punitive damages, prejudgment interest and post-judgment interest, an award of costs of suit including Plaintiff's attorney's fees, and such other and further relief as the Court deems proper.

## COUNT VIII – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

### CLAIM 1 18 U.S.C. § 1962(c)

164.    Zaftr incorporates by reference Paragraphs 1-163 as if set forth fully herein.

165.    Defendants associated together for a common purpose to create fraudulent schemes to induce Zaftr to pay millions of dollars to Defendants for BTC that would never be provided to Zaftr.

166.    Defendants had a formal or informal organization in that Defendant Lawrence would approach a buyer such as Zaftr, and would falsely attest to the seller's credentials and experience in the sale of large amounts of BTC. Defendant Kirk would then prepare Purchase Agreements and Escrow Agreements, wherein he would act as "mandate counsel" for Defendant Lawrence, promising to hold a buyer's funds until the seller provides the BTC.  In brokering these agreements, Defendant Lawrence would use his company Defendant BVFR while Defendant Kirk would use his law firm Defendant Kirk Law to add a sense of legitimacy to the fraudulent transactions.

167.    The fraudulent schemes by Defendants would continue to escalate in that they would require Zaftr to progressively provide more funds in order to unlock the BTC that Defendants kept promising to provide.  Defendants would then disburse the buyer's funds while failing to provide any BTC and while blaming their non-performance on the purported actions of third parties.

168.    Defendant Lawrence and Defendant Kirk were aware of at least the general existence of the enterprise and knew that it extended beyond each of their individual roles.

169.    The enterprise created by Defendant Lawrence and Defendant Kirk had an effect upon interstate commerce.

170.    Defendant Lawrence and Defendant Kirk, individually and through the entities they controlled, participated in the conduct, affairs, or operation of this enterprise through a pattern of racketeering activity involving a scheme to create fraudulent BTC transactions involving

misrepresentations that were transmitted via the wire, thereby constituting wire fraud under 18 U.S.C. §§ 1341 and 1343.

171.    Defendants knowingly participated in and furthered this scheme through numerous acts of wire fraud.  Indeed, Defendants Lawrence and Kirk, having devised a scheme or artifice to defraud, or for obtaining money or other property by means of false or fraudulent pretenses or representations, and for the purpose of executing such scheme or artifice or attempting to do so, sent numerous emails and messages by WhatsApp and other means in correspondences that included Zaftr and Defendants.

172.    The numerous transmittals of fraudulent misrepresentations about the nature of the parties and the BTC transactions constitute a pattern, and pose a threat of continued fraudulent activity with respect to repeating this scheme with other potential buyers. These acts are also interrelated by distinguishing characteristics, and are not isolated events.

173.    Alternatively, the above acts are a regular way of conducting Defendant Lawrence's ongoing business as an investment advisor or banker.  Likewise, the above acts are also a regular way of conducting Defendant Kirk's ongoing legal practice.

174.    Zaftr has suffered an injury to its business in the buying and selling of BTC, including harm to its reputation and the forced disruption of its business activities.

WHEREFORE, Plaintiff Zaftr Inc. demands judgment in its favor and against Defendants, jointly and severally, an amount in excess of $32,826,500.00, together with treble damages, attorneys' fees, punitive damages,  prejudgment interest and post-judgment interest, an award of costs of suit, and all other damages recoverable under the law as well as such other and further relief as the Court deems proper.

34

**CLAIM 2**
**18 U.S.C. § 1962(b)**

175.     Zaftr incorporates by reference Paragraphs 1-174 as if set forth fully herein.

176.     Through the above pattern of racketeering activity, Defendants acquired and/or maintained an interest in, or controlled an enterprise engaged in interstate commerce that was connected to the pattern of racketeering activity.

177.     Zaftr has suffered an injury to its business in the buying and selling of BTC, including harm to its reputation and the forced disruption of its business activities.  This injury was caused by Defendants' acquisition or control of the enterprise, and was independent from the injury caused by the pattern of racketeering.

178.     This injury was proximately caused by the racketeering activity engaged in by Defendants, in that the acts described above forced Zaftr to expend substantial sums of money to address the severe disruptions to its business operations and to recover the millions of dollars in funds it paid to Defendants for BTC that it never received.

WHEREFORE, Plaintiff Zaftr Inc. demands judgment in its favor and against Defendants, jointly and severally, an amount in excess of $32,826,500.00, together with treble damages, attorneys' fees, punitive damages,  prejudgment interest and post-judgment interest, an award of costs of suit, and all other damages recoverable under the law as well as such other and further relief as the Court deems proper.

**CLAIM 3**
**18 U.S.C. § 1962(a)**

179.     Zaftr incorporates by reference Paragraphs 1-178 as if set forth fully herein.

180.     Defendants Lawrence and Kirk derived income from the above pattern of racketeering activity.  Defendant Kirk received fees for his legal services and retains funds in

35

escrow for Defendants. Defendant Lawrence also received a fee for negotiating the transactions and acting as the seller's mandate.

181.    Defendant Lawrence and Defendant Kirk invested income from racketeering activities into the enterprise and/or used such income to operate the enterprise.

182.    Zaftr has suffered an injury to its business in the buying and selling of BTC, including harm to its reputation and the forced disruption of its business activities.

183.    This injury was proximately caused by the racketeering activity engaged in by Defendants in that the acts described above forced Zaftr to expend substantial sums of money to address the severe disruptions to its business operations and to recover the millions of dollars in funds it paid to Defendants for BTC that it never received.

WHEREFORE, Plaintiff Zaftr Inc. demands judgment in its favor and against Defendants Kevin J. Lawrence, John Kirk, BVFR & Associates, and Kirk Law PLLC for an amount in excess of $32,826,500.00, together with treble damages, attorneys' fees, punitive damages, prejudgment interest and post-judgment interest, an award of costs of suit, and such other relief and further relief as the Court deems proper.

## CLAIM 4
### 18 U.S.C. § 1962(d)

184.    Zaftr incorporates by reference Paragraphs 1-183 as if set forth fully herein.

185.    Defendants knowingly and willfully became members of the aforementioned conspiracy in that they agreed to participate, directly or indirectly, in the affairs of the enterprise to accomplish the objective of the enterprise—i.e., to defraud Zaftr out of millions of dollars under the guise of arranging purportedly legitimate purchase transactions for BTC.

186.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and engaged in the commission of those acts to further the scheme described above.

36

Specifically, Defendants engaged in a scheme or artifice to defraud by transmitting fraudulent misrepresentations to induce Zaftr to contract with them and send millions of dollars to Defendants for the purchase of BTC that would never be provided to Zaftr.

187.    In furtherance of said deception, Defendants made, or caused to be made, false or misleading statements regarding the credentials and authenticity of the seller with whom they purported to work.

188.    Because the representations Defendants made about the seller and other involved parties were false (and were known to be false), Defendants conspired and/or schemed to defraud Zaftr by use of such fraud.

189.    Zaftr has suffered an injury to its business in the buying and selling of BTC, including harm to its reputation and the forced disruption of its business activities.

190.    This injury was proximately caused by the racketeering activity engaged in by Defendants, in that the acts described above forced Zaftr to expend substantial sums of money to address the severe disruptions to its business operations and to recover the millions of dollars in funds it paid to Defendants for BTC that it never received.

WHEREFORE, Plaintiff Zaftr Inc. demands judgment in its favor and against Defendants Kevin J. Lawrence, John Kirk, BVFR & Associates, and Kirk Law PLLC for an amount in excess of $32,826,500.00, together with treble damages, attorneys' fees, punitive damages,  prejudgment interest and post-judgment interest, an award of costs of suit, and such other relief and further relief as the Court deems proper.

## COUNT IX – DECLARATORY JUDGMENT

191.    Plaintiff incorporates by reference paragraphs 1-190 as if fully set forth herein.

192.    The Purchase Agreement (Exhibit A hereto), Escrow Agreement (Exhibit B hereto), BVFR Side Letter (Exhibit C hereto), ID Verification Agreement (Exhibit D hereto) Second Escrow Agreement (Exhibit E hereto), and Addendum (Exhibit F hereto), are valid and binding agreements between the parties.

193.    Pursuant to the Purchase Agreement and Escrow Agreement, Defendants agreed to deliver 200 BTC once Zaftr submitted payment to Defendants.  Exhibit A, Purchase Agreement at 5; Exhibit B, Escrow Agreement at 1.

194.    Pursuant to the Second Escrow Agreement, Defendants agreed to deliver 205 BTC once Zaftr submitted payment to Defendants.  Exhibit E, Second Escrow Agreement at 2.

195.    Pursuant to the Purchase Agreement and Escrow Agreement, Zaftr paid $2,254,514 to Defendants. Zaftr never received the BTC as required by the Purchase Agreement and Escrow Agreement.

196.    Pursuant to the Second Escrow Agreement, Zaftr paid $1,683,942.68 to Defendants. Zaftr never received the BTC as required by the Second Escrow Agreement.

197.    Defendants have therefore breached their obligations under the parties' Agreements by failing to deliver any of the required BTC due under the Agreements, and by failing to return the entire balance paid by Zaftr.

198.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $367,536.40 which were not returned in connection with the August Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

199.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has suffered direct damages in the loss of the funds it paid to SOH in the amount of $1,683,942.68

with respect to the September Tranche as directed in the Agreements as payment for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

200.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff has suffered direct damages in the loss of the funds it paid to Defendants in the amount of $3,668,745.00 with respect to the October Tranche for BTC that Defendants never delivered to Plaintiff as promised under the parties' Agreements.

201.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff is entitled to all of its attorney's fees and costs incurred in connection with bringing this action.  *See* Exhibit B, Escrow Agreement, ¶ R6; Exhibit E, Second Escrow Agreement, ¶ R6.

202.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff is entitled to the Non-Performance Fee for each of the August Tranche, September Tranche, and October Tranche, being the amount of 71 BTC (equivalent to approximately $4,011,500.00 at current BTC prices).

203.    As a result of Defendants' breaches of the parties' Agreements, Plaintiff also has sustained damages arising as the natural and foreseeable consequence of Defendants' breaches of the parties' Agreements in an amount in excess of $32,826,500.00.

204.    The facts set forth above demonstrate the existence of an actual, justiciable controversy between Plaintiff and Defendant involving specific, adverse claims that are ripe for adjudication.  All facts necessary for an adjudication have occurred.

205.    The Court is vested with the power to declare the rights, status, and other legal relations of the parties, having the force and effect of a final judgment and to enter such other and further relief as may be necessary or proper under the circumstances.

