### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZAFTR INC. n/k/a SVELLA FINANCIAL CORP. | : : : | CIVIL ACTION |
| | : | NO. 21-2177 |
| Plaintiff, | : : | |
| v. | : : | JURY TRIAL DEMANDED |
| KEVIN JAMESON LAWRENCE, ESQUIRE; BVFR & ASSOCIATES, LLC; JOHN KIRK, ESQUIRE AND KIRK LAW PLLC | : : : : | ORAL ARGUMENT REQUESTED |
| | : : | |
| Defendants. | : : : | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNT I OF THE COMPLAINT**

Plaintiff Zaftr Inc. ("Zaftr" or "Plaintiff"), by and through its undersigned counsel, submits this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment as to Count I of the Complaint (the "Motion"), against Defendants BVFR & Associates, LLC ("BVFR") and Kevin Jameson Lawrence, Esquire (collectively the "Lawrence Defendants"), and John Kirk, Esquire and Kirk Law PLLC (collectively, the "Kirk Defendants").[1]

### A. The Parties And Their Contemplated Transactions

1. Plaintiff Zaftr is a company incorporated in Canada, located at 2500, 500 4 Avenue Southwest, Calgary, Alberta, Canada. **Ex. 6**, Compl. ¶ 4 (MSJ-APP-01257); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 4 (MSJ-APP-01371); **Ex. 33**, Lawrence Defendants' Ans. to Compl. ¶ 4 (MSJ-APP-01477).

2. Zaftr is engaged in the business of buying and selling digital currency, primarily Bitcoin. *See* **Ex. 1**, Deposition Transcript of Nathan Montgomery ("Montgomery Tr.") at 15:13-16:9 (MSJ-APP-00015).

3. Nathan Montgomery serves as Zaftr's CEO. *Id*.

4. At all relevant times, Zaftr was a FINTRAC regulated company, which is Canada's regulator for financial institutions and money services businesses. *Id*. at 17:10-15 (MSJ-APP-00017).

5. Defendant Kevin Jameson Lawrence, Esquire ("Lawrence") is an attorney who was licensed to practice law in the Commonwealth of Pennsylvania. **Ex. 6**, Compl. ¶ 5 (MSJ-APP-01257); **Ex. 33**, Lawrence Defendants' Ans. to Compl. ¶ 5 (MSJ-APP-01477).

---

[1] All citations to Exhibits herein are references to the exhibits in the Joint Appendix of Exhibits to the Parties' Motions for Summary Judgment, which is being contemporaneously filed herewith.

6.	Lawrence is the CEO & Managing Member of Defendant BVFR & Associates, LLC ("BVFR"), a Pennsylvania Limited Liability Company.  **Ex. 6**, Compl. ¶ 6 (MSJ-APP-01257); **Ex. 33**, Lawrence Defendants' Ans. to Compl. ¶ 6 (MSJ-APP-01477).

7.	Defendant John Kirk, Esquire ("Kirk") is an attorney licensed to practice law in the Commonwealth of Pennsylvania.  **Ex. 6**, Compl. ¶ 7 (MSJ-APP-01257); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 7 (MSJ-APP-01371); **Ex. 33**, Lawrence Defendants' Ans. to Compl. ¶ 7 (MSJ-APP-01477).

8.	Defendant Kirk is the Founding Shareholder of Defendant Kirk Law PLLC d/b/a Distributed Law Group ("Kirk Law"), a law firm organized as a Pennsylvania Limited Liability Company.  **Ex. 6**, Compl. ¶¶ 7-8 (MSJ-APP-01257); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶¶ 7-8 (MSJ-APP-01371); **Ex. 33**, Lawrence Defendants' Ans. to Compl. ¶¶ 7-8 (MSJ-APP-01477).

9.	Mr. Montgomery was first introduced to Defendants Lawrence and Kirk on August 19 or 20, 2020.  *See* **Ex. 1**, Montgomery Tr. at 21:19-22:12 (MSJ-APP-00021).

10.	Mr. Montgomery was informed that Defendants were looking to sell Bitcoins.  *Id*.

11.	Given the difficulty of finding reliable counterparties for cryptocurrency transactions, Mr. Montgomery was initially pleased to be dealing with two American lawyers:

> I had two American lawyers, one lawyer turned successful investment banker, as I later heard, and a doctor at that, who had a seller that they said is ready to go, and they were just looking for the right buyer.

**Ex. 1**, Montgomery Tr. at 22:15-23:2 (MSJ-APP-00022).

12.	In terms of the role of Defendants Lawrence and Kirk with respect to the parties' contemplated transactions, Mr. Montgomery understood that: "John Kirk was acting for and on behalf of BVFR and that BVFR had the full right to negotiate and act for its seller." *Id*. at 23:3-9 (MSJ-APP-00023).