206.    Plaintiffs has a direct, substantial and present interest in obtaining a clear judicial declaration concerning these matters as detailed above.  A declaratory judgment also will resolve the differences between the parties concerned, as to their legal rights, concerning these matters as detailed above, and could serve as a basis, if necessary or proper, for the award of supplemental relief.

207.    Plaintiff therefore asks the Court, in the exercise of its discretion, to award the requested declaratory relief in addition to the legal relief sought in this action.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court declare through entry of a judgment that:

(a) Defendants have breached their duties to Plaintiffs with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum;

(b) Plaintiff is entitled to a return of all of the funds it paid to Defendants, pursuant to the parties' Agreements for the BTC that Defendants never delivered to Plaintiff;

(c) As a direct and proximate result of Defendants' breaches of their duties to Plaintiff with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum, Plaintiff is entitled to the Non-Performance Fee for each of the August Tranche, September Tranche, and October Tranche, in the amount of 71 BTC;

(d) As a direct and proximate result of Defendants' breaches of their duties to Plaintiff with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum, Plaintiff has suffered direct and consequential damages in an amount in excess of $32,826,500.00;

(e) Plaintiff is entitled to an award of its attorney's fees and costs incurred in connection with bringing this action pursuant to the Escrow Agreement and the Second Escrow Agreement;

(f) Plaintiff is entitled to an award treble damages, punitive damages, prejudgment interest, and post-judgment interest; and

(g) Plaintiff is entitled to such other and further relief that this Honorable Court deems proper.

160603.00601/125786042v.3

## JURY DEMAND

Plaintiff, by and through its undersigned counsel, hereby demands a trial by jury on all issues so triable.

**BLANK ROME LLP**

Dated:  May 12, 2021

By: _s/ Lewis W. Schlossberg_
Joseph G. Poluka (Pa. ID No. 42035)
Lewis W. Schlossberg (Pa. ID No. 91773)
Taylor K. Lake (Pa. ID No. 323120)
Blank Rome LLP
One Logan Square
130 N. 18th St.
Philadelphia, PA  19103
(215) 569-5500

_Attorneys for Plaintiff_
_Zaftr Inc._

41

# EXHIBIT A

Date:  August 25, 2020
UNIDROIT <> SALES PURCHASE AGREEMENT TO DELIVER BITCOINS <>
UNCITRAL
CONTRACT CODE:  02202020343BVFR1975

This is a legally binding contract between Bulk Bitcoin Trader Ltd. a business organized under the laws of the United Kingdom of Great Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London, United Kingdom, EC1V 2NX represented by Mr. James Smith, Director, (**SELLER**) and Zaftr Inc.**,** represented by Mr. Nathan Montgomery, CEO, a Canadian based Corporation duly organized under the laws of the Province of Alberta, Canada, having principal place of business and Registered Office Address at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada, T2P 2V6 (**BUYER)** is effective as of August 25, 2020.

(Referred to jointly as the "Parties" and individually as a "Party")

1. This is an agreement for SELLER to deliver a minimum of **200 BTC** as a test tranche, in exchange for ____TBD____ Thousand United States Dollars and _TBD_ Cents only (USD $____TBD_____.) being wired to the SELLER nominated Mandate Counsel, as herein below defined. This price shall be accepted by Seller as suffficient payment for the 200 BTC test TRANCHE only. Thereafter upon successful delivery thereof, with rolls and extensions, not less than **200-500 BITCOIN (BTC) as part of a contract for 10,000 BTC** as mutually-agreed between the parties hereto, in exchange for wire transfer payments, of United States Dollars (USD) equal to 98% of the BTC market rate (which represents 2% total net discount to Buyer with 2% discount deducted from the market price and 2% in Commissions to Buyer and Seller team of introducing parties and referral partners that Seller's and Seller's Mandate Counsel ("Mandate Counsel") shall deliver, based upon the website www.blockchain.com on the date that Buyer's funds payable via wire transfer clears the corporate law firm account of the Seller's and Seller's Mandate Counsel designated herein below and as required in the related AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND PURCHASE OF BITCOIN COMMODITY ("Administration Agreement")  to be signed by Buyer and Seller. Buyer and Seller hereto Warrant and Agree that no discount shall be applied to any BTC purchase less than 200 BTC.

   Buyer and Seller further Warrant and Agree that the sales price to the Seller as well as the separate commissions to be paid to the Sell Side Team and Buy Side Team shall be payable from net proceeds due to Seller, and are separate and distinct from the Seller Mandate Fee, which shall be segregated and payable by Mandate Counsel upon receipt of said funds per each BTC TRANCHE purchased by the Buyer.

DEFINITIONS

2. Bitcoins, abbreviated BTC, are electronic units of stored value, useful as "virtual currency" in various online games and environments. Bitcoins are managed by the

software    program    Bitcoin    by    Satoshi    Nakamoto,    as    described    at
http://www.blockchain.com.

3.  A Bitcoin address is an endpoint for receiving payment. Bitcoins are delivered by
    assigning them to a Bitcoin address using the Bitcoin software program or
    functional equivalent. The fact that a transfer of Bitcoins has taken place can be
    validated through a software utility known as a Bitcoin "block explorer" such as the
    one available at http://www.blockchain.com.

TRANSACTION PROCEDURE

4.  A. Buyer provides its Client Intake Sheet ("CIS") and Proof of Funds ("POF") for a
    test Tranche of not less than **200 BTC**, to the attention of the Seller's Mandate: Dr.
    Jameson Lawrence, ESQ. via e-mail at Drjbvfr@gmail.com.

    B. Buyer & SELLER will sign this SALES Purchase Agreement (SPA) for BTC
    along with the related Administration Agreement that will govern where Buyer BTC
    purchase funds must be sent **PRIOR** to any BTC delivery from Seller to the Buyer's
    designated wallet address which is set forth below herein.

    C. Thereafter Buyer and Seller warrant and agree that BTC shall only be delivered
    to Buyer **AFTER** Seller's Mandate Counsel receives payment from Buyer via wire
    transfer and those funds have cleared the designated accounts as set forth in the
    related Administration Agreement and said funds are fully available. Then Mandate
    Counsel will notify Seller Mandate of funds availability and notify Seller of funds
    availability and thereafter Seller will immediately send an equivalent BTC amount
    equal to the face value of Buyer's funds in United States Dollars (after applicable
    discounts to Buyer and all fees and commissions are accounted for by Mandate
    Counsel). Buyer will be deemed to have accepted the proffered BTC from the
    Seller upon 6 block confirmations by Buyer and Seller herein on
    www.Blockchain.com and Mandate Counsel shall thereafter immediately release
    Buyer's funds to Seller and Seller Intermediary Team as directed by the
    Administration Agreement. **For the avoidance of doubt, Buyer and Seller
    warrant and agree that payment for the BTC shall not be released to the
    Seller by the Mandate Counsel from the designated accounts as set forth in
    the related Administration Agreement until Buyer receives the BTC.** Buyer
    further agrees to call Mandate Counsel and digitally execute via Adobe Sign a
    confirmation receipt document sent by Mandate Counsel for digital confirmation of
    receipt of the proffered BTC from Seller. Failure by Buyer to provide said notice
    within 30 minutes of 6 blockchain confirmations  (via www.blockchain.com), shall
    be deemed a waiver by Buyer and all parties due payments shall be paid
    immediately, as directed by Seller Mandate.

    D.  Step C will repeat until the BTC contract as contemplated herein is completed
    unless otherwise agreed by the parties hereto.

PAYMENT DETAILS

5.  Within 24 hours of signing this Agreement BUYER agrees to pay to Seller's Mandate Counsel in United States Dollars (USD) an amount equal to _____TBD_____ Thousand United States Dollars and __TBD__ Cents only (USD $_____TBD_____) for the **200 BTC TEST TRANCHE**. Thereafter, subsequent purchases of BTC of not less than **200-500 BTC** shall be based upon 98% of the current market price of BTC as set forth at www.blockchain.com at 9AM Eastern Time for each BTC TRANCHE purchased by Buyer from Seller and in all events said funds shall be delivered by 11AM Eastern Time on the date of each BTC TRANCHE settlement with proof of funds delivery in the form of 1) Wire Receipt and 2) Federal ID NUMBER provided directly to Seller's Mandate Dr. Jameson Lawrence, Esq. via e-mail at Drjbvfr@gmail.com. BUYER further warrants and agrees that Seller will not send the stipulated **200 BTC** or any other agreed upon BTC traunch until the date that Buyer's funds in the form of wire transfer are fully available in the designated Mandate Counsel's IOLTA account as further required in the Administration Agreement.

    Buyer warrants and agrees that the funds **must be sent to** MANDATE COUNSEL at the address and coordinates set forth below via wire transfer:

Attorney Name:

    Firm: KIRK LAW PLLC
    Bank: WELLS FARGO BANK
    Routing-Direct Deposit/Electronic: [REDACTED]
    Routing - U.S. Wire: [REDACTED]
    Bank Acct: [REDACTED]
    PA Attorney Registration No: 308436
    Law Office Address : 225 Wilmington West-Chester Pike, Suite 200
            Chadds Ford, PA 19317
    Bank Branch Address. 4301 William Cannon Dr., Building L Austin, TX 78749
    Bank contact: Dewayne Johns
    Phone number: (512) 344-5621

6.  SELLER agrees to act as "drop shipper" for the Buyer and deliver said digital Assets, from Time to Time, to each BTC Wallet address shown in the BTC delivery schedules to be presented to **Drjbvfr@gmail.com** for treatment under this Agreement. At all times, the Buyer's Coin Traffic & Logistics dept. will be responsible for any errors made for any BTC delivered to the wrong address. To be clear: Seller is hereby indemnified against any whatsoever claim for error of BTC Wallet address, excepting only where the SELLER made the error, in which instance the SELLER will resend the BTC to the correct BTC Wallet address at no extra cost to the Buyer.

7.  SELLER shall deliver BTC value equal to the face value of each wire transfer issued by Buyer to the above referenced Mandate Counsel for the benefit of Seller based upon the market rate of BTC minus 2% NET Discount, on the date the proffered Buyer's funds are fully available. The Seller agrees that the above referenced **200 BTC** will be sent to Buyer's designated BTC Wallet address set forth on the last page below and incorporated in this paragraph as if set forth in full

herein. However for all subsequent BTC TRANCHES purchases Seller shall deliver the agreed upon BTC Tranche no later than 24 hours upon receipt of notice from the above-referenced Mandate Counsel that the related wire transfer in USD for each BTC tranche have been received by said MANDATE COUNSEL and that said Buyer's funds are fully available in each account as set forth in the related Administration Agreement signed by the Buyer and Seller hereto.