13. Defendant Kirk would have a "dual role of holding the funds in escrow and acting as counsel for BVFR." *Id*. at 23:21-22 (MSJ-APP-00023).

14. Defendant Lawrence would be "the face and the voice of the seller." *Id*. at 24:23-24 (MSJ-APP-00024).

15. Defendant Lawrence claimed that "[h]e had authority to negotiate terms on behalf of the seller." *Id*. at 24:24-25:1 (MSJ-APP-00024).

16. Mr. Montgomery was "never allowed to communicate with the seller, despite many requests to do so over the course of the transactions." *Id*. at 25:1-3 (MSJ-APP-00025).

17. Defendant Lawrence "was the one providing all signatures, providing all information and representations for the seller." *Id*. at 25:4-6 (MSJ-APP-00025).

18. Mr. Montgomery's role "was to pay for the Bitcoins," and on behalf of Zaftr, he "needed to make sure [he] was comfortable with the transaction." *Id*. at 25:11-13 (MSJ-APP-00025).

19. Mr. Montgomery came to learn that the Seller was an individual named James Smith, working through his company, BBT. **Ex. 1**, Montgomery Tr. at 27:8-28:4 (MSJ-APP-00027).

20. Defendant Lawrence brought James Smith to Mr. Montgomery. *See* **Ex. 3**, Deposition Transcript of Kevin Jameson Lawrence ("Lawrence Tr.") at 171:18-172:1 (MSJ-APP-00963).

21. In connection with the parties' contemplated transactions, Zaftr sought to confirm the identities of James Smith and BBT as well as their ability to perform the contemplated transactions. **Ex. 1**, Montgomery Tr. at 28:5-15 (MSJ-APP-00028).

22. With respect to verifying BBT, Zaftr performed a corporate records search on BBT, which confirmed with the company's house registry in the U.K. that James Smith was the sole owner and sole director of BBT, and that it was in good standing in the U.K. *Id*. at 28:19-29:5 (MSJ-APP-00028).

23. With respect to verifying the identity of James Smith through his passport, there were several acceptable methods under Canada's FINTRAC requirements. **Ex. 1**, Montgomery Tr. at 33:14-20 (MSJ-APP-00033).

24. "[O]ne of them involved notarized copies, one of them involved video conference and showing it, and another … was to have a professional agent attest to the validation of that." *Id*. at 33:20-24 (MSJ-APP-00033).

25. As Defendant Lawrence was an attorney, he would qualify as a professional agent to attest to the validation of James Smith's passport through a limited purpose agency agreement. *Id*. at 33:24-34:24 (MSJ-APP-00033).

26. Mr. Montgomery advised Defendants as to the different acceptable methods for verifying the identity of James Smith through his passport, and "the Defendants advised [Mr. Montgomery] that the limited purpose agency process was preferred." *Id*. at 41:3-10 (MSJ-APP-00041).

**B. Zaftr Enters Into A Limited Purpose Agency Agreement With Defendants Lawrence And BVFR To Verify The Identity Of James Smith Through His Passport.**

27. In connection with the parties' contemplated transactions for the sale of Bitcoin, Zaftr entered into a Limited Purpose Agency Agreement (the "ID Verification Agreement") with Defendants Lawrence and BVFR. *See* **Ex. 10**, ID Verification Agreement (MSJ-APP-01352).

28. The purpose of the ID Verification Agreement was to verify, for the benefit of Zaftr, the identity of the Bitcoin seller, James Smith, through his passport. **Ex. 3**, Lawrence Tr. at 176:13-19 (MSJ-APP-00968); **Ex. 2**, Deposition Transcript of John Kirk ("Kirk Tr.") at 198:3-200:2 (MSJ-APP-00558); 345:2-346:1 (MSJ-APP-00705).

29. The ID Verification Agreement provided that it:

> establishes a Limited Purpose Agency Agreement ('Agreement') for the limited purpose of assisting Zaftr, Inc., a Canadian based Corporation duly organized under the laws of the Province of Alberta and having principal place of business and Registered Office Address at Suite 2500, 500 4th Ave., Calgary, Alberta, Canada, T2P 2V6 ('Zaftr') *for Identify Verification for ascertaining the identity of a certain Individual*, defined below (the 'Identity Verification').

**Ex. 10**, ID Verification Agreement at 1 (MSJ-APP-01353).

30. As set forth in the Agreement:

> BVFR, by way of its CEO and Managing Member, Dr. Jameson Lawrence, Esq., undersigned below, agrees and accepts to act as a limited purpose agent of behalf of Zaftr, and its affiliates, successors and assigns for the purpose of Identity Verification, specifically regarding the below defined Individual.

*Id*. (MSJ-APP-01353).