**BUYER and SELLER WARRANT AND AGREE THAT EACH SHALL BE LIABLE FOR A 10% NON PERFORMANCE FEE, DUE AND PAYABLE IN BTC IF SELLER FAILS TO DELIVER THE BTC, AND DUE AND PAYABLE IN USD IF BUYER FAILS TO TIMELY DELIVER THE FUNDS FOR ANY AGREED UPON BTC TRANCHE WITHIN 24 HOURS OF THE DATE OF EXECUTION OF THIS AGREEMENT IN THE CASE OF THE BUYER; OR IF ANY AGREED BTC TRANCHE SELLER FAILS TO DELIVER THE AGREED UPON BTC AMOUNT WITHIN 24 HOURS OF RECEIPT AND FULL CLEARANCE OF BUYER'S FUNDS DELIVERED AND FULLY AVAILABLE AS SET FORTH IN THE ADMINISTRATION AGREEMENT IN THE CASE OF THE SELLER.**

EXECUTION OF THE CONTRACT

8. This <u>One Month</u> contract, extendable by mutual consent, shall be deemed executed by SELLER when properly digitally signed by SELLER and said signed document is electronically delivered to BUYER in the form of a Certified PDF Document, pursuant to ECE/TRADE/257 (Geneva, May 2000).

9. BUYER may execute this contract by printing it and sending a signed copy to SELLER'S MANDATE in any manner acceptable to SELLER. In the absence of a signature, digital or otherwise, this contract shall be deemed executed by BUYER regardless, when a wire transfer in the above amount is made to Mandate Counsel and accepted by the Mandate Counsel by or on behalf of BUYER in the above amount.

10. BUYER warrants being the rightful owner of/to the Funds being sent to purchase Bitcoins, and that they were acquired legally. BUYER agrees to indemnify SELLER against any losses incurred as a result of BUYER's funds having been illegally acquired.  BUYER warrants and agrees that the Funds sent shall be from an account designated and controlled by BUYER.

11. BUYER shall not be responsible for wire delays caused solely by the banking system or Federal Reserve. In the event of an anticipated delay, and in all events BUYER shall promptly notify SELLER'S MANDATE of the pertinent transaction details, including the Federal Reserve reference number of the wire transfer and wire receipt both of which must be delivered to SELLER'S MANDATE on the date wire is sent.

12. The SELLER shall not be responsible for reasonable delays incurred by the banking system beyond SELLER's control.

EXECUTION OF THIS CONTRACT

13. This highly-confidential agreement, subject to the laws of the Commonwealth of Pennsylvania, shall be executed by the set forth below parties (a) being of sound Mind, (b) having whatever requisite power and authority to engage their respective person, (c) being under no duress, threat, intimidation, nor promise of reward to compromise or undermine the other.

**SELLER & BUYER SIGNATURES:**

SELLER'S SIGNATURE
Seller: For the benefit of  Bulk Bitcoin Trader, Ltd
By:

Name: Mr. James Smith
Title: Principal
GBR Passport #532879412 expiring 23JUN25
Date:  August __, 2020

BUYER'S SIGNATURE

Buyer: Zaftr, Inc.

By:_____

Name: Mr. Nathan Montgomery
Title: Chief Executive Officer, President, and Sole Director
Canadian Passport #HD733314 expiring 21JUL25
Date:  August 25, 2020

# First Schedule
### (Cryptocurrencies deliveries)

Initial **200 BTC** to Address listed by Buyer in the Adobe PDF execution version of this Agreement:   3ESU78E2W15Zw833HUdK9RjmpPPraoGeUh

Tranche Schedule:

| DATE | TOTAL BTC |
|---|---|
| Tuesday, August 25, 2020 | 200 |
| Wednesday, August 26, 2020 | 200 |

| | |
|---|---|
| Thursday, August 27, 2020 | 200 |
| Friday, August 28, 2020 | 400 |
| Monday, August 31, 2020 | 500 |
| Tuesday, September 1, 2020 | 500 |
| Wednesday, September 3, 2020 | 500 |
| Thursday, September 4, 2020 | 500 |
| Friday, September 5, 2020 | 500 |
| Monday, September 7, 2020 | 0: LABOR DAY (US) BANKS CLOSED |
| Tuesday, September 8, 2020 | 500 |
| Wednesday, September 9, 2020 | 500 |
| Thursday, September 10, 2020 | 500 |
| Friday, September 11, 2020 | 500 |
| Monday, September 14, 2020 | 500 |
| Tuesday, September 15, 2020 | 500 |
| Wednesday, September 16, 2020 | 500 |
| Thursday, September 17, 2020 | 500 |
| Friday, September 18, 2020 | 500 |
| Monday, September 21, 2020 | 500 |
| Tuesday, September 22, 2020 | 500 |
| Wednedsay, September 23, 2020 | 500 |
| Thursday, September 24, 2020 | 500 |
| FRIDAY, SEPTEMBER 25, 2020 | NONE W/O EXTENSION: TOTAL 10,000 |

# EXHIBIT B

**BITCOIN EXCHANGE**

**AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND
PURCHASE OF BITCOIN COMMODITY
PRIVATE AND CONFIDENTIAL
CONTRACT CODE:  0220202O343BVFR1975**

**THIS AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE
AND PURCHASE OF BITCOIN COMMODITY (hereinafter, the "AGREEMENT") is made this
25th day of August 2020, between the following Mandate Counsel with the authorization and consent
of SELLER and BUYER, as hereinafter defined:**

**BULK BITCOIN TRADER LTD is the Seller entity who will be represented by James Smith as
Principal and Director, and is a business organized under the laws of the United Kingdom of Great
Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London,
United Kingdom, EC1V 2NX (hereinafter "SELLER" or "Seller"). Seller has undertaken a private
sale with Zaftr Inc., represented by its CEO Mr. Nathan Montgomery, a Canadian based
Corporation duly organized under the laws of the Province of Alberta, and having principal place
of business at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada T2P 2V6 (hereinafter "BUYER"
or "Buyer") in regards to certain BTC Purchase funds that shall be NET of all fees and commissions
due hereunder unless otherwise stated herein; and**

**John Kirk, Esq., an attorney licensed in the Commonwealth of Pennsylvania, USA, and Founding
Shareholder of KIRK LAW PLLC 225 Wilmington West-Chester Pike, Suite 200, Chadds Ford,
Pennsylvania, a Pennsylvania Professional Limited Liability Company (hereinafter, "LICENSED
PENNSYLVANIA ATTORNEY") has been engaged by Dr. Jameson Lawrence, Esq. as CEO of
BVFR & ASSOCIATES, LLC Seller's Mandate, as hereinafter defined, to serve as its counsel and,
therefore, represents the Seller's Mandate (hereinafter, the "SELLER'S MANDATE" or "Seller's
Mandate".)**

**Hereinafter, LICENSED PENNSYLVANIA ATTORNEY shall be referred to as "SELLER'S
MANDATE COUNSEL" or "Mandate Counsel". SELLER and BUYER join in this Agreement for
the purposes of acknowledging they agree to the terms herein as being consistent with the
requirements of Mandate Counsel to abide by the terms of the Sales Purchase Agreement defined
infra, and hereby consent to Mandate Counsel's application of the terms and instructions thereto,
as defined by Seller's Mandate and as agreed by BUYER and SELLER.**

**It is hereby understood and acknowledged that the Mandate Counsel represents Seller's Mandate
as counsel in connection with this Agreement and related agreements, as well as certain other
matters.  It is further understood and acknowledged hereto that the Mandate Counsel shall be
entitled to continue to represent Seller's Mandate in any matter, including, without limitation, any
matter, claim, dispute, or controversy among Buyer, Seller, and Seller's Mandate.  To the extent
that any conflict or potential conflict arises, each of the Buyer and Seller, individually and on behalf
of such party's successors and assigns, have waived any and all objections thereto.  By executing
this Agreement, each of Buyer and Seller acknowledge and agree that it has consulted with
independent counsel, and with full knowledge of all relevant facts consents to Mandate Counsel
continuing to serve as Mandate Counsel hereunder, and to follow the instructions of the Sales
Purchase Agreement as defined herein, and waive any objections for conflicts of interest.**

1

**RECITALS**

**R1.**    SELLER has entered into a purchase and sale transaction involving digital currency, specifically qualified bitcoin ("<u>BTC</u>") with BUYER, a sophisticated purchaser and seller of BTC that is capable of evaluating the risks of market transactions in BTC.

**R2.**    BUYER possesses available funds and has agreed to engage in a transaction with the Seller for the purchase of BTC, to be accepted and deposited in Buyer's existing digital BTC Wallet(s).

**R3.**    SELLER has provided its identifying information to Seller Mandate for Principal James Smith, namely a British Passport showing his date of birth and place of birth and passport number 532879412, which was issued on 06/23/2015 and expires on 06/23/2025.

**R4.**    In accordance with applicable agreements, SELLER, has agreed to transfer through its connected commercial associates, financial authorities and institutional network, BTC directly to BUYER'S existing digital BTC wallet for review and acceptance upon proof that BUYER has transferred the Seller's Net BTC Purchase Amount *which includes* the Seller's Mandate Fee to Mandate Counsel as required on the related SALES PURCHASE AGREEMENT TO DELIVER BITCOINS  WITH TRANSACTION CODE : 02202020343BVFR1975 (the "Sales Purchase Agreement") which is incorporated herein by reference and being executed substantially contemporaneously herewith this Agreement (collectively, the "<u>Transaction Agreements</u>"). The Buyer and Seller agree that out of the total gross discount of 4% to the Buyer, 2% of the FACE VALUE OF ANY AND ALL BTC PURCHASE AMOUNT SENT TO THE MANDATE COUNSEL BY THE BUYER via check or wire transfer is due and owed in equal amount to Buyer side Broker and Seller side Broker to their designated Paymaster details to be provided to Seller's Mandate Counsel under separate cover via the WhatsApp chat established by those parties or email per the instructions of MANDATE COUNSEL herein.