31. The Individual in question was identified as follows:

> Mr. James Smith, known to BVFR as a citizen of the United Kingdom of Great Britain and Northern Ireland, and Director of Bulk Bitcoin Trader Ltd. (the 'Company Identified') a private limited company organized under the laws of the United Kingdom of Great Britain and Northern Ireland, with Registered Office at Kemp House 160 City Road, London, United Kingdom, EC1V 2NX.

*Id*. at 2 (MSJ-APP-01354).

32. With respect to the passport of the Individual, the Agreement provided: "BVFR shall provide to Zaftr a high-quality photographic copy of the Individual's Passport, by way of its Counsel, John A. Kirk, Esq, as provided below." *Id*. (MSJ-APP-01354).

6

33. The Passport being verified was specifically identified as follows:

> The Passport, as defined in this Agreement, means a certain passport, known to BVFR to issued by the United Kingdom of Great Britain and Northern Ireland, with issuance number 532879412, and an expiry date of June 23rd, 2025, will be provided to Zaftr via email from BVFR's counsel on the date of this Addendum, and Zaftr shall reciprocally provide the passport of its undersigned Chief Executive Officer on the same date of this Addendum.

*Id.* (MSJ-APP-01354).

34. As set forth on page 3 of the ID Verification Agreement, it was executed on August 24, 2020, by Mr. Montgomery on behalf of Zaftr, and Defendant Lawrence on behalf of Defendant BVFR. *Id.* at 3 (MSJ-APP-01355).

35. At the direction of Defendant Lawrence, Defendant Kirk provided the purported passport of James Smith to Zaftr in connection with the signing of the ID Verification Agreement, which Kirk sent to Zaftr via email. **Ex. 2**, Kirk Tr. at 195:16-196:3 (MSJ-APP-00555); **Ex. 3**, Lawrence Tr. at 341:23-342:15 (MSJ-APP-01134); **Ex. 18**, 8/25/20 Email from Kirk to Montgomery Encl. James Smith Passport (MSJ-APP-01420).

36. Zaftr relied on Defendant Lawrence and Defendant BVFR verifying the identity of James Smith through his passport, via the ID Verification Agreement, in proceeding with the parties' transactions. **Ex. 1**, Montgomery Tr. at 174:16-175:9 (MSJ-APP-000174).

37. Zaftr never would have proceeded with the parties' contemplated transactions had Zaftr known that the purported passport of James Smith was fraudulent. **Ex. 3**, Lawrence Tr. at 362:8-365:2 (MSJ-APP-01154); **Ex. 2**, Kirk Tr. at 345:2-346:1 (MSJ-APP-00705).

**C. After Defendants Lawrence And BVFR Enter Into The ID Verification Agreement, <u>Zaftr Agrees To Sign The Parties Related Agreements.</u>**

**1. Zaftr Enters Into The Sales Purchase Agreement to Deliver Bitcoins.**

38. On August 25, 2020, Zaftr entered into the Sales Purchase Agreement to Deliver

7

Bitcoins (the "Purchase Agreement"). *See* **Ex. 7**, Purchase Agreement (MSJ-APP-01333).

39. The Agreement provided for the purchase by Zaftr of multiple tranches of Bitcoin from James Smith and BBT. *Id*. (MSJ-APP-01333).

40. Under the Purchase Agreement, Zaftr would purchase an aggregate of 10,000 BTC in tranches, with a minimum of 200 BTC per tranche. *Id*. ¶ 1 (MSJ-APP-01334).

41. The Purchase Agreement provided that Zaftr would send payment to the Kirk Defendants, who would act as escrow agent. *Id*. ¶ 4 (MSJ-APP-01335).

42. BVFR, acting through Lawrence, was BBT's Mandate, and Kirk was BBT's Mandate Counsel (*i.e.*, he was counsel to BVFR). *Id*. (MSJ-APP-01335).

43. The funds were to be held in escrow with the Kirk Defendants until the Bitcoin was delivered. *Id*. (MSJ-APP-01335).

44. The Purchase Agreement further provided that the Kirk Defendants would not release payment to the Seller until after Zaftr had received the Bitcoin. *Id*. ¶ 4(c) (MSJ-APP-01335) ("**payment for the BTC shall not be released to the Seller by the Mandate Counsel from the designated accounts as set forth in the related Administration Agreement until Buyer receives the BTC**.") (emphasis in original).

45. Additionally, under the Purchase Agreement, each party agreed to a non-performance fee of 10% of the tranche amount if any party defaulted in its respective payment obligations under the Purchase Agreement (the "Non-Performance Fee"). *Id*. (MSJ-APP-01335.

**2. Zaftr Enters Into The Agreement For Administration Of Fees And Commissions From Sale And Purchase Of Bitcoin Commodity.**

46. On August 25, 2020, Zaftr entered into the Agreement For Administration Of Fees And Commissions From Sale And Purchase Of Bitcoin Commodity (the "Escrow Agreement"). *See* **Ex. 8**, Escrow Agreement (MSJ-APP-01340).