 Excepting only the 1% MANDATE COUNSEL FEE to be deducted and held by the MANDATE COUNSEL and as provided in the Sales Purchase Agreement, the remaining NET BTC Purchase Amount shall be transferred by Mandate Counsel, as provided for in Paragraph 4, Section C of the Sales Purchase Agreement, wherein the BTC shall be sent on the date Buyer's funds are fully available in the Mandate Counsel's Interest on Lawyer's Trust Account (hereinafter "IOLTA"), and upon 6 block confirmations on www.blockchain.com Mandate Counsel shall be permitted to release the funds to Seller and Brokers after BTC delivery to Buyer and its acceptance under the terms set forth herein and in the fully executed SALES AND PURCHASE AGREEMENT referenced and incorporated herein as if fully set forth.

Upon Mandate Counsel's receipt of Buyer's wire transfer, and confirmation the funds are cleared in Mandate Counsel's IOLTA account, as confirmed in writing by Mandate Counsel's bank officer at Mandate Counsel's bank identified below, Mandate Counsel shall provide wire transfer receipts to Seller Mandate who will provide same to Seller. The Seller will then immediately send the BTC to the Buyer's designated wallet and provide notice of said BTC delivery to Seller Mandate and Mandate Counsel. The Seller and Buyer have agreed to undertake an initial sale of 200 BTC as part of a 10,000 BTC minimum contract and Buyer has sent said funds in the form of wire transfer to KIRK LAW PLLC via the Account information set forth below herein at Wells Fargo BANK. The Seller and Buyer further warrant and agree that the funds for the remaining stipulated BTC in at least 200 BTC minimum tranches shall be sent by Buyer via wire transfer to the Mandate Counsel's account set forth below at the Wells Fargo Bank unless otherwise agreed to in writing by the Seller and Buyer.

R5.     This Agreement is in connection with a secondary market purchase and sale transaction between a non-US person or his wholly owned entity, as Seller, a non-US institution, as Buyer, but through its accounts held and domiciled in the United States, that involves digital BTC currency.  This purchase and sale transaction shall be deemed a private transaction pertaining to digital currency and is not intended to be, and shall not be, interpreted or construed as a public offer of purchase or sale of securities.

R6.     Buyer and Seller each hereby acknowledge and agree, as affirmed as undersigned below, that Mandate Counsel is legal counsel for Seller's Mandate, a Pennsylvania Limited Liability Company, and that no undertaking for legal services by Mandate Counsel, nor attorney-client relationship exists between Mandate Counsel and either Buyer or Seller.  Buyer and Seller further agree and acknowledge that all performance as governed by the Transaction Agreements, defined above as this Agreement and the Sales Purchase Agreement incorporated by reference, including but not limited to the disbursement of the transaction funds to Seller from the Mandate Counsel's IOLTA account, is strictly construed by the procedure set forth in the Transaction Agreements.  As agreed to in the Sales Purchase Agreement between Seller and, for the avoidance of doubt, Buyer and Seller warrant and agree that payment for the BTC shall not be released to the Seller from the designated account as set forth in the Transaction Agreements until Buyer receives the BTC. Both Seller and Buyer hereby agree and acknowledge to look exclusively to each other for all remedies, in both law and equity, for any failure to perform, and further indemnify and hold harmless Mandate Counsel and Seller's Mandate.  Buyer and Seller each explicitly accept and consent to the exclusive jurisdiction the State and Federal Courts of the Commonwealth of Pennsylvania, Delaware County, USA in such state and federal courts which preside and exercise jurisdiction in and for Delaware County, Pennsylvania, for any and all claims by either Buyer or Seller against Mandate Counsel, and Seller's Mandate under both this AGREEMENT and the Sale's Purchase Agreement, and agree that this Agreement shall exclusively be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles.  Buyer and Seller further expressly agree, warrant, and accept that the prevailing party in any such action brought against either Mandate Counsel, or Seller's Mandate shall be entitled to recover its reasonable costs and attorney's fees for enforcement of this AGREEMENT or incurred in defense of this Agreement, upon any order, decree, or award of judgment.  By signing below, both Buyer and Seller further agree and acknowledge that Mandate Counsel shall be entitled to, and both Buyer and Seller shall be jointly and severally liable for Mandate Counsel's reasonable attorneys' fees should Mandate Counsel prevail in defending any claim brought against it in connection to the performance of Mandate Counsel's duties under the terms of this Agreement or otherwise in performance of its duties as Mandate Counsel; provided, however, that Mandate Counsel shall not be entitled for any loss, damage, liability, expense, or attorneys' fees arising out of Mandate Counsel's gross negligence, willful misconduct, or failure to act in good faith.  All interest earned on the funds held in the Mandate Counsel's IOLTA are duly allocated to the IOLTA Board of the Supreme Court of Pennsylvania, as authorized by the Statutes of the Commonwealth of Pennsylvania, which provide all interest for funds earned in IOLTA Accounts be applied to support the provision of civil legal services to the Commonwealth's poor and disadvantaged, as the Mandate Counsel is required to do under both Pennsylvania Rule of Professional Conduct 1.15 for funds for nominal and short-term fiduciary funds, as well as the IOLTA policies of JPMorgan Chase Bank, N.A., and Wells Fargo Bank, N.A.  Buyer and Seller agree and acknowledge that the interest on any funds held in the IOLTA shall be allocated to the IOLTA Board of the Supreme Court of Pennsylvania, and shall be maintained in the Mandate Counsel's IOLTA until released pursuant to this Transaction Agreements.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, with the

3

foregoing recitals being incorporated herein and forming a part of this Agreement, the signatories intend to be legally bound as follows:

1.    **Settlement Procedure.**  Mandate Counsel has entered into an engagement agreement with SELLER'S MANDATE outlining the scope of his engagement and that he represents SELLER'S MANDATE BVFR & ASSOCIATES, LLC % Dr, Jameson Lawrence, ESQ..  Pursuant to the written Sales Purchase Agreement between BUYER and SELLER, BUYER has agreed to send funds payable to KIRK LAW PLLC to MANDATE COUNSEL'S IOLTA account (hereinafter, the "KIRK LAW IOLTA") for the purchase of at least 200 BTC with rolls and extensions including the aforementioned 200 BTC TEST TRANCHE at market price minus the 2% NET discount to Buyer that shall be calculated based on the website www.blockchain.com as of 9AM EST on the date that the proffered Buyer funds are fully available in the KIRK LAW IOLTA. For the avoidance of doubt, Buyer and Seller warrant and agree that payment for the BTC shall not be released to the Seller from the designated accounts as set forth in this Agreement until Buyer receives the BTC.  The Buyer will confirm and acknowledge receipt of the applicable BTC pricing from Seller on the date of settlement for any and all BTC TRANCHES undertaken between the Buyer and Seller hereto so that the Mandate Counsel knows the exact amount due from Buyer, and the Buyer further agrees to provide Mandate Counsel with written confirmation via Adobe Sign as provided for in the Sales Purchase Agreement.

2.    **Wire Transfer Information for Licensed Pennsylvania Attorney**.  The wire transfer information for the Licensed Pennsylvania Attorney is as follows:

**Firm: KIRK LAW PLLC**
**Bank: WELLS FARGO BANK**
**Routing-Direct Deposit/Electronic: [REDACTED]**
**Routing - U.S. Wire: [REDACTED]**
**Bank Acct: [REDACTED]**
**PA Attorney Registration No: 308436**
**Law Office Address : 225 Wilmington West-Chester Pike, Suite 200**
         **Chadds Ford, PA 19317**
**Bank Branch Address.**
**4301 William Cannon Dr., Building L Austin, TX 78749**
**Bank contact: Dewayne Johns**
**Phone number: (512) 344-5621**

3.    **Insurance and Licensing Information.**  Mandate Counsel agrees, upon request, to provide proof of: (i) errors and omissions insurance; (ii) licensing to serve as an attorney in PENNSYLVANIA; and (iii) that the Licensed PENNSYLVANIA Attorney's IOLTA is maintained in a regulated attorney trust account for the benefit of its clients, and administered in accordance with the Transaction's Agreements.

**NOW, THEREFORE, the Buyer, Seller, and Mandate Counsel, intending to be bound as of August 25, 2020 execute this Agreement where provided below.  This Agreement may be executed in counterparts and a facsimile signature may be accepted the same as an original signature.**

**THIS CONTEMPLATED BTC TRANSACTION FOR AT LEAST THE INITIAL 200 BTC TRANCHE MUST BE EXECUTED AND COMPLETED WITHIN ___ BUSINESS DAYS OF THE DATE SET FORTH ABOVE (August 25 2020) OF SIGNING OR IT BECOMES NULL & VOID UNLESS OTHERWISE AGREED TO BY SELLER AFTER A 10% NON-PERFORMANCE FEE**

**IS DEDUCTED FROM BUYER'S FUNDS IN THE EVENT BUYER FAILS TO SEND ALL REQUIRED FUNDS TO MANDATE COUNSEL HEREIN WITHIN 24 HOURS OF THE EXECUTION OF THIS AGREEMENT AND THE RELATED BTC SALES AND PURCHASE AGREEMENT REFERENCED ABOVE.  THE SELLER ALSO AGREES TO PAY A 10% NON-PERFORMANCE FEE OF AT LEAST 20 BTC (OR WHATEVER AMOUNT THE PARTIES HERETO AGREE UPON FOR SETTLEMENT) IF THE BTC IS NOT DELIVERED WITHIN 24 HOURS OF MANDATE COUNSEL'S RECEIPT OF FULLY CLEARED AND AVAILABLE FUNDS FROM BUYER.  FOR THE AVOIDANCE OF DOUBT, BUYER AND SELLER WARRANT AND AGREE THAT PAYMENT FOR THE BTC SHALL NOT BE RELEASED TO SELLER BY THE MANDATE COUNSEL FROM THE DESIGNATED ACCOUNTS AS SET FORTH IN THIS AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND PURCHASE OF BITCOIN COMMODITY UNTIL THE BUYER RECEIVES THE BTC.**

**KIRK LAW PLLC**
**Mandate Counsel:**

**By:** _____

**JOHN KIRK, Esq., Founding Shareholder**
**KIRK LAW PLLC**
**SEEN AND AGREED:**

FOR AND ON BEHALF OF THE SELLER:
**BULK BITCOIN TRADER LTD**

_____

**JAMES SMITH, PRINCIPAL**

**Date: August _____, 2020**

**U.K. Passport#532879412**
**Issue Date: 06/23/2015**
**Expiry Date: 06/22/2025**

FOR AND BEHALF OF THE BUYER:
**ZAFTR, INC.**
**By:** _____

**Name: Mr. Nathan Montgomery**
**Title: Chief Executive Officer, President, and Sole Director**
**Canadian Passport #HD733314 expiring 07/21/2025**
**Date:  August 25, 2020**