8

47.     The Escrow Agreement was signed by Zaftr and the Kirk Defendants. *Id*. at 5 (MSJ-APP-01345).

48.     The Escrow Agreement affirmed that Defendants Lawrence and BVFR had engaged Defendant Kirk to represent Defendants Lawrence and BVFR in connection with the parties' contemplated transactions. *Id*. at 1 (MSJ-APP-01341).

49.     Pursuant to the Escrow Agreement, the Kirk Defendants would receive the funds from Zaftr for the purchase of Bitcoin and would retain a one-percent fee for acting as Defendant Lawrence's and Defendant BVFR's counsel. *Id*. (MSJ-APP-01341).

50.     Notably, as with the Purchase Agreement, the Escrow Agreement provided that the purchase funds from Zaftr were not to be released to the Seller until delivery of the Bitcoin to Zaftr:

> Excepting only the 1% MANDATE COUNSEL FEE to be deducted and held by the MANDATE COUNSEL and as provided in the Sales Purchase Agreement, the remaining NET BTC Purchase Amount shall be transferred by Mandate Counsel, as provided for in Paragraph 4, Section C of the Sales Purchase Agreement, wherein the BTC shall be sent on the date Buyer's funds are fully available in the Mandate Counsel's Interest on Lawyer's Trust Account (hereinafter "IOLTA"), and upon 6 block confirmations on www.blockchain.com ***Mandate Counsel shall be permitted to release the funds to Seller and Brokers <u>after</u> BTC delivery to Buyer*** and its acceptance under the terms set forth herein and in the fully executed SALES AND PURCHASE AGREEMENT referenced and incorporated herein as if fully set forth.

*Id*. at ¶ R4 (MSJ-APP-01342) (emphasis added).

51.     The Purchase Agreement was incorporated into the Escrow Agreement "as if fully set forth." *Id*. (MSJ-APP-01342).

9

**3. Zaftr Enters Into Addendum To The Agreement For Administration Of Fees And Commissions From Sale And Purchase Of Bitcoin Commodity.**

52. On August 24, 2020, Zaftr entered into the Addendum to Agreement for Administration of Fees and Commissions from Sale and Purchase of Bitcoin Commodity (the "BVFR Side Letter Agreement"). *See* **Ex. 9**, BVFR Side Letter Agreement (MSJ-APP-01347).

53. The BVFR Side Letter Agreement was signed by Zaftr, the Kirk Defendants, and the Lawrence Defendants. *Id*. at 4 (MSJ-APP-01351).

54. The BVFR Side Letter Agreement provided that the purchase funds from Zaftr were not to be released by Defendants to the Seller, or any third party, until after delivery of the Bitcoin to Zaftr had occurred:

> ***Mandate Counsel, further has agreed in the Administration Agreement not to release any of the funds sent by Zaftr*** *to the Firm's IOLTA agreement **to any parties**, excepting BVFR for its Mandate Fee, **until the BTC has been sent as provided for in the Transaction Agreements***.

*Id*. at 2 (MSJ-APP-01349) (emphasis added).

55. The BVFR Side Letter Agreement also provided:

> By way of this Addendum, the Firm represents and warrants to Zaftr that should the BTC not be sent within 24 hours of Zaftr's funds being sent to the Firm's IOLTA and successfully cleared in the IOLTA as provided for in the Transaction Agreements (the "Default Period"), that all funds sent to the IOLTA – excepting the Mandate Fee – shall be returned to the account which Zaftr originated its funds from within one business day.
>
> …
>
> In regard to the Mandate Fee, BVFR separately represents and warrants by way of this Addendum that it shall return the Mandate Fee to the Firm's IOLTA, less the Breakup Fee as defined herein within one business day of the Default Period in the event the BTC is not sent as provided in the Transaction Documents in order to allow the Firm to separately return the balance of the Mandate Fee to Zaftr. The Firm represents and warrants that all of BVFR's Mandate Fee funds returned to the IOLTA shall be promptly returned to the account which Zaftr originated its funds from within one business day of the Firm receiving them back from BVFR in the event the

Default Period occurs.

*Id*. at 2-3 (MSJ-APP-01349).

56.     The Escrow Agreement was incorporated into the BVFR Side Letter Agreement by reference.  *See id*. (MSJ-APP-01349) ("You [Zaftr] and DLG [Kirk Law] mutually agree to amend the terms of the Administration Agreement, the terms of which are incorporated by reference herein, to reflect further representations and warranties outside of the scope of the Administration Agreement.").

57.     The agreements attached as Exhibits A through F of Plaintiff's Complaint are true and accurate copies of the parties' Agreements.  **Ex. 3**, Lawrence Tr. at 315:3-24 (MSJ-APP-01107); **Ex. 2**, Kirk Tr. at 109:17-110:9 (MSJ-APP-00469); 274:9-277:18 (MSJ-APP-00634); 305:16-306:5 (MSJ-APP-00665); 312:13-314:1 (MSJ-APP-00672).