**"ACCEPTED AND AGREED WITHOUT CHANGE (ELECTRONIC SIGNATURE IS VALID AND ACCEPTED SAME AS HAND SIGNATURE)"**
**EDT (Electronic Document Transmission)**
**EDT (Electronic document transmissions) shall be deemed valid and in respect of any provisions of this Contract. As applicable, this agreement shall be:**

1- **Incorporate U.S. Public Law106-229, ''Electronic Signatures in Global and National Commerce Act'' or such other applicable law conforming to the**
   **UNCITRAL Model Law on Electronic Signatures (2001) and**

2- **ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and**
   **Electronic Business (UN/CEFACT).**

3- **EDTdocumentsshallbesubjecttoEuropeanCommunityDirectiveNo.95/46/EEC, as applicable. Either Party may request the hard copy of**
   **any document that has been previously transmitted by electronic means provided, however, that any such request shall in no manner delay the parties from performingtheirrespectiveobligationsanddutiesunderEDTinstruments.**

**6**

# EXHIBIT C



DISTRIBUTED LAW GROUP

225 WILMINGTON-WEST CHESTER PIKE
SUITE 200
CHADDS FORD, PA 19317
DISTRIBUTEDLAWGROUP.COM
TELEPHONE 512.360.0049

AUGUST 24, 2020

**SENT VIA EMAIL**

Zaftr, Inc.
c/o Mr. Nathan Montgomery
CEO & Sole Director
Suite 2500
500 4th Ave.
Calgary,  AL
Canada
T2P 2V6
**Email**: Nathan@zaftr.com

BVFR & Associates LLC
c/o Dr. Jameson Lawrence, Esq.
CEO & Managing Member
2023 N. 2nd St.
Suite 301
Harrisburg, PA 17102
**Email**: drjbvfr@gmail.com

Re: **Addendum to Agreement for Administration of Fees and Commissions from Sale and
      Purchase of Bitcoin Commodity**

Dear Mr. Montgomery:

Please find this letter (this "**Addendum**") to a certain Agreement for Administration of
Fees and Commissions from Sale and Purchase of Bitcoin Commodity dated August 25 , 2020, and
referencing Contract Code: 02202020343BVFR1975 (the "**Administration  Agreement**"), as
provided for and agreed by Kirk Law PLLC d/b/a Distributed Law Group, a Pennsylvania
Professional Limited Liability Company with registered address of 225 Wilmington West Chester
Pike, Suite 200, Chadds Ford, PA 19317 (the "**Firm**", "**DLG**", or "**Mandate Counsel**") and Zaftr,



Inc., a Canadian based Corporation duly organized under the laws of the Province of Alberta, Canada, and having principal place of business and Registered Office Address at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada, T2P 2V6 ("**Zaftr**" or "**You**") as signatories to the Administration Agreement.

You and DLG mutually agree to amend the terms of the Administration Agreement, the terms of which are incorporated by reference herein, to reflect further representations and warranties outside of the scope of the Administration Agreement. Zaftr agrees and acknowledges that the Firm is counsel to BVFR & Associates, LLC a Pennsylvania Limited Liability Company with Registered Address of 2023 N. 2nd St., Suite 301, Harrisburg, PA 17102 ("**BVFR**" or "**Seller's Mandate**"), and the Firm's position in the Administration Agreement as Mandate Counsel is that of the legal representative of BVFR, which is a third-party beneficiary to the Administration Agreement.

The Administration Agreement provides for the administration of fees related to a certain SALES PURCHASE AGREEMENT TO DELIVER BITCOINS WITH TRANSACTION CODE : 02202020343BVFR1975 dated August 25 2020 (the "**Sales Purchase Agreement**"). The Administration Agreement and the Sales Purchase Agreement (collectively, the "**Transaction Agreements**") provide that firstly, the "Net BTC Purchase Amount *which includes* the Seller's Mandate Fee" shall be payable to the Firm's IOLTA, and secondly that the purchase amount and net funds are "separate and distinct from the Seller Mandate Fee, which shall be segregated and payable by Mandate Counsel upon receipt of said funds".

The Firm, as Counsel to BVFR, is required to send the Seller's Mandate Fee as defined in the Transaction Agreements. The Firm, as Mandate Counsel, further has agreed in the Administration Agreement not to release any of the funds sent by Zaftr to the Firm's IOLTA agreement to any parties, excepting BVFR for its Mandate Fee, until the BTC has been sent as provided for in the Transaction Agreements.

By way of this Addendum, the Firm represents and warrants to Zaftr that should the BTC not be sent within 24 hours of Zaftr's funds being sent to the Firm's IOLTA and successfully cleared in the IOLTA as provided for in the Transaction Agreements (the "**Default Period**"), that all funds sent to the IOLTA – excepting the Mandate Fee – shall be returned to the account which Zaftr originated its funds from within one business day.

The Firm further represents and warrants that the funds being sent to the Firm's IOLTA – excepting the Mandate Fee – shall be held in Trust as with the Fiduciary duties of an Escrow Agent as applicable under the laws of the Commonwealth of Pennsylvania, and that none of the Mandate Counsel fee, broker fees, or any of Seller's funds shall be moved from the IOLTA until the BTC has been successfully sent as agreed in the Transaction Agreements, to Zaftr's designated wallet, as confirmed by 6 block confirmations on blockchain.com

In regard to the Mandate Fee, BVFR separately represents and warrants by way of this Addendum that it shall return the Mandate Fee to the Firm's IOLTA, less the Breakup Fee as



DISTRIBUTED LAW GROUP

defined herein within one business day of the Default Period in the event the BTC is not sent as provided in the Transaction Documents in order to allow the Firm to separately return the balance of the Mandate Fee to Zaftr. The Firm represents and warrants that all of BVFR's Mandate Fee funds returned to the IOLTA shall be promptly returned to the account which Zaftr originated its funds from within one business day of the Firm receiving them back from BVFR in the event the Default Period occurs.

Zaftr further agrees, represents, and warrants that by way of this Addendum, and the Transaction Agreements, has requested of BVFR as Seller's Mandate to obtain concessions and deviations from the initial proposals for the substantive transaction underlying the Transaction Agreements, and that BVFR has obtained said concessions, including significant costs and legal fees to modify such, and in so doing is entitled to good and valuable consideration for obtaining the concessions for Zaftr's benefit. In the essence of good faith and fair dealing, the concessions obtained shall inure to the benefit of Zaftr, its successors and assigns, and for good and valuable consideration, the sufficiency of which is acknowledged by Zaftr and confirmed by BVFR by signing herein, Zaftr agrees to pay an administrative fee of $50,000 to BVFR (the "**Breakup Fee**").

BVFR would ordinarily require the Breakup Fee to be paid prior to the submission of the Transaction Agreements and the further negotiations between Zaftr and BVFR, including those undertaken by the Firm as BVFR's Mandate Counsel, but in the spirit of good faith and fair dealing hereby waives and agrees to waive the Breakup Fee to be paid separately and prior to execution of the Transaction Agreements.

Zaftr and BVFR agree and acknowledge that the payment of the Breakup Fee shall be made part and parcel to the funds sent to the IOLTA at the commencement of the transactions as described in the Transaction Documents, and should the transaction fail following Zaftr sending the funds to the Firm's IOLTA as described in the Transaction Agreements, the Breakup Fee shall be deducted and offset against any of BVFR's Mandate Fee returned to the Firm. Zaftr, BVFR, and the Firm further agree and acknowledge that in the event of the occurrence of a Default Period after the first Test Tranche as provided in Section 5 of the Sales Purchase Agreement, the offset Breakup Fee shall not be applicable in any event of non-performance due to BVFR, the Firm, or the Seller, and Zaftr agrees that any reimbursement of the Breakup Fee shall be sought as part of its remedies and recoveries against the Seller as provided for in the Sales Purchase Agreement.

The Firm, Zaftr, and BVFR further agree to follow and incorporate the terms of the Administration Agreement for the resolution of any disputes, including the jurisdiction and governing law provisions therein.

[SIGNATURE PAGE FOLLOWS]



KIRK LAW PLLC d/b/a Distributed Law Group

BY: _John A. Kirk_____

John A. Kirk, Esq.
**Founding Shareholder**

Aug 24, 2020
**Date:** _____


BVFR & ASSOCIATES, LLC

BY: _Dr. Jameson Lawrence, ESQ./CEO (Aug 24, 2020 21:31 EDT)_

Dr. Jameson Lawrence, Esq.
**CEO & Managing Member**

Aug 24, 2020
**Date:** _____


ZAFTR, INC

BY: _Nathan Montgomery_____

Nathan Montgomery
**CEO, President, and Sole Director**

Aug 24, 2020
**Date:** _____

# EXHIBIT D

8/23/2020

**SENT VIA EMAIL**

Zaftr,  Inc.
Suite 2500
500 4th Ave.
Calgary,  AL
Canada
T2P 2V6

**Email**: Nathan@zaftr.com

## LIMITED PURPOSE AGENCY AGREEMENT: IDENTITY VERIFICATION

*WHEREAS*, this letter agreement establishes a Limited Purpose Agency Agreement ("**Agreement**") for the limited purpose of assisting Zaftr, Inc., a Canadian based Corporation duly organized under the laws of the Province of Alberta and having principal place of business and Registered Office Address at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada, T2P 2V6 ("**Zaftr**") for Identify Verification for ascertaining the identity of a certain Individual, defined below (the "**Identity Verification**"); and

*WHEREAS*, BVFR & Associates, LLC, a Pennsylvania Limited Liability Company with Registered Address of 2023 N. 2nd St., Suite 301, Harrisburg, PA 17102 ("**BVFR**") will be pleased to assist Zaftr, (together with any other legal entity which is the intended requester of the Identity Verification) for the limited purposes described in this Agreement; and;

*WHEREAS*, BVFR and Zaftr (each a "Party" and collectively "Parties") fully consent to the provisions of this Agreement, for good and valuable consideration, the sufficiency of which is hereby acknowledged as accepted by signing herein; and

*WHEREAS*, the Parties hereby further consent to the following terms of this Agreement as follows:

BVFR, by way of its CEO and Managing Member, Dr. Jameson Lawrence, Esq., undersigned below, agrees and accepts to act as a limited purpose agent of behalf of Zaftr, and its affiliates, successors and assigns for the purpose of Identity Verification, specifically regarding the below defined Individual.  BVFR is currently active and in good standing as a limited liability company duly registered with the Commonwealth of Pennsylvania.