### D. Zaftr Begins Paying For Bitcoin Under The Parties Agreements, Defendants Make Secret Payments To Bank Accounts At The Direction Of The Seller In Violation Of The Parties' Agreements, And Zaftr Never Receives Any Bitcoin.

58.     On August 25, 2020, Lawrence, on behalf of Smith and BBT, fixed the purchase price for the first tranche of 200 Bitcoin at $2,254,514 (the "August Tranche").  **Ex. 6**, Compl. ¶ 24 (MSJ-APP-01260); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 24 (MSJ-APP-01373).

59.     Consequently, Zaftr sent $2,254,514 to the Kirk Defendants, and Kirk confirmed receipt of the funds.  **Ex. 6**, Compl. ¶ 25 (MSJ-APP-01260); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 25 (MSJ-APP-01373).  *See also* **Ex. 3**, Lawrence Tr., at 246:9-247:13 (MSJ-APP-01038).

60.     Despite having paid in full for the first tranche of 200 Bitcoin under the parties' Agreements, Zaftr did not receive any of the Bitcoin.  *See* **Ex. 2**, Kirk Tr. at 271:3-21 (MSJ-APP-00631); **Ex. 3**, Lawrence Tr. at 292:9-293:12 (MSJ-APP-01084).

61.     However, *at the Seller's direction*, Defendants transferred a portion of Zaftr's purchase funds to a bank account identified by the Seller under the name "A.E. Consult LLC."

**Ex. 3**, Lawrence Tr. at 248:20-250:6 (MSJ-APP-01040); **Ex. 2**, Kirk Tr. at 370:9-371:8 (MSJ-APP-00730); **Ex. 14**, Kirk Answers to Zaftr's Interrogatories at Response #9 (MSJ-APP-01398).

62.     The next day, Defendants recalled that payment, and then made another payment, in the same amount, *at the Seller's direction, to a different bank account identified by the Seller*, under the name "Nationwide Finance LLC."  **Ex. 3**, Lawrence Tr. at 251:4-253:1 (MSJ-APP-01043); **Ex. 2**, Kirk Tr. at 370:14-372:10 (MSJ-APP-00730); **Ex. 14**, Kirk Answers to Zaftr's Interrogatories at Response #9 (MSJ-APP-01398).

63.     These payments in August 2020 by Defendants, *made at the Seller's direction*, *to bank accounts identified by the Seller*, *were sent without Zaftr's knowledge.*  **Ex. 1**, Montgomery Tr. at 237:22-238:8 (MSJ-APP-00237).

64.     These secret payments by Defendants, to bank accounts identified by the Seller, using Zaftr's purchase funds, were sent in violation of the Purchase Agreement.  *See* **Ex. 7**, Purchase Agreement at ¶ 4(c) (MSJ-APP-01335) ("payment for the BTC shall not be released to the Seller by the Mandate Counsel from the designated accounts as set forth in the related Administration Agreement until Buyer receives the BTC").

65.     These secret payments by Defendants, to bank accounts identified by the Seller, using Zaftr's purchase funds, were sent in violation of the Escrow Agreement.  *See* **Ex. 8**, Escrow Agreement at ¶ R4 (MSJ-APP-01342) ("Mandate Counsel shall be permitted to release the funds to Seller and Brokers after BTC delivery to Buyer").

66.     These secret payments by Defendants, to bank accounts identified by the Seller, using Zaftr's purchase funds, were sent in violation of the BVFR Side Letter Agreement.  *See* **Ex. 9**, BVFR Side Letter Agreement at 2 (MSJ-APP-01349) ("Mandate Counsel, further has agreed in the Administration Agreement not to release any of the funds sent by Zaftr to the Firm's IOLTA

agreement to any parties, excepting BVFR for its Mandate Fee, until the BTC has been sent as provided for in the Transaction Agreements").

67. Had Zaftr known of these secret payments at the time they were made, Zaftr would have immediately requested the return of all of its purchase funds, and would not have proceeded with any of the transactions with Defendants. **Ex. 1**, Montgomery Tr. at 237:22-241:7 (MSJ-APP-00237).

68. Zaftr was not made aware of these secret payments by Defendants to Seller-designated bank accounts, using Zaftr's purchase funds, before any Bitcoin was delivered to Zaftr, and so Zaftr continued to proceed with the parties' transactions unaware of these breaches of the parties' Agreements. **Ex. 1**, Montgomery Tr. at 237:22-241:7 (MSJ-APP-00237).

69. Various excuses were given for the failures to send Zaftr the Bitcoin for which it paid. **Ex. 2**, Kirk Tr. at 277:19-279:4 (MSJ-APP-00637); **Ex. 1**, Montgomery Tr. at 66:2-67:1 (MSJ-APP-00066).