BVFR was introduced to the Individual by Craig Burris, former founder of SmartCEO Magazine and his colleague Paulson Ambookan a few years ago and has since then worked with the Individual, and on or about May 2018 BVFR examined one current original government issued identification document requested for the Identity Verification of the Individual, specifically the Passport, defined *infra*, and reviewed the Passport and confirmed that it is the same as the Individual which BVFR has (1) direct personal knowledge and business dealings

1

with, for the past several years; and (2) has been confirmed the name, person, likeness, and features of the Individual, in his dealings with BVFR and the Individual in video chat sessions verifying the name and authentic features of the Individual, which accurately are represented in the Passport.

BVFR shall provide to Zaftr a high-quality photographic copy of the Individual's Passport, by way of its Counsel, John A. Kirk, Esq, as provided below.

The Individual, as defined in this Agreement, means a Mr. James Smith, known to BVFR as a citizen of the United Kingdom of Great Britain and Northern Ireland, and Director of Bulk Bitcoin Trader Ltd. (the "Company Identified") a private limited company organized under the laws of the United Kingdom of Great Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London, United Kingdom, EC1V 2NX.

The Passport, as defined in this Agreement, means a certain passport, known to BVFR to issued by the United Kingdom of Great Britain and Northern Ireland, with issuance number 532879412, and an expiry date of June 23rd, 2025, will be provided to Zaftr via email from BVFR's counsel on the date of this Addendum, and Zaftr shall reciprocally provide the passport of its undersigned Chief Executive Officer on the same date of this Addendum.

The month, and year of birth of the Individual as provided on the Passport are identical to those which are further listed on the official documents of the Company Identified, which was directed to BVFR's attention through it's counsel, John A. Kirk, Esq., of Kirk Law PLLC.

The foregoing is true and accurate to the best of my knowledge.

**WHEREFORE**, the Parties hereto execute this Agreement by their authorized signatures.

[SIGNATURE PAGE FOLLOWS]

BVFR & ASSOCIATES, LLC

BY: _____
Dr. Jameson Lawrence, Esq.
**CEO & Managing Member**

     Aug 24, 2020
**Date:** _____

ZAFTR, INC

BY: _____
Nathan Montgomery, CEO, President, and Sole Director

     Aug 24, 2020
**Date:** _____

3

# EXHIBIT E

**BITCOIN EXCHANGE**

**AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND PURCHASE OF BITCOIN COMMODITY**
**PRIVATE AND CONFIDENTIAL**
**CONTRACT CODE: 09222020343BVFR197568**

**THIS AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND PURCHASE OF BITCOIN COMMODITY (hereinafter, the "AGREEMENT") is made this ___ day of September 2020, among the following Mandate Counsel, Escrow Counsel, and BUYER and SELLER, as hereinafter defined:**

**BULK BITCOIN TRADER LTD is the Seller entity who will be represented by James Smith as Principal and Director, and is a business organized under the laws of the United Kingdom of Great Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London, United Kingdom, EC1V 2NX (hereinafter "SELLER" or "Seller"). Seller has undertaken a private sale with Zaftr Inc., represented by its CEO Mr. Nathan Montgomery, a Canadian based Corporation duly organized under the laws of the Province of Alberta, and having principal place of business at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada T2P 2V6 (hereinafter "BUYER" or "Buyer") in regards to certain BTC Purchase funds that shall be NET of all fees and commissions due hereunder unless otherwise stated herein; and**

**John Kirk, Esq., an attorney licensed in the Commonwealth of Pennsylvania, USA, and Founding Shareholder of KIRK LAW PLLC 225 Wilmington West-Chester Pike, Suite 200, Chadds Ford, Pennsylvania, a Pennsylvania Professional Limited Liability Company (hereinafter, "LICENSED PENNSYLVANIA ATTORNEY") has been engaged by Dr. Jameson Lawrence, Esq. as CEO of BVFR & ASSOCIATES, LLC Seller's Mandate, as hereinafter defined, to serve as its counsel and, therefore, represents the Seller's Mandate (hereinafter, the "SELLER'S MANDATE" or "Seller's Mandate"); and**

**Hereinafter, LICENSED PENNSYLVANIA ATTORNEY shall be referred to as "SELLER'S MANDATE COUNSEL" or "Mandate Counsel". SELLER and BUYER join in this Agreement for the purposes of acknowledging they agree to the terms herein as being consistent with the requirements of Mandate Counsel to abide by the terms of the Sales Purchase Agreement defined *infra*, and hereby consent to Mandate Counsel's application of the terms and instructions thereto, as defined by Seller's Mandate and as agreed by BUYER and SELLER; and**

**Kenneth Gomes, an Attorney licensed in the Federation of Malaysia, representing law firm, SABARUDIN OTHMAN & HO, No. 12-2, Jalan Telawi Dua, Bangsar Baru, 59100, Kuala Lumpur, Malaysia (hereinafter "Seller's Counsel" or "Escrow Counsel"); and**

**It is hereby understood and acknowledged that the Mandate Counsel represents Seller's Mandate as counsel in connection with this Agreement and related agreements, as well as certain other matters. It is further understood and acknowledged hereto that the Mandate Counsel shall be entitled to continue to represent Seller's Mandate in any matter, including, without limitation, any matter, claim, dispute, or controversy among Buyer, Seller, and Seller's Mandate. To the extent that any conflict or potential conflict arises, each of the Buyer and Seller, individually and on behalf of such party's successors and assigns, have waived any and all objections thereto. By executing this Agreement, each of Buyer, Seller, and Escrow Counsel acknowledge and agree that each has consulted with independent counsel, and with full knowledge of all relevant facts consents to**

1

Mandate Counsel continuing to serve as Mandate Counsel hereunder, and to follow the instructions of the Sales Purchase Agreement as defined herein, and waive any objections for conflicts of interest.

**RECITALS**

      **R1.**    SELLER has entered into a purchase and sale transaction involving digital currency, specifically qualified bitcoin (**"BTC"**) with BUYER, a sophisticated purchaser and seller of BTC that is capable of evaluating the risks of market transactions in BTC.

      **R2.**    BUYER possesses available funds and has agreed to engage in a transaction with the Seller for the purchase of BTC, to be accepted and deposited in Buyer's existing digital BTC Wallet(s).

      **R3.**    SELLER has provided its identifying information to Seller Mandate for Principal James Smith, namely a British Passport showing his date of birth and place of birth and passport number 532879412, which was issued on 06/23/2015 and expires on 06/23/2025.

      **R4.**    In accordance with applicable agreements, SELLER, has agreed to transfer through its connected commercial associates, financial authorities and institutional network, BTC directly to BUYER'S existing digital BTC wallet for review and acceptance upon proof that BUYER has transferred the Seller's Net BTC Purchase Amount *which includes* the Seller's Mandate Fee to Mandate Counsel as required on the related SALES PURCHASE AGREEMENT TO DELIVER BITCOINS WITH TRANSACTION CODE : 09222020343BVFR197568 (the "Sales Purchase Agreement") which is incorporated herein by reference and being executed substantially contemporaneously herewith this Agreement (collectively, the **"Transaction Agreements").** The Buyer and Seller agree that out of the total gross discount of 4% to the Buyer, 2% of the FACE VALUE OF ANY AND ALL BTC PURCHASE AMOUNT SENT TO THE MANDATE COUNSEL BY THE BUYER via wire transfer is due and owed in equal amount to Buyer side Broker and Seller side Broker to their designated Paymaster details to be provided to Seller's Mandate Counsel under separate cover via the WhatsApp chat established by those parties or email per the instructions of MANDATE COUNSEL herein.

      Excepting only the 1% MANDATE COUNSEL FEE to be deducted and held by the MANDATE COUNSEL and as provided in the Sales Purchase Agreement, the remaining NET BTC Purchase Amount shall be transferred by Mandate Counsel, as provided for in Paragraph 4, Section C of the Sales Purchase Agreement, wherein the BTC shall be sent on the date Buyer's funds are fully available in the Mandate Counsel's Interest on Lawyer's Trust Account (hereinafter "IOLTA"), and upon 6 block confirmations on www.blockchain.com Mandate Counsel shall be permitted to release funds to Mandate Counsel and Brokers after BTC delivery to Buyer and its acceptance under the terms set forth herein and in the fully executed SALES AND PURCHASE AGREEMENT referenced and incorporated herein as if fully set forth.

Upon Mandate Counsel's receipt of Buyer's wire transfer, and confirmation the funds are cleared in Mandate Counsel's IOLTA account, as confirmed in writing by Mandate Counsel's bank officer at Mandate Counsel's bank identified below, Mandate Counsel shall immediately send all net funds to Escrow Counsel at Escrow Counsel's bank identified below, and provide wire transfer receipts to Seller Mandate and Escrow Counsel, who will provide same to Seller (the **"Mandate Counsel Net Funds Transfer").** Upon receipt by Escrow Counsel of the Mandate Counsel Net Funds Transfer, the Seller will immediately send the BTC to the Buyer's designated wallet and provide notice of said BTC delivery to Seller Mandate and Mandate Counsel. The Seller and Buyer have agreed to

undertake an initial sale of 200 BTC, with a 5 BTC bonus not inclusive in any pricing calculations, as part of a 10,000 BTC minimum contract and Buyer is to send funds for this initial tranche <u>only</u> directly to Escrow Counsel at Escrow Counsel's designated account set forth below. For all separate tranches, Buyer is to send funds in the form of wire transfer to Mandate Counsel via the Account information set forth below herein at Chase Bank, N.A. The Seller and Buyer further warrant and agree that the funds for the remaining stipulated BTC in at least 200 BTC minimum tranches shall be sent by Buyer via wire transfer to the Mandate Counsel's account set forth below at the Chase Bank, N.A. unless otherwise agreed to in writing by the Seller and Buyer.

R5.    This Agreement is in connection with a secondary market purchase and sale transaction between a non-US person or his wholly owned entity, as Seller, a non-US institution, as Buyer, but through its accounts held and domiciled in the United States, that involves digital BTC currency. This purchase and sale transaction shall be deemed a private transaction pertaining to digital currency and is not intended to be, and shall not be, interpreted or construed as a public offer of purchase or sale of securities.