70. On or around September 1, 2020, Defendants Lawrence and BVFR advised Zaftr that the Seller would supposedly complete the agreed upon transaction if a different procedure were utilized. **Ex. 6**, Compl. ¶ 27 (MSJ-APP-01261); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 27 (MSJ-APP-01373); **Ex. 2**, Kirk Tr., at 287:18-288:15 (MSJ-APP-00647).

71. A new procedure proposed by Defendants involved a law firm in Malaysia: Sabarudin, Othman & Ho ("SOH"), represented by Kenneth Gomes ("Gomes"). **Ex. 1**, Montgomery Tr. at 76:4-77:11 (MSJ-APP-00076); **Ex. 2**, Kirk Tr., at 287:18-288:15 (MSJ-APP-00647).

72. Under the new procedure, SOH would act as an escrow intermediary. **Ex. 2**, Kirk Tr., at 288:16-24 (MSJ-APP-00648).

73. Defendant Lawrence advised Zaftr that Defendants Lawrence and BVFR had previously worked with Gomes, as well as Gomes' Bitcoin miner.  **Ex. 2**, Kirk Tr., at 289:1-9 (MSJ-APP-00649).

74. To convince Zaftr of the legitimacy of the transaction, Lawrence advised Zaftr that he had vetted the SOH bank account "years ago" and that Gomes was the signatory on the account as well as the managing partner of SOH.  **Ex. 6**, Compl. ¶ 29 (MSJ-APP-01261); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 29 (MSJ-APP-01374).

75. All contact information for Gomes was provided through Lawrence, and Lawrence instructed Plaintiff that Lawrence would manage all communication involving Gomes.  **Ex. 6**, Compl. ¶ 29 (MSJ-APP-01261); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 29 (MSJ-APP-01374).

76. On September 4, 2020, Kirk Law returned $1,886,977.60 to Zaftr from the failed August Tranche.  **Ex. 6**, Compl. ¶ 30 (MSJ-APP-01261); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 30 (MSJ-APP-01374).

77. The remaining $367,536.40 was retained by Lawrence and BVFR, subject to the anticipated successful completion of the parties' contemplated transaction involving the first tranche of 200 BTC.  **Ex. 6**, Compl. ¶ 30 (MSJ-APP-01261); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 30 (MSJ-APP-01374).

78. Zaftr was not advised that a portion of the purchase funds not returned had been distributed to Seller-designated bank accounts at the Seller's direction. **Ex. 3**, Lawrence Tr. at 248:20-253:1 (MSJ-APP-01040); **Ex. 2**, Kirk Tr. at 370:9-372:10 (MSJ-APP-00730); **Ex. 14**, Kirk Answers to Zaftr's Interrogatories at Response #9 (MSJ-APP-01398).

79. On September 23, 2020, Zaftr, BBT, SOH, and Kirk Law entered into another agreement (the "Second Escrow Agreement"). **Ex. 2**, Kirk Tr., at 293:5-20 (MSJ-APP-00653).

80. A true and correct copy of the Second Escrow Agreement is included in the Joint Appendix as **Ex. 11** (MSJ-APP-01356).

81. A true and correct copy of the Addendum to the Second Escrow Agreement is included in the Joint Appendix as **Ex. 12** (MSJ-APP-01364).

82. SOH agreed to act as the escrow attorney using its account at Hong Leong Bank as the escrow account. **Ex. 2**, Kirk Tr., at 293:5-20 (MSJ-APP-00653).

83. Under this new arrangement, Smith would send Zaftr 205 BTC upon receipt of payment for a new tranche in the amount of $2,051,479.08 (the "September Tranche"). *Id.* at 294:6-16 (MSJ-APP-00654).

84. This represented 200 BTC for the first tranche, plus an additional 5 BTC towards the Non-Performance Fee for BBT's failure to close the August Tranche. *Id.* 294:17-24 (MSJ-APP-00654).

85. Three additional payments of 5 BTC each were promised to be delivered to Zaftr with the following three tranches. *Id.* at 295:1-9 (MSJ-APP-00655).

86. The same day, Zaftr sent $1,683,942.68 to the SOH account. **Ex. 6**, Compl. ¶ 33 (MSJ-APP-01262); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 33 (MSJ-APP-01374).

87. This agreed-upon amount was the fixed value of the BTC for the September Tranche, less the $367,536.40 BVFR had kept in connection with the August Tranche. **Ex. 6**, Compl. ¶ 33 (MSJ-APP-01262); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 33 (MSJ-APP-01374). *See also* **Ex. 2**, Kirk Tr., at 295:10-296:15 (MSJ-APP-00655).

88. Despite paying in full for the September Tranche, Zaftr did not receive any of the Bitcoin. **Ex. 2**, Kirk Tr., at 259:23-260:12 (MSJ-APP-00619); **Ex. 3**, Lawrence Tr. at 184:4-185:12 (MSJ-APP-00976).