R6.    Buyer, Seller, and Escrow Counsel all hereby acknowledge and agree, as affirmed as undersigned below, that Mandate Counsel is legal counsel for Seller's Mandate, a Pennsylvania Limited Liability Company, and that no undertaking for legal services by Mandate Counsel, nor attorney-client relationship exists between Mandate Counsel and any among Buyer, Seller, or Escrow Counsel. Buyer, Seller, and Escrow Counsel further agree and acknowledge that all performance as governed by the Transaction Agreements, defined above as this Agreement and the Sales Purchase Agreement incorporated by reference, including but not limited to the disbursement of the transaction funds to Seller from the Mandate Counsel's IOLTA account, is strictly construed by the procedure set forth in the Transaction Agreements. As agreed to in the Sales Purchase Agreement between Seller and, for the avoidance of doubt, Buyer and Seller warrant and agree that payment for the BTC shall immediately be released to the Escrow Counsel from Mandate Counsel upon receipt from Buyer, and as set forth in the Transaction Agreements. Escrow Counsel warrants and affirms that upon receipt of the first tranche funds sent directly by Buyer, as well as any separate Mandate Counsel Net Funds Transfer, Escrow Counsel will hold all such funds in Trust as a fiduciary for the benefit of Buyer, and not release to any parties, until Buyer receives the BTC. Each of Seller, Buyer, and Escrow Counsel hereby agree and acknowledge to look exclusively to one another for all remedies, in both law and equity, for any failure to perform, and further indemnify and hold harmless Mandate Counsel and Seller's Mandate. Buyer, Seller, and Escrow Counsel all explicitly accept and consent to the exclusive jurisdiction the State and Federal Courts of the Commonwealth of Pennsylvania, Delaware County, USA in such state and federal courts which preside and exercise jurisdiction in and for Delaware County, Pennsylvania, for any and all claims by either Buyer, Seller, or Escrow Counsel, against Mandate Counsel or Seller's Mandate under both this AGREEMENT and the Sale's Purchase Agreement, and agree that any interpretation of this Agreement in regard to Escrow Counsel or Mandate Counsel shall exclusively be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of law principles. Buyer, Seller, and Escrow Counsel further expressly agree, warrant, and accept that the prevailing party in any such action brought against either Mandate Counsel, or Seller's Mandate shall be entitled to recover its reasonable costs and attorney's fees for enforcement of this AGREEMENT or incurred in defense of this Agreement, upon any order, decree, or award of judgment. By signing below, each of Buyer, Seller, and Escrow Counsel further agree and acknowledge that Mandate Counsel shall be entitled to, and any among Buyer, Seller, or Escrow Counsel shall be jointly and severally liable for Mandate Counsel's reasonable attorneys' fees should Mandate Counsel prevail in defending any claim brought against it in connection to the performance of Mandate Counsel's duties under the terms of this Agreement or otherwise in performance of its duties as Mandate Counsel; provided, however, that Mandate Counsel shall not be entitled for any loss, damage,

3

liability, expense, or attorneys' fees arising out of Mandate Counsel's gross negligence, willful misconduct, or failure to act in good faith. All interest earned on the funds held in the Mandate Counsel's IOLTA are duly allocated to the IOLTA Board of the Supreme Court of Pennsylvania, as authorized by the Statutes of the Commonwealth of Pennsylvania, which provide all interest for funds earned in IOLTA Accounts be applied to support the provision of civil legal services to the Commonwealth's poor and disadvantaged, as the Mandate Counsel is required to do under both Pennsylvania Rule of Professional Conduct 1.15 for funds for nominal and short-term fiduciary funds, as well as the IOLTA policies of JPMorgan Chase Bank, N.A., and Wells Fargo Bank, N.A. Buyer and Seller agree and acknowledge that the interest on any funds held in the IOLTA shall be allocated to the IOLTA Board of the Supreme Court of Pennsylvania, and shall be maintained in the Mandate Counsel's IOLTA until released pursuant to this Transaction Agreements.

R7. Escrow Counsel warrants and agrees that all funds sent to it by Buyer, including any Mandate Counsel Net Funds Transfer, shall be held in trust in Escrow Counsel's attorney account set forth below for the benefit of Buyer, and not released to any parties, until Buyer has received its BTC. Escrow Counsel agrees to return any funds received by Buyer, including any Mandate Counsel Net Funds Transfer, immediately to the party it received any such funds from within 24 hours should Seller fail to send any BTC as specified in the Transaction Agreements. Buyer, Seller, and Escrow Counsel shall consent to the governing law, interpretation of escrow, and other matters under as specified in this Agreement unless agreed separately otherwise. Regarding Buyer, Seller, and Escrow Counsel as it pertains to the interpretation of this Agreement, its governing law, forum, and the duties arising under Escrow Agent's duties fiduciary for the benefit of Buyer regarding Buyer's funds Escrow Counsel holds in Trust until BTC is sent as specified, Buyer, Seller, and Escrow Counsel choose to interpret this Agreement and specifically the duties of Escrow Counsel as if the Agreement is governed entirely under Malaysian law, and with the appropriate forum for any dispute resolution in Kuala Lumpur, Malaysia.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, with the foregoing recitals being incorporated herein and forming a part of this Agreement, the signatories intend to be legally bound as follows:

1.   Settlement Procedure. Mandate Counsel has entered into an engagement agreement with SELLER'S MANDATE outlining the scope of his engagement and that he represents SELLER'S MANDATE BVFR & ASSOCIATES, LLC % Dr, Jameson Lawrence, ESQ.. Pursuant to the written Sales Purchase Agreement between BUYER and SELLER, BUYER has agreed to send funds – excepting the first tranche - payable to KIRK LAW PLLC to MANDATE COUNSEL'S IOLTA account (hereinafter, the "KIRK LAW IOLTA") for the purchase of at least 200 BTC with rolls and extensions excluding the aforementioned 205 BTC TEST TRANCHE at market price minus the 2% NET discount to Buyer that shall be calculated based on the website www.blockchain.com as of 10PM EST on the date that the proffered Buyer funds are fully available in the KIRK LAW IOLTA. Upon receipt of any of Buyer's funds other than the 205 BTC test tranche sent directly to Escrow Counsel, Buyer and Seller acknowledge and agree that payment for the BTC shall be released by Mandate Counsel to Escrow Counsel upon receipt. Escrow Counsel shall not release to Seller or any parties any funds received by Buyer or Mandate Counsel Net Funds Transfer in its designated accounts as set forth in this Agreement until Buyer receives the BTC. The Buyer will confirm and acknowledge receipt of the applicable BTC pricing from Seller on the date of settlement for any and all BTC TRANCHES undertaken between the Buyer and Seller hereto so that the Mandate Counsel knows the exact amount due from Buyer, and the Buyer further agrees to provide Mandate Counsel with written confirmation via Adobe Sign as provided for in the Sales Purchase Agreement.

**2.**     **Wire Transfer Information for Licensed Pennsylvania Attorney.**  The wire transfer information for the Licensed Pennsylvania Attorney is as follows:

**Firm: KIRK LAW PLLC**
**Bank: CHASE BANK, N.A.**
**Routing - U.S. Wire: [REDACTED]**
**Bank Acct: [REDACTED]**
**PA Attorney Registration No: 308436**
**Law Office Address : 225 Wilmington West-Chester Pike, Suite 200**
         **Chadds Ford, PA 19317**
**Bank Branch Address.**
**6600 S MoPac Expy, Suite 1000, Austin TX 78749**
**Bank contact: Leticia Ibarra**
**Phone number: (512) 891-5204**

**3.**  **Wire Transfer Information for Escrow Counsel**

**NAME OF ACCOUNT**: Sabarudin  Othman & Ho
**ACCOUNT NO**: **[REDACTED]**
**SWIFT CODE**: **[REDACTED]**
**BANK**:  Hong Leong Bank Bhd
**BANK BRANCH ADDRESS**: No 32 Jalan Telawi 3, Bangsar Baru, 59100, Kuala Lumpur, Malaysia

**4.**     **Insurance and Licensing Information.  Mandate Counsel agrees, upon request, to provide proof of: (i) errors and omissions insurance; (ii) licensing to serve as an attorney in PENNSYLVANIA; and (iii) that the Licensed PENNSYLVANIA Attorney's IOLTA is maintained in a regulated attorney trust account for the benefit of its clients, and administered in accordance with the Transaction's Agreements.  Escrow Counsel agrees, upon request, to provide proof of: (i) errors and omissions insurance; (ii) licensing to serve as an attorney in the Federation of Malaysia; and (iii) that the Escrow Counsel's account provided above is maintained in a corporate account that provides for segregation of funds held for the benefit of clients and third party beneficiaries, and administered in accordance with the Transaction's Agreements.**

**NOW, THEREFORE, the Buyer, Seller, Mandate Counsel, and Escrow Counsel intending to be bound as of September___, 2020 execute this Agreement where provided below.  This Agreement may be executed in counterparts and a facsimile signature may be accepted the same as an original signature.**

**THIS CONTEMPLATED BTC TRANSACTION FOR AT LEAST THE INITIAL 205 BTC TRANCHE MUST BE EXECUTED AND COMPLETED WITHIN ___ BUSINESS DAYS OF THE DATE SET FORTH ABOVE (September _, 2020) OF SIGNING OR IT BECOMES NULL & VOID UNLESS OTHERWISE AGREED TO BY SELLER AFTER A 10% NON-PERFORMANCE FEE IS DEDUCTED FROM BUYER'S FUNDS IN THE EVENT BUYER FAILS TO SEND ALL REQUIRED FUNDS TO ESCROW COUNSEL OR MANDATE COUNSEL HEREIN WITHIN 24 HOURS OF THE EXECUTION OF THIS AGREEMENT AND THE RELATED BTC SALES AND PURCHASE AGREEMENT REFERENCED ABOVE.  THE SELLER ALSO AGREES TO PAY A 10% NON-PERFORMANCE FEE OF AT LEAST 20 BTC (OR WHATEVER AMOUNT THE PARTIES HERETO AGREE UPON FOR SETTLEMENT) IF THE BTC IS NOT DELIVERED WITHIN 24 HOURS OF MANDATE COUNSEL OR ESCROW COUNSEL'S RECEIPT OF FULLY CLEARED AND AVAILABLE FUNDS FROM BUYER.  FOR THE**

**AVOIDANCE OF DOUBT, BUYER AND SELLER WARRANT AND AGREE THAT PAYMENT FOR THE BTC SHALL NOT BE RELEASED TO SELLER OR ANY PARTIES, EXCEPTING THE SELLER'S MANDATE, BY THE MANDATE COUNSEL OR ESCROW COUNSEL FROM THE DESIGNATED ACCOUNTS AS SET FORTH IN THIS AGREEMENT FOR ADMINISTRATION OF FEES AND COMMISSIONS FROM SALE AND PURCHASE OF BITCOIN COMMODITY UNTIL THE BUYER RECEIVES THE BTC.**