89. On October 16, 2020, the Lawrence Defendants told Zaftr that BBT had proposed yet another adjustment to the plan. **Ex. 2**, Kirk Tr., at 315:22-317:7 (MSJ-APP-00675).

90. Defendants told Plaintiff that if Plaintiff would lock-in and send funds for a *further* tranche of 305 Bitcoin (including 5 Bitcoin towards the August Tranche Non-Performance Fee), BBT would then deliver the full 510 Bitcoin immediately upon the funds arriving at the bank and without the requirement for the funds to clear. **Ex. 2**, Kirk Tr., at 315:22-317:7 (MSJ-APP-00675).

91. On October 23, 2020, Defendant Lawrence set the price of the second tranche (the "October Tranche") of Bitcoin at $3,668,745.00. **Ex. 6**, Compl. ¶ 43 (MSJ-APP-01263); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 43 (MSJ-APP-01375).

92. Zaftr sent the funds to the Kirk Defendants pursuant to the parties' new agreement. **Ex. 6**, Compl. ¶ 43 (MSJ-APP-01263); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 43 (MSJ-APP-01375).

93. Defendant Kirk wired $3,095,120.70 to the OCBC account from the Chase bank account of Defendant Kirk Law. **Ex. 2**, Kirk Tr., at 323:4-11 (MSJ-APP-00683).

94. "The Lawrence Defendants retained $573,624.30 as their payment for the new transaction, which included $36,687.45 for the 1% Kirk Law fee." **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 44 (MSJ-APP-01375).

95. Yet again, however, despite having paid in full for the October Tranche of Bitcoin, Zaftr did not receive any of the Bitcoin under the parties' Agreements. **Ex. 2**, Kirk Tr., at 259:23-260:12 (MSJ-APP-00619); **Ex. 3**, Lawrence Tr. at 184:4-185:12 (MSJ-APP-00976).

### E. Defendants Refuse To Return The Purchase Funds To Zaftr, And Zaftr Learns That The Purported Passport Of James Smith Is Fraudulent.

96. The BVFR Side Letter Agreement required that Defendants return Zaftr's purchase funds if the BTC Zaftr paid for was not delivered. *See* **Ex. 9**, BVFR Side Letter Agreement at 2-3 (MSJ-APP-01349).

97. Having paid for but not received any Bitcoin, on November 14, 2020, Zaftr requested that Defendants return all of the purchase funds within their possession that Zaftr had paid for the Bitcoin it never received. **Ex. 2**, Kirk Tr., at 379:12-381:18 (MSJ-APP-00739); **Ex. 29**, 11/14/20 E-Mail Re: Zaftr/Bulk Bitcoin Trader - Return of Funds (MSJ-APP-01467).

98. In response, the Kirk Defendants returned only $36,687.45 of Zaftr's funds. **Ex. 1**, Montgomery Tr. at 243:11-21 (MSJ-APP-00243).

99. The Kirk Defendants continue to hold onto $111,312.35 of Zaftr's purchase funds. **Ex. 14**, Kirk Answers to Zaftr's Interrogatories at Response #18 (MSJ-APP-01401).

100. The Lawrence Defendants refused to return any of Zaftr's funds. **Ex. 1**, Montgomery Tr. at 243:22-244:9 (MSJ-APP-00243); **Ex. 3**, Lawrence Tr. at 358:12-16 (MSJ-APP-01150).

101. In total, Zaftr paid a net amount of $5,683,536.63 for Bitcoin that it never received. **Ex. 3**, Lawrence Tr. at 185:4-12 (MSJ-APP-00977); **Ex. 2**, Kirk Tr. at 294:6-16 (MSJ-APP-00654); Ex. 6, Compl. ¶ 43 (MSJ-APP-01263); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 43 (MSJ-APP-01375).

102. This amount reflects the $2,051,479.08 that Zaftr paid for the September Tranche of Bitcoin (*see* **Ex. 2**, Kirk Tr. at 294:6-16 (MSJ-APP-00654)), plus the $3,668,745.00 that Zaftr paid for the October Tranche of Bitcoin (*see* **Ex. 6**, Compl. ¶ 43 (MSJ-APP-01263); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 43 (MSJ-APP-01375)), minus the $36,687.45 that the Kirk

Defendants subsequently returned to Zaftr (*see* **Ex. 1**, Montgomery Tr. at 243:11-21 (MSJ-APP-00243)).

103. After Zaftr sent all of the purchase funds but never received any Bitcoin, it hired a private investigator. **Ex. 1**, Montgomery Tr. at 32:12-22 (MSJ-APP-00032).