**KIRK LAW PLLC**
**Mandate Counsel:**


By: _____
**JOHN KIRK, Esq., Founding Shareholder**
**KIRK LAW PLLC**
**SEEN AND AGREED:** 9/22/2020_____


**SABARUDIN OTHMAN & HO**
**Escrow Counsel:**


By: _____
**KENNETH GODFREY GOMES, PRINCIPAL**
**SABARUDIN OTHMAN & HO**
**SEEN AND AGREED:**   9/23/2020_____


FOR AND ON BEHALF OF THE SELLER:
**BULK BITCOIN TRADER LTD**


_____

**JAMES SMITH, PRINCIPAL**

**Date: September  23 , 2020**

**U.K. Passport#532879412**
**Issue Date: 06/23/2015**
**Expiry Date: 06/22/2025**

**FOR AND BEHALF OF THE BUYER:**
**ZAFTR, INC.**
**By:** _____

**Name: Mr. Nathan Montgomery**
**Title: Chief Executive Officer, President, and Sole Director**
**Canadian Passport #HD733314 expiring 07/21/2025**
**Date:   September 23, 2020**

**"ACCEPTED AND AGREED WITHOUT CHANGE (ELECTRONIC SIGNATURE IS VALID AND ACCEPTED SAME AS HAND SIGNATURE)"**
**EDT (Electronic Document Transmission)**
**EDT (Electronic document transmissions) shall be deemed valid and in respect of any provisions of this Contract. As applicable, this agreement shall be:**
1- **Incorporate U.S. Public Law106-229, ''Electronic Signatures in Global and National Commerce Act'' or such other applicable law conforming to the**
   **UNCITRAL Model Law on Electronic Signatures (2001) and**
2- **ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and**
   **Electronic Business (UN/CEFACT).**
3- **EDTdocumentsshallbesubjecttoEuropeanCommunityDirectiveNo.95/46/EEC, as applicable. Either Party may request the hard copy of**
   **any document that has been previously transmitted by electronic means provided, however, that any such request shall in no manner delay the parties from performingtheirrespectiveobligationsanddutiesunderEDTinstruments.**

# EXHIBIT F



225 WILMINGTON-WEST CHESTER PIKE
SUITE 200
CHADDS FORD, PA 19317
DISTRIBUTEDLAWGROUP.COM
TELEPHONE 512.360.0049

OCTOBER 16, 2020

**SENT VIA EMAIL**

Zaftr, Inc.
c/o Mr. Nathaniel Mark Montgomery
CEO & Sole Director
**Email**: Nathan@zaftr.com

Seller's confidential entity as defined herein
c/o Mr. James Smith
Director
**Email**: c/o Seller's Mandate, defined herein, drjbvfr@gmail.com

BVFR & Associates LLC
c/o Dr. Jameson Lawrence, Esq.
CEO & Managing Member
**Email**: drjbvfr@gmail.com

Sabarudin Othman & Ho
c/o Mr. Kenneth Godfrey Gomes
Managing Attorney
**Email**: gomesneth70@gmail.com

**Re**: <u>**Addendum to Agreement for Administration of Fees and Commissions from Sale and Purchase of Commodities**</u>

Dear Messrs. Montgomery, Smith, and Gomes:

Please find this letter addendum (this "**Addendum**") to a certain Agreement for Administration of Fees and Commissions dated September 23, 2020 referencing Private and Confidential Contract Code 09222020343BVFR197568 (the "**Administration Agreement**") as provided for and agreed by Kirk Law PLLC d/b/a Distributed Law Group, a Pennsylvania Professional Limited Liability Company with registered address of 225 Wilmington West Chester Pike, Suite 200, Chadds Ford, PA 19317 (the "**Firm**", "**DLG**", or "**Mandate Counsel**"),



Zaftr, Inc., a Canadian based Corporation duly organized under the laws of the Province of Alberta, Canada, and having principal place of business and Registered Office Address at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada, T2P 2V6 ("**Zaftr**" or "**Buyer**"), the Seller, as defined in the Previous Documents as defined in this Addendum *infra*, which is a business organized under the laws of the United Kingdom of Great Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London, United Kingdom, EC1V 2NX represented by Mr. James Smith as signatory, and the below mentioned Seller's Counsel as its legal counsel ( "**Seller**"), and Sabarudin, Othman & Ho, a law firm and its licensed attorney Kenneth Godfrey Gomes, in the Federation of Malaysia, 12-2, Jalan Telawi Dua, Bangsar Baru, 59100, Kuala Lumpur, Malaysia ( "**Seller's Counsel**" or "**Escrow Counsel**") as signatories to the Administration Agreement. Mandate Counsel is counsel to BVFR & Associates LLC, a Pennsylvania Limited Liability Company which is the Seller's Mandate (hereinafter "**BVFR**" or "**Seller's Mandate**") and authorized representative to deliver this Addendum to Seller. Seller's Counsel, Mandate Counsel, Seller's Mandate, Buyer, and Seller (collectively, the "**Parties**") agree to the provisions set forth in this Addendum.

     *WHEREAS*, the Parties incorporate by reference the Administration Agreement, and further incorporate by reference the Sales Purchase Agreement as defined in the Administration Agreement with transaction code 09222020343BVFR197568 (the "**Sales Purchase Agreement**") to modify the provisions thereto as provided in this Addendum as follows:

     1.     The units of commodities as specified in the Administration Agreement and Sales Purchase Agreement (collectively, the "**Previous Documents**") is hereby amended to reflect five-hundred-and-ten (510) units to be transferred by Seller to Buyer (the "**Revised Units**"), and Buyer and Seller further agree that the two-hundred-and-five (205) units referenced in Prior Documents have been paid for in full to Seller's Counsel to hold in trust as a fiduciary of Buyer.

     2.     Seller and Seller's Counsel amend the Previous Documents to guarantee delivery of the Revised Units upon receipt of the Additional Net Funds, as defined below, delivered by Mandate Counsel from its Attorney IOLTA account as follows:

**Firm: KIRK LAW PLLC**
**Bank: CHASE BANK, N.A.**
**Routing - [REDACTED]**
**Bank Acct: [REDACTED]**
**PA Attorney Registration No: 308436**
**Law Office Address : 225 Wilmington West-Chester Pike, Suite 200**
     **Chadds Ford, PA 19317**
**Bank Branch Address.**
**6600 S MoPac Expy, Suite 1000, Austin TX 78749**
**Bank contact: Leticia Ibarra**
**Phone number: (512) 891-5204**



3.      Seller's Counsel and Seller hereby modify the Escrow Counsel account as defined in the Administration Agreement to receive the Additional Net Funds to the following account for Seller's Counsel (hereinafter the "**Escrow Counsel Account**"):

### SABARUDIN OTHMAN & HO

> **BENEFICIARY NAME : CONJOIN-WIN INTERNATIONAL(H.K.) CO., LIMITED**
> **BENEFICIARY ADDRESS RM 2902 29/F HO KING COMM CTR 2-16 FA YUEN ST MONGKOK KLN HONG KONG**
> **ACCOUNT NO. : [REDACTED]**
>
> **SWIFT CODE : [REDACTED]**
>
> **BANK NAME : OVERSEA-CHINESE BANKING CORPORATION LIMITED**
> **BANK ADDRESS : OCBC BANK,65 CHULIA STREET#01- 00 OCBC CENTRE, SINGAPORE 049513**

4.      Seller and Seller's Counsel hereby agree and guarantee to Buyer that the Revised Units shall be sent to Buyer as per Buyer's instructions in the Previous Documents within 24 hours of receipt of the Additional Net Funds sent by Mandate Counsel, and the Parties hereby agree that Additional Net Funds means: any and all funds for the commodities sent as provided for in the Previous Documents which are sent by Mandate Counsel from the Chase Bank account specified in the Previous Documents, which funds are the lawful funds for the benefit of Buyer, and the receipt of which is accepted, agreed, acknowledged and guaranteed by Seller and Seller's Counsel shall constitute being "received" upon the date on which the receiving BANK for the Escrow Counsel Account can electronically identify that said funds are within its banking system, regardless of when the BANK for the Escrow Counsel Account posts or clears said funds to the Escrow Counsel Account, and for the avoidance of doubt does <u>not</u> mean when such funds have fully cleared or otherwise are fully available as previously provided for in the Administration Agreement, the terms providing for full clearance and availability are hereby replaced by this definition of Additional Net Funds in this Addendum.

5.      Seller and Seller's Counsel guarantee that the Revised Units, and any such further units to be sent as provided for in this Addendum and the Previous Documents upon Seller's Counsel receiving the Additional Net Funds from Mandate Counsel (the "**Subsequent Units**") shall be sent no later than twenty-four (24) hours after receiving Additional Net Funds from Mandate Counsel.  Failure to transfer Revised Units or Subsequent Units within twenty-four hours after receiving Additional Net Funds from Mandate Counsel shall be a material breach, and Buyer shall be entitled to all remedies provided for in the Previous Documents.

6.      The Parties agree and incorporate the jurisdiction, venue, governing law, and remedies specifically as applicable to the Firm and BVFR as provided for in the Previous Documents.



*WHEREFORE*, for good and valuable consideration, the sufficiency for which the Parties hereby acknowledge by signing this Addendum as set forth herein, the terms of this Addendum hereby modified the Previous Documents as set forth herein.

[SIGNATURE PAGE FOLLOWS]

KIRK LAW PLLC

BY: _____

John A. Kirk, Esq.
**Founding Shareholder**

**Date:** 10.21.2020 _____

BVFR & ASSOCIATES, LLC

BY: _____
<span style="font-size:small">Dr. Jameson Lawrence, ESQ./CEO (Oct 21, 2020 11:27 EDT)</span>

Dr. Jameson Lawrence, Esq.
**CEO & Managing Member**

Oct 21, 2020

**Date:** _____



DISTRIBUTED LAW GROUP

SELLER – a confidential entity verified by Seller's Counsel

**BY:** _____

**MR. JAMES SMITH**
**DIRECTOR**

**DATE: 18/10/2020**


ZAFTR, INC


BY: _____
Nathaniel Mark Montgomery
**CEO, President, and Sole Director**
          Oct 21, 2020
**Date:** _____


**SABARUDIN OTHMAN & HO**


BY: _____
MR. KENNETH GODFREY GOMES
**MANAGING ATTORNEY**

**DATE: 18/10/2020**