104. Following an investigation into the authenticity of the purported passport of James Smith, the private investigator prepared the Veritas Investigations Fraud Report (the "Veritas Report"). **Ex. 1**, Montgomery Tr. at 32:12-22 (MSJ-APP00032); **Ex. 20**, Veritas Report (MSJ-APP-01425); **Ex. 57**, Affidavit of Tanya Lee Desborough, re: Veritas Fraud Report ("Desborough Affidavit") (MSJ-APP-01929).

105. The Veritas Report revealed that the purported passport of James Smith is fraudulent. **Ex. 2**, Kirk Tr. at 351:9-356:23 (MSJ-APP-00711); **Ex. 20**, Veritas Report (MSJ-APP-01437); **Ex. 57**, Desborough Affidavit (MSJ-APP-01929).

106. Defendants do not dispute that the purported passport of James Smith is fraudulent. **Ex. 3**, Lawrence Tr. at 336:3-:337:24 (MSJ-APP-01128); **Ex. 2**, Kirk Tr. at 208:2-7 (MSJ-APP-00568).

107. Neither the Kirk Defendants nor the Lawrence Defendants dispute any of the facts or findings within the Veritas Report that the purported passport of James Smith is fraudulent. **Ex. 2**, Kirk Tr. at 351:9-356:23 (MSJ-APP-00711); **Ex. 3**, Lawrence Tr. at 320:14-332:17 (MSJ-APP-01112).

108. In addition to the Veritas Report, Zaftr was eventually able to run a report on the authenticity of the James Smith passport through Jumio (the "Jumio Report"). **Ex. 1**, Montgomery Tr. at 31:13-23 (MSJ-APP-00031); **Ex. 21**, Jumio Report (MSJ-APP-01438).

109. Jumio has the capability to validate U.K. passports, which Zaftr did not have access to at the time the parties entered into their Agreements. **Ex. 1**, Montgomery Tr. at 33:1-34:4 (MSJ-APP-00033); 267:13-268:12 (MSJ-APP-00267).

110. The Jumio Report, as with the Veritas Report, identified that the purported passport of James Smith is fraudulent. **Ex. 21**, Jumio Report (MSJ-APP-01438); **Ex. 2**, Kirk Tr. at 364:6-22 (MSJ-APP-00724); **Ex. 3**, Lawrence Tr. at 333:1-336:2 (MSJ-APP-01125).

111. Neither the Kirk Defendants nor the Lawrence Defendants dispute the Jumio Report's finding that the James Smith passport is fraudulent. **Ex. 2**, Kirk Tr. at 364:6-366:7 (MSJ-APP-00724); **Ex. 3**, Lawrence Tr. at 333:1-336:2 (MSJ-APP-01125).

112. The Kirk Defendants do not dispute that Zaftr was the victim of fraud. **Ex. 2**, Kirk Tr. at 356:24-357:4 (MSJ-APP-00716).

113. All Defendants have conceded that Zaftr never would have moved forward with any of the parties' transactions if Zaftr had known that the purported passport of James Smith was fraudulent. **Ex. 3**, Lawrence Tr. at 362:8-365:2 (MSJ-APP-01154); **Ex. 2**, Kirk Tr. at 345:2-346:1 (MSJ-APP-00705).

114. Had Zaftr been made aware of the secret payments made by Defendants to Seller-designated bank accounts in August 2020, using Zaftr's purchase funds, in violation of the Purchase Agreement, the Escrow Agreement, and the BVFR Side Letter Agreement, Zaftr never would have moved forward with the parties' transactions, and would have immediately requested the return of all of its purchase funds that it paid to Defendants. **Ex. 1**, Montgomery Tr. at 237:22-241:7 (MSJ-APP-00237).

115. As a result of the Lawrence Defendants' breaches of the ID Verification Agreement, the Lawrence Defendants' breaches of the Purchase Agreement, and all Defendants'

breaches of the Escrow Agreement and the BVFR Side Letter Agreement, Zaftr paid a net amount of $5,683,536.63 for Bitcoin that it never received.  **Ex. 3**, Lawrence Tr. at 185:4-12 (MSJ-APP-00977); **Ex. 2**, Kirk Tr. at 294:6-16 (MSJ-APP-00654); **Ex. 6**, Compl. ¶ 43 (MSJ-APP-01263); **Ex. 13**, Kirk Defendants' Ans. to Compl. ¶ 43 (MSJ-APP-01375).

                                                Respectfully submitted,

                                                **BLANK ROME LLP**

Dated:  June 17, 2022                          By: */s/ Lewis W. Schlossberg*
                                                      Joseph G. Poluka (Pa. ID No. 42035)
                                                        Lewis W. Schlossberg (Pa. ID No. 91773)
                                                       Blank Rome LLP
                                                       One Logan Square
                                                       130 N. 18th St.
                                                       Philadelphia, PA  19103
                                                      (215) 569-5500
                                                      *Attorneys for Plaintiff Zaftr Inc.*