IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZAFTR INC.,<br>**Plaintiff,**<br><br>v.<br><br>KEVIN JAMESON LAWRENCE, BVFR<br>& ASSOCIATES, LLC, JOHN KIRK,<br>AND KIRK LAW PLLC,<br>**Defendants.** | CIVIL ACTION<br><br><br><br>NO.  21-2177 |

## OPINION

Plaintiff Zaftr, Inc. ("Zaftr")'s attempt to purchase 10,000 Bitcoin between August and November 2020 was foiled not once, not twice, but three times. Across the failed attempts at the transaction, Zaftr paid $5.6 million and did not receive a single Bitcoin in return. The purported seller of the Bitcoin is not a party to this lawsuit, but the persons and entities who facilitated the transaction, *i.e.*, Defendants Kevin Jameson Lawrence and his company BVFR & Associates, LLC (the "Lawrence Defendants") and Defendants John Kirk and his law firm Kirk Law PLLC (the "Kirk Defendants"), are. Plaintiff maintains that the Defendants have retained nearly $1 million of the money it paid. Seeking to recoup these amounts and other damages alleged to be in excess of $32 million, Zaftr asserts claims for breach of contract, unjust enrichment, conversion, fraudulent and negligent misrepresentation (including omission and non-disclosure), and civil conspiracy. It also seeks a declaratory judgment regarding Defendants' liability and its alleged damages. The Kirk Defendants raise a crossclaim for indemnification and contribution against the Lawrence Defendants.

Zaftr now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on its first breach of contract claim (Count I), the Kirk Defendants move for summary judgment

1

on all of Zaftr's claims, and the Lawrence Defendants move for summary judgment on all of

Zaftr's claims—except that for declaratory judgment (Count IX)—as well as the Kirk

Defendants' crossclaim.  For the reasons that follow, each of the parties' summary judgment

motions shall be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

Plaintiff Zaftr is a Canadian company based in Calgary engaged in the business of buying

and selling digital currency, primarily Bitcoin (sometimes referred to as "BTC").  Zaftr's CEO is

Nathan Montgomery.  Zaftr is regulated by FINTRAC, a Canadian regulator for financial

institutions.  Zaftr's business in Bitcoin involves borrowing Bitcoin through a line of credit from

one of its shareholders and liquidating that Bitcoin to fund new purchases of Bitcoin.  When

Zaftr receives new Bitcoin from such a purchase, it replenishes the line of credit and profits from

the difference in the purchase price of the new Bitcoin and the sale proceeds of the credited

Bitcoin.

Defendant Kevin Jameson Lawrence is an attorney, once licensed to practice law in

Pennsylvania but whose license has been administratively suspended.  Lawrence is the CEO and

managing member of Defendant BVFR & Associates, LLC ("BVFR"), a Pennsylvania LLC.

Defendant John Kirk is an attorney licensed to practice law in Pennsylvania and the

founding shareholder of Defendant Kirk Law PLLC (d/b/a Distributed Law Group) ("Kirk

Law"), based in Pennsylvania.

### A.  The Contemplated Transaction

Around mid-August 2020, Montgomery was introduced by non-party brokers to

Defendants Lawrence and Kirk, kicking off the process for Zaftr's potential purchase of Bitcoin.

During a call with Montgomery set up by the brokers, Lawrence mentioned a potential third-

party seller whom he knew and had worked with previously, one James Smith, and the parties

discussed the procedure for the purchase.  Montgomery was told that Smith had relationships

with Bitcoin miners and that through those relationships his company Bulk Bitcoin Trader, Ltd.

("BBT") was in a position to sell Bitcoin.  After the parties' initial encounter, Montgomery was

under the impression he was dealing with two American lawyers—one of whom (Lawrence) was

also represented to be a doctor, a former federal prosecutor, and an alumnus of the "Clinton

administration"—as well as a seller (Smith) who had experience selling Bitcoin.  As it turned

out, "James Smith" appears not to be a real person and the purported seller's true identity

remains a mystery.  Additionally, Zaftr later discovered that Lawrence is not a medical doctor,

his law license was administratively suspended, he was never a federal prosecutor, and he did not

ever work in the Clinton administration.

　　　　After the initial call, the roles of the parties were set forth: Smith would provide the

Bitcoin; Zaftr would provide the funds; Kirk Law, through Kirk, would hold the funds in escrow

and act as counsel for BVFR; and BVFR, through Lawrence, would act as liaison with Smith,

acting, in Montgomery's words, as the "face and the voice of the seller."  The arrangement was

such that Montgomery did not communicate with the purported seller during the transactions.

　　　　Before proceeding with any transaction, Zaftr attempted to conduct a due diligence

review to confirm the identities of James Smith and BBT, as well as their ability to complete the

contemplated transaction.  A corporate records search revealed that Smith was listed as sole

owner and director of BBT, a company registered in the United Kingdom and in good standing at

the time.  Kirk provided a copy of Smith's passport in an email to Zaftr on behalf of Lawrence,

who provided it to Kirk on behalf of Smith.  Zaftr then ran a report on Smith through Trulioo, a

service for watchlist screening and ID verification.  According to Montgomery, Zaftr did not, at

the time it ran the report, have a subscription enabling it to validate U.K. passports.  So while the Trulioo report indicated no red flags for Smith, it did not validate Smith's passport.  As it turned out, the passport was fake.

### B.  Identity Verification

Beyond Zaftr's own due diligence, the parties also decided to use Lawrence as a professional agent to attest to Smith's identity through a limited purpose agency agreement (the "ID Verification Agreement").  Pursuant to the ID Verification Agreement—signed by BVFR and Zaftr—Lawrence, on behalf of BVFR, represented he had prior dealings with Smith and verified that the individual he had spoken with in past video conferences was the same individual as described and pictured in the passport.

### C.  First Transaction ("August Tranche")

To execute the transaction, Zaftr entered into the "First Purchase Agreement" with BBT, which set forth a plan to purchase Bitcoin through a number of tranches, beginning with 200 BTC and concluding at an aggregate of 10,000 BTC.  The First Purchase Agreement also includes a 10% non-performance fee, due by Zaftr or BBT to the other in the event one party failed to perform.  It also provides for a "Seller Mandate Fee" to be separated from the purchase funds and paid to BVFR (as the "Seller's Mandate").  Specifically, under the First Purchase Agreement, the Seller Mandate Fee was to be "segregated and payable by Mandate Counsel [Kirk Law]" to BVFR.

Zaftr also entered into the "First Escrow Agreement" with Kirk Law and BBT.  This agreement affirms that Kirk Law (specifically, Kirk) was engaged by BVFR to serve as its counsel and provides for a 1% "Mandate Counsel Fee" for Kirk Law.  Both the First Purchase and First Escrow Agreements provide that Kirk Law, as the party maintaining the escrow

4

account, could only release Zaftr's purchase funds to BBT *after* the Bitcoin was delivered to Zaftr.

The third and final agreement in this first set is the "First Addendum" between Zaftr, Kirk Law, and BVFR.  The First Addendum provides that Kirk Law would not release funds in the escrow account before the receipt of Bitcoin to any party except the Seller Mandate Fee to BVFR.  It further provides that if the Bitcoin were not delivered within 24 hours of Zaftr's funds being sent to Kirk Law and being successfully cleared (the "Default Period"), funds sent to Kirk Law would be returned to Zaftr within one day.  Importantly, the First Addendum also provided that, in the event the transaction failed, BVFR would return its Seller Mandate Fee to the Kirk Law IOLTA to be returned to Zaftr, minus a conditional "Breakup Fee" of $50,000 to be retained by BVFR.

Lawrence, on behalf of Smith and BBT, fixed the purchase price for the first tranche of 200 BTC ("August Tranche") at $2,254,514.  On August 25, 2020, Zaftr sent that amount to Kirk Law and Kirk confirmed receipt of those funds.  But Zaftr did not receive any Bitcoin in return.

During this time, Smith and Lawrence shared WhatsApp communications about the transaction, during which Smith stated there was a delay in performance due to a "timing" issue, apparently related to the Bitcoin miner(s).  This information was relayed by Lawrence to Kirk and then from Kirk to Montgomery.

### i.    *Transfers to Third-Party Bank Accounts*

As completion of the August Tranche stalled, Kirk Law, at the Lawrence Defendants' direction, made transfers of a portion of the August Tranche funds sent by Zaftr to Kirk Law's IOLTA to two third-party bank accounts held under the names "A.E. Consult LLC" and "Nationwide Finance LLC."  Communications between Lawrence and Smith suggest the purpose

of these payments was to facilitate the stalled transaction, and Lawrence testified he directed these payments based on Smith's requests.  Kirk Law first sent $40,000 to A.E. Consult LLC but soon recalled the payment at Lawrence's direction.  Despite the recall, however, the $40,000 was not recovered.  Lawrence then instructed Kirk Law to send $40,000 to the Nationwide Finance LLC account.  This payment was also recalled, but only a portion of the funds were recovered ($20,000).  Zaftr was unaware of these payments to third-party accounts at the time.

### ii.    Aftermath of the Failed August Tranche

On August 28, in light of the failed attempt, Zaftr requested return of its funds, including the Seller Mandate Fee.  Zaftr repeated its request on September 2, asking the Kirk Defendants to prepare to return the funds, and again on September 4.  Kirk Law returned $1,886,977.60 to Zaftr on September 4, an amount that included Kirk Law's 1% Mandate Counsel Fee for the August Tranche.

At the end of the failed August Tranche, Zaftr was short $367,536.40, the amount claimed by BVFR as its Seller Mandate Fee, which BVFR was allowed to keep heading into the next transaction attempt (although the conditions on its keeping those funds are disputed).  The amount actually retained by the Defendants, however, appears to be $367,536.40 minus the $60,000 that was sent but not recovered from the two third-party accounts, thus equaling $307,536.40.

### D.  Second Transaction ("September Tranche")

The Lawrence Defendants next advised Zaftr that the purported seller would perform if a different procedure was utilized.  The new procedure involved a Malaysian law firm, Sabarudin, Othman & Ho ("SOH"), represented by one Kenneth Gomes.  Lawrence advised Zaftr that he had previously worked with Gomes and that Gomes was managing partner at SOH.  Zaftr also

6

performed its own due diligence on Gomes and SOH, engaging local counsel in Malaysia to assist.  As it turned out, Gomes, or the person purporting to be Gomes, was not managing partner at SOH.

Under this arrangement and as set forth in a new set of agreements—the "Second Purchase Agreement" (signed by BBT and Zaftr) and the "Second Escrow Agreement" (signed by Kirk Law, SOH, BBT, and Zaftr)—SOH would serve as an escrow intermediary and SOH's Malaysian bank account would serve as the escrow account.  Similar to the first set of agreements, the second set also set forth a plan to purchase Bitcoin through multiple tranches in order to reach an aggregate of 10,000 BTC.  For the first tranche, Zaftr would pay $2,051,479.08 in exchange for 205 BTC from Smith ("September Tranche"), which represented 200 BTC from the failed August Tranche plus 5 BTC towards the non-performance fee for the August Tranche. Three additional payments of 5 BTC were promised to be delivered to Zaftr for the three subsequent tranches.

The Second Escrow Agreement set forth a general plan by which Zaftr would send money first to Kirk Law, which would then send the money to SOH, at which point Smith would provide the Bitcoin.  But for the initial tranche of 205 BTC, Zaftr was to send funds *directly* to SOH—bypassing Kirk Law.

On this basis, Zaftr sent $1,683,942.68 to the designated SOH account for the September Tranche, reflecting the agreed-upon amount for the September Tranche minus the $367,536.40 BVFR claimed from the August Tranche as its Seller Mandate Fee.  Once again, Zaftr did not receive any Bitcoin in exchange, nor were the funds sent to SOH returned to Zaftr.

At the end of the failed September Tranche, Zaftr was out $2,051,479.08; the Defendants retained $307,536.40 (with the remaining $60,000 of the amount claimed by BVFR as its Seller

Mandate Fee in the possession of the two third-party accounts); and SOH/Gomes had $1,683,942.68 of Zaftr's funds.

### E.  Third Transaction ("October Tranche")

After the failure of the September Tranche, either the Lawrence Defendants (on behalf of Smith) or Gomes proposed another adjustment to the plan.  Zaftr was told that if it would send funds for a further tranche of 305 BTC (including 5 BTC towards the non-performance fee for the September Tranche), then BBT would deliver the full 510 BTC owed ("October Tranche").

To effectuate the new plan, Zaftr entered into a final agreement (the "Second Addendum")—signed by Kirk Law, BVFR, BBT, Zaftr, and SOH—which resumed the procedure by which Zaftr would send funds to Kirk Law, and Kirk Law would forward the funds to SOH—now through a bank account in Singapore.

Lawrence set the price for the October Tranche at $3,668,745.  Zaftr sent the funds to Kirk Law.  Kirk Law wired $3,095,120.70 to the Singapore account, retaining $573,624.30 of the funds for BVFR's Seller Mandate Fee (an amount that included $36,687.45 for Kirk Law's 1% Mandate Counsel Fee).  Again, no Bitcoin was delivered.  Between October 27 and November 5, 2020, although Zaftr sent numerous communications to Lawrence and Gomes requesting delivery of the 510 BTC, it never received any of the Bitcoin.

On November 14, 2020, Zaftr requested Defendants return all of the funds sent by Zaftr in their possession, calculating the amount not sent to Gomes to be $941,160.70.  In response, Kirk Law returned its 1% Mandate Counsel Fee related to the October Tranche ($36,687.45).

At the end of the failed October Tranche, then, Zaftr was out $5,683,536.63.  BVFR

claims $904,473.25 as its Seller Mandate Fee from the August and October Tranches.[1]  The

Defendants appear to retain $844,473.25 of that amount, the remaining $60,000 having been sent

and not recovered from the two third-party accounts.  Those funds are distributed between the

Kirk Defendants and the Lawrence Defendants.  At present, the Kirk Defendants retain

$111,312.35, treating that amount as funds disputed in this litigation.[2]  The Lawrence

Defendants apparently retain the remainder (roughly $733,160.90[3]).  Gomes retained

$4,779,063.38 of Zaftr's funds.

There is no dispute that BBT signed and is bound by the First Purchase Agreement, the

Zaftr filed a lawsuit in Singapore related to the account funds remaining in Gomes's bank

account there and obtained a judgment in its favor, recovering $2,145,120.70, which has since

been paid to its Singapore law firm.  Litigation concerning amounts remaining in Singapore is

ongoing.  Zaftr also continues to seek recovery of stolen funds in the courts of Malaysia.

## II.   PRELIMINARY MATTERS

### A.  Which Parties Are Bound by Which Agreements

Before turning to the breach of contract claims, a recap of who signed what, and a

determination of which entity is bound by which agreements.

There is no dispute that BBT signed and is bound by the First Purchase Agreement, the

First Escrow Agreement, the Second Purchase Agreement, the Second Escrow Agreement, and

---

[1] This amount might not take account of various wire fees, but it is used here as the amount relied upon by the parties in their briefing and as supported by the record.

[2] Answers to interrogatories suggest that the Kirk Defendants might maintain that some of the $111,312.35 is not claimed by BVFR as the Seller Mandate Fee but is instead due to them as being "allocated towards general legal work."  This issue has not been addressed by the parties in the briefing, so $111,312.35 will be used as the presumptive amount.

[3] It is unclear if this amount fails to take account of various wire fees.

the Second Addendum.  There is also no disagreement that only BVFR and Zaftr are signatories

to the ID Verification Agreement.  But the question is not so straightforward with respect to

whether Kirk Law and BVFR are bound by all of the first set of agreements (governing the

August Tranche)—the First Purchase Agreement, the First Escrow Agreement, and the First

Addendum—and all of the second set of agreements (governing the September and October

Tranches)—the Second Purchase Agreement, the Second Escrow Agreement, and the Second

Addendum.

Kirk Law and BVFR both signed the First Addendum and Second Addendum, both of

which expressly incorporate other agreements.  Specifically, the First Addendum expressly

incorporates the First Escrow Agreement, which in turn expressly incorporates the First Purchase

Agreement.  The Second Addendum expressly incorporates both the Second Escrow Agreement

and Second Purchase Agreement.  Given that, the question is whether Kirk Law and BVFR are

bound by the agreements incorporated into the First and Second Addenda.  The answer is yes.

"[A] party is bound by all of the provisions in the written agreement that it signs as well as the

provisions that are expressly incorporated by reference into the contract." *Friedman v. Yula*, 679

F. Supp.2d 617, 624 n.15 (E.D. Pa. 2010) (quoting *Pro. Sports Tickets & Tours, Inc. v.*

*Bridgeview Bank Grp.*, 2001 WL 1090148, at *4 (E.D. Pa. Sept. 13, 2001)).  Similarly, "where a

contract refers to and incorporates the provisions of another, both shall be construed together."

*Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 560 (Pa. Super. 2006).  Because

Kirk Law and BVFR signed the outer, incorporating agreements, they are bound by the terms of

the inner, incorporated agreements.

### B.  Indemnification and Hold-Harmless Provisions

Another preliminary issue to be addressed is the Defendants' argument that two

indemnification and hold-harmless clauses, appearing in the First and Second Escrow

Agreements, operate to protect them[4] from suits associated with BBT or SOH's failure to

perform and, in effect, bar Zaftr's claims against them here.[5]

The First Escrow Agreement states: "Both Seller and Buyer hereby agree and

acknowledge to look exclusively to each other for all remedies, in both law and equity, for any

failure to perform, and further indemnify and hold harmless Mandate Counsel [Kirk Law[6]] and

Seller's Mandate [BVFR]."  The Second Escrow Agreement, which also includes SOH as

"Escrow Counsel," states: "Each of Seller, Buyer, and Escrow Counsel hereby agree and

acknowledge to look exclusively to one another for all remedies, in both law and equity, for any

---

[4] The Defendants appear to argue that the indemnification provisions cover both the individuals and entities, referring broadly to the "Kirk Defendants" and "BVFR Defendants" in their briefing.  But they have not addressed specifically whether the individuals, in addition to the entities, would also be covered by the indemnification provisions.  The conclusions that follow as to the two indemnification provisions, however, remain the same in either case.

[5] The parties do not distinguish between the terms "indemnify" and "hold harmless."  The two are often treated as two sides of the same coin.  *See, e.g.*, *Indemnify*, Black's Law Dictionary (11th ed. 2019) ("To reimburse (another) for a loss suffered because of a third party's or one's own act or default; HOLD HARMLESS."); *Hold Harmless*, Black's Law Dictionary (11th ed. 2019) ("To absolve (another party) from any responsibility for damage or other liability arising from the transaction; INDEMNIFY."); *Waynesborough Country Club of Chester Cnty. v. Diedrich Niles Bolton Architects, Inc.*, 2008 WL 4916029, at *3 (E.D. Pa. Nov. 12, 2008) ("A clause which contains the words 'indemnify' and 'hold harmless' is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons." (citation omitted)).  *But see Korn v. Kertesz*, 2008 WL 11513249, at *2 (E.D. Pa. Jan. 30, 2008) (treating indemnity and hold-harmless clauses differently, apparently on the grounds that to hold harmless would prevent suit in the first place whereas to indemnify refers to a right of reimbursement following payment); *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 n.6 (3d Cir. 1995) ("Generally, an indemnity agreement also includes a 'hold harmless' clause by which the indemnitor agrees 'to indemnify and hold harmless' the indemnitee.  A hold harmless agreement is '[a] contractual arrangement whereby one party assumes the liability inherent in the undertaking, thereby relieving the other party of the responsibility.'" (citing Black's Law Dictionary 658 (5th ed. 1979))).  The parties in this case have not suggested that there is a difference that would affect the analysis here.

[6] There is some ambiguity in the First and Second Escrow Agreements as to whether "Mandate Counsel," as used in those agreements, refers to Kirk Law or Kirk.  Kirk, however, signs the agreements on behalf of Kirk Law and is expressly treated in his role as the founding shareholder of Kirk Law, and Kirk Law is clearly treated as the "Mandate Counsel" in the First and Second Addenda, which incorporate the First and Second Escrow Agreements, respectively, as discussed *supra*.  On that basis, and without specific argument on the issue by the parties, "Mandate Counsel" is treated here as referring to Kirk Law.

failure to perform, and further indemnify and hold harmless Mandate Counsel and Seller's Mandate."  But, as discussed below, neither of these provisions contains language which indemnifies the Kirk Defendants or the Lawrence Defendants from either their own breaches of any agreement to which they were a party or their own tortious conduct.

"It is well settled, under Pennsylvania law that '[i]ndemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract.'" *Cottman Ave. PRP Grp. v. AMEC Foster Wheeler Env't Infrastructure Inc.*, 439 F. Supp.3d 407, 438 (E.D. Pa. 2020) (citing *Consol. Rail Corp. v. Delaware River Port Auth.*, 880 A.2d 628, 632 (Pa. Super. 2005)).  "The construction of an indemnity contract is a question of law for the court to decide," and "the court must strictly construe the scope of an indemnity contract against the party seeking indemnification."  *Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 371 (3d Cir. 2001).  The intention of the parties "should be ascertained primarily by looking to the language used in the agreement."  *Fallon Elec. Co., Inc. v. Cincinnati Ins. Co.*, 121 F.3d 125, 127 (3d Cir. 1997).

Whether the agreements' indemnification provisions apply here differs depending on which type of claim is being considered.  Those claims by which Zaftr seeks to hold the Lawrence Defendants and the Kirk Defendants liable for Zaftr, BBT, or SOH's failure to perform their (Zaftr, BBT, or SOH's) obligations under the contracts must be seen through a different lens from those in which Zaftr seeks to hold the Lawrence Defendants and the Kirk Defendants liable for their own (the Lawrence Defendants and the Kirk Defendants') obligations under the parties' agreements.  And another turn of the kaleidoscope is required to consider whether the indemnification provisions cover the Lawrence Defendants and the Kirk Defendants for their own tortious acts.

12

The plain language of the two provisions supports the Lawrence Defendants and the Kirk Defendants' argument that the indemnification and hold-harmless provisions protect them from liability for Zaftr, BBT, or SOH's failure to perform.[7]  In this regard, the provisions require Zaftr (the Buyer) to look exclusively to BBT (the Seller) or SOH (the Escrow Counsel under the Second Escrow Agreement) for all remedies for their own (Zaftr, BBT, or SOH's) failure to perform and to indemnify and hold harmless Kirk Law and BVFR for any such failure to perform.  To the extent that Zaftr's Complaint maintains that "Defendants have breached their obligations" by "failing to deliver any of the required BTC" or, more broadly, is premised on either BBT or SOH's failure to perform their own obligations under the agreements, the indemnification and hold-harmless clauses put paid to Zaftr's claims against the Kirk Defendants and the Lawrence Defendants.[8]

The indemnification and hold-harmless provisions do not, however, bear on any claims that arise from the Lawrence Defendants or the Kirk Defendants' own alleged breach of the parties' agreements.  Specifically, there is no language in the clauses that purports to extend indemnification or hold-harmless protections to the Kirk Defendants or the Lawrence Defendants

---

[7] Specifically, the Lawrence Defendants argue that Zaftr has "broadly and unequivocally relieved [them] from any liability related to Buyer and/or Seller's failure to perform under the agreements" and liability relating to SOH's failure to perform.  The Kirk Defendants similarly argue that the clauses render them indemnified and held harmless "from any loss associated with Smith's failure to perform and/or deliver Bitcoin."  Further, the Kirk Defendants argue that "[s]ince Zaftr's unsupported claims clearly arise from Smith's alleged failure to perform and deliver the subject bitcoin, those claims are barred. . . ."  As to the last argument, while the Kirk Defendants use the language "arise from," which might otherwise be read expansively in the context of indemnification or other contractual contexts, *see, e.g.*, *Nitterhouse Concrete Prod., Inc. v. Molders*, 2016 WL 827131, at *3 (M.D. Pa. Mar. 3, 2016) (interpreting a provision including the phrase "may arise by reason of" broadly); *Allstate Ins. Co. v. Masco Corp.*, 2008 WL 183651, at *2 (E.D. Pa. Jan. 22, 2008) (treating an arbitration clause featuring the language "arise under the terms of [an agreement]" as having a "broad scope"), the two provisions at issue do not feature this language, and the Kirk Defendants may not write terms into the contract that are not there.

[8] Zaftr does not provide any argument that the two provisions would not also protect the individual Defendants, who signed the agreements on behalf of their respective entities, from liability in this respect.

for such breaches.[9]  Thus, for example, Zaftr's contentions that the Lawrence Defendants breached the ID Verification Agreement; that the Kirk Defendants and the Lawrence Defendants improperly retained funds from the transaction; and that the Kirk Defendants and the Lawrence Defendants violated the parties' agreements by sending funds to third-party bank accounts before any Bitcoin was delivered are not covered by the provisions.

The same applies to claims based on alleged tortious acts of the Kirk Defendants or the Lawrence Defendants.  (Here, Zaftr's tort claims are for conversion, fraudulent and negligent misrepresentation and omission, and civil conspiracy.)  "It is well-settled in Pennsylvania that an indemnity agreement that covers loss due to the indemnitee's own negligence must be clear and unequivocal."  *Jacobs Constructors*, 264 F.3d at 371; *see also Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 503 (3d Cir. 2021), *as revised* (Mar. 25, 2021) ("In Pennsylvania, a prospective release for negligence is 'unenforceable' unless it does so 'with the greatest particularity.'" (quoting *Topp Copy Prod., Inc. v. Singletary*, 626 A.2d 98, 99 (Pa. 1993))).[10] Moreover, a release from suits based on a party's own future reckless, grossly negligent, or intentional conduct generally violates public policy.  *See Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1203 (Pa. 2012) (provision releasing reckless conduct invalid as against public policy);

---

[9] The lack of such language can be seen by comparison to the case cited by the Lawrence Defendants, *Booth v. Bowen*, 2008 WL 220067 (D.V.I. Jan. 10, 2008).  In *Booth*, there was broad exculpatory language in the contract at issue: "further *release* and hold harmless . . . *from any claim or lawsuit*. . . ."  *Id.* at *2 (emphasis added).  Here, there is no such language releasing Defendants from all potential claims by Zaftr.

[10] To the extent that the Kirk Defendants and the Lawrence Defendants argue that the indemnification and hold-harmless provisions apply to their own tortious action or breach of contract, that would essentially treat the two provisions as releases from liability or exculpation clauses.  After all, if the indemnification and hold-harmless provisions did apply to the Defendants' own conduct, the provisions would functionally release them from liability to Zaftr.  *See, e.g.*, *Dansko Holdings*, 991 F.3d at 503 ("If Dansko had to indemnify Benefit against its own negligence suits against Benefit, that would effectively release Benefit from negligence liability to Dansko.").  Along these lines, it is worth noting that exculpatory clauses must be "expressed in clear and unequivocal terms."  *Topp Copy Prod.*, 626 A.2d at 101.  Here, the contracts contain nothing that could be read as an exculpatory clause.

14

*Hackerman v. Demeza*, 2016 WL 1295036, at *12 (M.D. Pa. Mar. 31, 2016) (provision releasing grossly negligent conduct unenforceable as against public policy); *see also* 8 Williston on Contracts § 19:24 (4th ed.) ("A party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing.").  Here, there is no clear language purporting to release, indemnify, or hold-harmless the Kirk Defendants or the Lawrence Defendants for their own tortious conduct, and any interpretation extending the two clauses to cover intentional tortious conduct would violate public policy.

In short, the main flaw in the Lawrence Defendants and the Kirk Defendants' arguments is that they are premised on the assumption that Zaftr's claims rest only on BBT and/or SOH's failure to perform.  But Zaftr's claims against these Defendants reach further in that they concern the Kirk Defendants or the Lawrence Defendants' own alleged breaches of the agreements as well as their own alleged tortious conduct.[11]

### C.  The Kirk Defendants' Crossclaim for Indemnification and Contribution

In their Answer, the Kirk Defendants raise a crossclaim against the Lawrence Defendants for common law indemnification and contribution.  The Lawrence Defendants move for summary judgment on this crossclaim on grounds that it fails to allege a cause of action under Pennsylvania law.

---

[11] The Kirk Defendants and Lawrence Defendants' proposed interpretation of the indemnification provisions—that they cover all suits in contract or tort, including their own breaches of the contracts and their own tortious actions—also ignores the Pennsylvania Supreme Court's admonition that "a contract must be interpreted to give effect to all of its provisions."  *See Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 464 (Pa. 2015).  Specifically, the remainder of the paragraphs in which the two indemnification clauses appear require Zaftr, BBT, and, in the case of the Second Escrow Agreement, SOH to consent to the jurisdiction of Pennsylvania courts "for any and all claims" against Kirk Law (as "Mandate Counsel") and BVFR (as "Seller's Mandate").  This language expressly acknowledges the possibility of suits by Zaftr against both entities.

As a preliminary matter, "common law indemnity is only available for liability sounding in tort and is not available for breach of contract." *Baum v. Schlesinger*, 2022 WL 3716682, at *14 (W.D. Pa. May 26, 2022).  Further, common law indemnity is not available where the party seeking indemnity is found to be an intentional tortfeasor. *Bank v. City of Philadelphia*, 991 F. Supp.2d 523, 530-31 (E.D. Pa. 2014).

With those strictures comes a further restriction that, absent a contractual provision, indemnity under Pennsylvania law is only available where the party seeking indemnity is "vicariously or secondarily liable for the indemnitor's acts." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 448 (3d Cir. 2000) (citation omitted); *Ruggieri v. Quaglia*, 2008 WL 5412058, at *9 (E.D. Pa. Dec. 24, 2008) ("Once secondary or vicarious liability is established, the indemnitee, who was legally obliged to pay damages solely because of its legal status, may seek reimbursement from the party who is primarily liable.").  The "classic example of such a legal relationship is that of principal and agent, employer and employee." *Bachtell v. Gen. Mills, Inc.*, 422 F. Supp.3d 900, 907 (M.D. Pa. 2019) (quoting *City of Wilkes-Barre v. Kaminski Bros.*, 804 A.2d 89, 92 (Pa. Commw. 2002)).  "One way to think of indemnification is considering whether the indemnitee properly delegated one of its legal responsibilities to a party whose failure to carry out that duty resulted in the plaintiff's injury." *Id.* at 908.  An example of such a relationship would be a municipality delegating the "authority to maintain a public walkway to a nearby property owner": if a pedestrian suffered injury due to the walkway not being shoveled, say, the municipality and property owner "would both be liable, as a matter of law, but the municipality could seek indemnification from the property owner." *Id.*  In other words, the principal, liable only because of a legal construct (*e.g.*, vicarious liability) can seek indemnification from the agent whose actions were the primary cause of the harm.

16

In this situation, the Kirk Defendants are, if anything, the "agent" in their relationship to the Lawrence Defendants, who serve as the analogous principal. Kirk Law (specifically, Kirk) served as counsel to the client BVFR during the transaction, and an attorney-client relationship is generally recognized to be a principal-agent relationship under Pennsylvania law whereby the attorney is the agent of the client. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853 (3d Cir. 1996).

The problem with the Kirk Defendants' indemnification claim, then, is that it turns the typical situation in which a party would be entitled to common law indemnification on its head. Rather than a principal seeking indemnification from an agent, whose actions make the agent primarily liable for the harm, the Kirk Defendants, as the analogous agent, seek indemnification from the Lawrence Defendants, the principal. The Kirk Defendants point to no authority suggesting that common law indemnification should be extended to encompass the inverse of cases in which it would normally apply. Put another way, the Kirk Defendants have not demonstrated that they would be "liable for the [Lawrence Defendants'] conduct as a matter of law" (*e.g.*, vicariously liable for the conduct of the Lawrence Defendants) such that they could then seek indemnification from the Lawrence Defendants as the party whose conduct "actually gave rise to liability." *Bachtell*, 422 F. Supp.3d at 907.

Because the criteria for common law indemnification are not met, the Lawrence Defendants motion for summary judgment shall be granted against the Kirk Defendants' crossclaim in respect to its claim for indemnity.

Contribution, however, is "distinct from an indemnity claim" and applies in a situation where "a party seeks to *share* blame with a joint tortfeasor." *Id.*; *see EQT Prod. Co. v. Terra Servs., LLC*, 179 F. Supp.3d 486, 495 n.5 (W.D. Pa. 2016); *see also* 42 Pa. C.S. § 8324(a)

("Right of contribution").  Joint tortfeasors are defined as parties who are "jointly or severally liable in tort for the same injury to persons or property."  42 Pa. C.S. § 8322.  As yet, no party is liable under any of the tort theories in this matter—the case is still in the thick of litigation. Accordingly, in that any ruling on the Kirk Defendants' demand for contribution would be premature before the resolution of the outstanding tort claims, *see Pittsburgh Logistics Sys., Inc. v. Landstar Ranger, Inc.*, 2018 WL 4096282, at *2 (W.D. Pa. Aug. 28, 2018) (listing cases holding that contribution claims are premature before the plaintiff has been held liable, judgment has been made, and plaintiff suffers the damages sought), summary judgment will be denied in respect to the contribution demand in the Kirk Defendants' crossclaim.

## III.  SUMMARY JUDGMENT STANDARDS

With the brush now cleared, the discussion turns to the thicket of the substance of the claims.  A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted).  The standard does not change when, as here, the parties have filed cross-motions for summary judgment: "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

### A.  Breach of Contract Claims

Counts I and II of Zaftr's Complaint are for breach of the various contracts.  Count I alleges breach of not one, not two, not three, but four of them: the First Purchase and Escrow Agreements, the First Addendum, and the ID Verification Agreement.  Count II alleges breach of the Second Escrow Agreement and Second Addendum.[12]  Zaftr moves for summary judgment as to Count I, and Defendants move for summary judgment as to both counts.

In Pennsylvania a breach of contract claim is premised on: "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F. Supp.2d 675, 685 (E.D. Pa. 2009) (citing *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa. Super. 2000)).  "To

---

[12] Per the analysis *supra*, the terms of the Second Purchase Agreement are incorporated into the Second Addendum, for which reason it is also discussed in the context of Zaftr's breach of contract claims.

withstand summary judgment on a claim for breach of contract, the non-moving party must demonstrate the existence of a genuine issue of fact regarding those three elements." *Id.*[13]

No party disputes the existence of the contracts nor that there were damages. The focus of all parties is whether or not the contracts were breached.

Zaftr seeks summary judgment as to Count I on the grounds that: the Lawrence Defendants breached the ID Verification Agreement; Defendants breached the first set of agreements (governing the August Tranche) by sending funds to third-party accounts before any Bitcoin was delivered; and Defendants failed to return all of Zaftr's funds after the failed transaction.[14]

In turn, the Kirk Defendants move for summary judgment as to Count I on the basis that they were entitled to send funds to the third-party accounts (arguing they constituted a portion of BVFR's Seller Mandate Fee) and were not party to the ID Verification Agreement. They also

---

[13] To the extent that evaluation of whether there is a breach depends on interpretation of contract terms, the first task is to determine whether the language of the contractual provision at issue is clear or ambiguous. *Polish Am. Mach. Corp. v. R.D. & D. Corp.,* 760 F.2d 507, 512 (3d Cir. 1985). The initial determination of a contract's ambiguity is a question of law to be resolved by the court at summary judgment. *Silvis v. Ambit Energy L.P.*, 674 F. App'x 164, 167 (3d Cir. 2017). If the relevant provisions are unambiguous, the Court proceeds to address whether summary judgment is warranted. But where the language of a provision at issue is ambiguous, *i.e.* "it is reasonably susceptible of different constructions and capable of being understood in more than one sense*," Hutchison v. Sunbeam Coal Corp*., 519 A.2d 385, 390 (Pa. 1986), its interpretation is for the jury and summary judgment must be denied. *See id.*; *Silvis*, 674 F. App'x at 167 ("Deciding whether a term is ambiguous is a question of law but deciding the meaning of an ambiguous contract clause is an issue of fact.").

[14] At the outset it must be noted that the parties do not rigorously separate out the potential liability of the Defendant entities that did sign the Agreements and the individuals who signed on the entities' behalf (specifically Lawrence who signed on behalf of BVFR in his capacity as CEO and Managing Director and Kirk who—signing on behalf of Kirk Law—did so in his capacity as Founding Shareholder of Kirk Law). Maddeningly in their briefs the parties tend to refer to "Defendants" generally or to "the Kirk Defendants" or "the Lawrence Defendants" with no distinction being made between the various Defendants.

This penchant—by all parties—of not carefully connecting each Defendant separately to each claim (or explaining why separation is unwarranted) runs throughout the briefs untrammeled by any conventional approach to legal argument.

move for summary judgment as to Counts I and II on the basis that that they have returned all purchase funds in their possession—other than those disputed in the instant case (which remain in Kirk Law's escrow account)—including their own Mandate Counsel Fee, and have complied with all other obligations under the parties' agreements in their role as escrow counsel.

The Lawrence Defendants move for summary judgment as to Count I on the grounds that the ID Verification Agreement is unenforceable for lack of consideration and, in any case, they complied with their contractual obligations under it.  They also move for summary judgment as to Counts I and II on the basis they are entitled to retain funds claimed as part of their Seller Mandate Fee from the August and October Tranches.

### i.   ID Verification Agreement

Turning first to the ID Verification Agreement, as discussed *supra*, it was signed only by Zaftr and BVFR and not the Kirk Defendants.  Given that the Kirk Defendants did not sign it, without more they are not bound by it.  While the ID Verification Agreement includes a provision referring to actions undertaken by the Kirk Defendants ("[t]he month, and year of birth of [Smith] as provided on the Passport are identical to those which are further listed on the official documents of [BBT], which was directed to BVFR's attention through it's [sic] counsel, John A. Kirk, Esq., of Kirk Law PLLC"), it does not bind the Kirk Defendants.  Thus, summary judgment will be granted in favor of the Kirk Defendants to the extent Count I concerns the ID Verification Agreement.

The analysis is more involved as it concerns BVFR.  The ID Verification Agreement provides in relevant part:

> BVFR . . . examined one current original government issued identification
> document . . . the Passport . . . and reviewed the Passport and confirmed that it is
> the same as the Individual [James Smith] which BVFR has (1) direct personal

21

knowledge and business dealings with, for the past several years; and (2) has been confirmed the name, person, likeness, and features of the Individual, in his dealings with BVFR and the Individual in the video chat sessions verifying the name and authentic features of the Individual, which accurately are represented in the Passport.

BVFR separately represents in the agreement that it "was introduced to [Smith] . . . a few years ago and has since then worked with [Smith]" who is referred to in the agreement as a citizen of the United Kingdom and director of BBT.  The agreement then describes in some detail Smith's purported passport including its issuance number and expiration date.  It ends with the statement: the "foregoing is true and accurate to the best of my knowledge," referring to Lawrence (signing on behalf of BVFR).

Zaftr contends that the Lawrence Defendants breached the ID Verification Agreement by providing a fraudulent passport and by failing to verify the identity of the purported seller, James Smith.  The Lawrence Defendants counter that the ID Verification Agreement is not enforceable for lack of valid consideration, and, in the alternative, they have nonetheless fully complied with the agreement because it did not require BVFR, through Lawrence, to guarantee the validity of the passport (or run the passport through an authentication service) or do anything more than confirm that the person represented in the passport appeared to be the person with whom BVFR/Lawrence had prior business dealings.  For the reasons set forth below, the ID Verification Agreement is supported by valid consideration, and whether BVFR breached it can be resolved at summary judgment in favor of Zaftr.

With respect to consideration, the Pennsylvania Uniform Written Obligations Act ("UWOA") states: "A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer

intends to be legally bound." 33 P.S. § 6. "Under the UWOA, a written agreement may not be

avoided for lack of consideration if it contains a provision expressing the intent of the parties to

be legally bound by the agreement." *InterDigital Commc'ns Corp. v. Fed. Ins. Co.*, 392 F.

Supp.2d 707, 712 (E.D. Pa. 2005); *see also Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266,

1277 (Pa. 2015) (similar); *Electra Realty Co. Inc. v. Kaplan Higher Educ. Corp.*, 825 F. App'x

70, 73 (3d Cir. 2020) (similar).

The statute has been construed quite broadly and does not prescribe a set of magic words

for its application. *See, e.g.*, *Capitol Presort Servs., LLC v. XL Health Corp.*, 2014 WL

4467840, at *4 (M.D. Pa. Sept. 9, 2014) (holding an agreement valid under the UWOA even

where the promise was illusory); *InterDigital Commc'ns Corp.*, 392 F. Supp.2d at 712 ("The

requirements of the UWOA are met by 'an additional express statement, *in any form of

language*, that the signer intends to be bound.'" (quoting 33 P.S. § 6 (emphasis added))); *see also*

4 Williston on Contracts § 8:9 (4th ed.) ("By its terms, the statute applies to any signed written

release or promise provided that the writing contains an express statement that the signer intends

legally to be bound.  Its avowed purpose is to permit the parties to enter into solemn

undertakings without the need for consideration, and it has been so construed by the courts.").

The ID Verification Agreement contains a statement to this effect: "BVFR and Zaftr . . .

fully consent to the provisions of this agreement, for good and valuable consideration, the

sufficiency of which is hereby acknowledged as accepted by signing herein."  This statement is

sufficient to meet the statute's requirements. *See, e.g.*, *Harrisburg Auth. v. CIT Cap. USA, Inc.*,

869 F. Supp.2d 578, 598 (M.D. Pa. 2012) (finding sufficient the clause "now, therefore, in

consideration of the mutual premises set forth herein, and for other good and valuable

consideration, the receipt and adequacy of which is hereby acknowledged" (emphasis omitted)).

23

Pursuant to the UWOA, there is therefore valid consideration to support the enforceability of the ID Verification Agreement.

Regardless, BVFR argues that it has complied with the terms of the ID Verification Agreement, contending that it is not required, as a contractual matter, to undertake additional verification of the passport (*i.e.*, through a verification or authentication service provider) or to guarantee the authenticity of the passport.  But the ID Verification Agreement mandates that BVFR "examine[] one current original government issued identification document."  Thus, the first question is whether the document it examined was in fact an "original government issued identification document."  The summary judgment record contains two reports regarding the authenticity of the passport which suggest that it was not: the "Veritas Report" and the "Jumio Report."  Both reports conclude that the passport is fraudulent and counterfeit.

The Jumio Report, prepared by Zaftr through Jumio, an identification verification service, determined that the passport is indisputably fraudulent although provides little in support of this assessment.  The report displays the image of Smith's purported passport and states that the report was "DENIED" due to "FRAUD" while listing some extraneous transaction details.

The Veritas Report arrives at the same result but provides greater support for its conclusion.  Zaftr engaged Veritas Investigations Ltd. to investigate the authenticity of the passport.  Having done so, the Veritas investigator reported that the image in the passport appears to be of another person (likely a third party not connected with this litigation named Jose Carlos Riveira) and the passport number belongs to another named person, making the passport counterfeit.  The Veritas Report also concludes that there was no U.K. birth record for James Smith under the purported birth date on the passport.  It thus determines that: "It would therefore seem impossible that BVFR could have had face to face contact with the male pictured, believing

him to be James Smith, especially given that the male pictured speaks very little English.  It is not believable that the real man in the images, Jose Carlos Riveira, has presented himself to BVFR as James SMITH."  In a footnote, Defendants dispute the findings of the Veritas Report and maintain that the private investigator should have been offered as an expert witness but offer little argument as to why.  Absent reasoned argument in the body of the brief as to why the report's conclusions should not be considered,[15] its findings, along with the Jumio Report, ineluctably lead to the conclusion that summary judgment should be granted with respect to the claim regarding the breach of the ID Verification Agreement.  Specifically, given the statements in the record that the passport was fake, BVFR cannot have examined a "current original government issued identification document."  Accordingly, summary judgment shall be granted in favor of Zaftr and against BVFR on Count I to the extent that it concerns BVFR's breach of the ID Verification Agreement.[16]

### ii.   Purchase Funds Sent to Third-Party Bank Accounts

Zaftr next argues that it is entitled to summary judgment on its claim that the Defendants breached the first set of agreements (the First Purchase Agreement, the First Escrow Agreement and the First Addendum) by releasing funds to third-party bank accounts before any Bitcoin was delivered.  Plaintiff argues that each of these agreements contained a provision preventing Defendants from releasing any of its purchase funds to the Seller until after the Bitcoin was

---

[15] *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("[A] passing reference to an issue . . .  will not suffice to bring that issue before [the] court." (citation omitted)).

[16] The parties' have not addressed the issue of whether Lawrence, signing the agreement on behalf of BVFR, can be individually liable for breach of the ID Verification Agreement.  As a result, the Court cannot address the issue at this time.

delivered but that notwithstanding these provisions Defendants, once they received the funds from Zaftr, promptly transferred some of the money to third-party bank accounts before Zaftr received any Bitcoin.  The Kirk Defendants argue to the contrary, that they are entitled to summary judgment because Kirk Law was entitled to send such funds on the basis they constituted a portion of BVFR's Seller Mandate Fee and BVFR directed it to send the funds.

The terms of the provisions upon which this theory is based each refer to restraints on Mandate Counsel (*i.e.*, Kirk Law).  The First Purchase Agreement states that "payment for the BTC shall not be released to the Seller *by the Mandate Counsel . . .* until Buyer receives the BTC" (emphasis added).  The First Escrow Agreement spells out that "*Mandate Counsel* shall be permitted to release the funds to Seller and Brokers after BTC delivery to Buyer" (emphasis added).  And the First Addendum provides: "*Mandate Counsel . . .* has agreed in the [First Escrow Agreement] not to release any of the funds sent by Zaftr to [Kirk Law's] IOLTA . . . to any parties, excepting BVFR for its Mandate Fee, until the BTC has been sent" (emphasis added).  Thus, although Plaintiff refers to "Defendants" transferring funds to third-party accounts, the provisions concern only Kirk Law's, *i.e.* Mandate Counsel's, actions and not the Lawrence Defendants.

Although the Lawrence Defendants never undertook in any of the agreements the obligation to transfer money to the Seller and, in fact, were never in a position to directly do so in that Kirk Law acted as escrow counsel in the first transaction and handled the distribution of funds, Zaftr maintains that the Lawrence Defendants nevertheless breached the parties' agreements because they directed Kirk Law to make the payments.  Zaftr does not provide any legal citation in support of its proposition—which, shorn of the facts here, is that a party to a contract may be found to have breached that contract if it instructs another party to take action

that arguably breaches that other party's obligations under the contract.  Given that the contractual obligations restricting the release of funds apply only to the Kirk Defendants and not to the Lawrence Defendants, summary judgment will be granted in favor of the Lawrence Defendants and against Zaftr to the extent that Zaftr's first breach of contract claim is premised on the contention that the Lawrence Defendants' prematurely released funds to third parties.

To review the undisputed facts with respect to Kirk Law and this claim: Kirk Law, at the Lawrence Defendants' direction, sent $80,000 to two third-party accounts: $40,000 to A.E. Consult LLC and $40,000 to Nationwide Finance LLC.  The payments were recalled, but only $20,000 was recovered—from Nationwide Finance LLC.  It is not disputed that these accounts are controlled by a third party and, most importantly, are *not* controlled by BVFR.  It is not disputed that the Lawrence Defendants' directed Kirk Law to release such funds.  Nor is it disputed that Lawrence was directed to make these transfers by Smith.[17]

The Kirk Defendants set forth a number of theories as to why these transfers did not violate the parties' agreements: (1) the Seller did not directly tell the Kirk Defendants to make the transfers (*i.e.*, communicate directly with Kirk Law) but rather engaged directly only with Lawrence; (2) the transfers consisted of Seller Mandate Fee funds, which are excepted from the prohibition on sending funds before receipt of the Bitcoin; and (3) the prohibition only applies to transfers to the Seller or parties to the agreements.

With respect to the first argument, it is not dispositive whether the direction to make the transfers came to Kirk Law directly from the Seller or through Lawrence as an intermediary.

---

[17] Lawrence states in his testimony that Smith made these requests.  In respect to the Nationwide Finance LLC transfer, Lawrence suggests the instruction may have come originally from a Bitcoin miner but states that Smith ultimately made the request to Lawrence.

While the agreements contain restrictions on the release of funds to the Seller and to other parties, there is no carve-out (putting aside the Seller Mandate Fee) in any of the provisions that allows Kirk Law to ignore these restrictions and release funds so long as it was directed to do so by the Seller, the Lawrence Defendants, or anyone else.  So while the record evidence supports that Lawrence directed Kirk Law to make the transfers on behalf of the Seller, this fact has no bearing—at least on the record presented and positions argued to the Court—on whether Kirk Law breached the agreements by prematurely releasing funds.

As to the second argument, while Lawrence testified that the $80,000 transferred "technically would have been part of [BVFR's Seller Mandate Fee]," that some of it was to serve as "a trigger for the release of BTC for a . . . different miner," and that the remainder was "to trigger the release of the BTC," the parties' agreements are silent as to the purposes for or the amount of the Seller Mandate Fee and thus do not help in determining whether these stated purposes warranted the transfer.[18]  But even if the $80,000 did constitute part of the Seller Mandate Fee and assuming that the Seller Mandate Fee was properly distributed prior to Zaftr's receipt of the Bitcoin, the First Addendum provides that the Seller Mandate Fee was to be released to "BVFR."  Here, the money was not sent directly to BVFR or to a BVFR account.  Rather it was sent to two bank accounts neither of which BVFR controlled.[19]

---

[18] Some of Lawrence's communications with Smith, not referenced by the parties in their briefing, further suggest that Lawrence considered the funds sent to the two third-party accounts as constituting part of his Seller Mandate Fee.  For instance, he writes to Smith: "BVFR [i]mmediately sent some of its Mandate Fee to the designated recipient . . . which was the wrong LLC . . . we were then told that LLC would return funds and then it didn't so I needed to recall the wire; we then sent Mandate Fee to Nationwide. . . ."  Kirk also testified that the amounts sent to the third-party accounts were part of BVFR's Seller Mandate Fee, but Kirk treated the "specifics" discussed with BVFR as to the distribution of its Seller Mandate Fee as privileged.

[19] For example, Lawrence testified that the Nationwide Finance LLC account was related to a "reputable . . . Florida-based businessperson."

The Kirk Defendants' final argument arises from their misstatement of the language of the First Addendum.  In their briefs, the Kirk Defendants argue that the prohibition on sending funds before the receipt of Bitcoin only applies to transfers to the Seller or "parties to the agreements" and that because Kirk Law transferred the funds to the two bank accounts they "never transferred any funds to the Seller or to any parties to the agreements."  But the First Addendum's provision does not just limit transfer to the Seller and to "parties to the agreements."[20]  Transfer is limited in respect to the Seller and "***to any parties***" regardless as to whether they are parties to the agreements: "Mandate Counsel [] further has agreed . . . not to release any of the funds sent by after . . . ***to any parties***, excepting BVFR for its Mandate Fee, until the BTC has been sent. . . ."[21]

Accordingly, the undisputed facts are that Kirk Law released funds to third-party accounts before Zaftr received any Bitcoin and that neither the $40,000 transferred to A.E. Consult LLC nor $20,000 of the $40,000 transferred to Nationwide Finance LLC was recovered.  Given that, summary judgment shall be granted in favor of Zaftr and against Kirk Law on Zaftr's breach of contract claim to the extent that it relies on Kirk Law's premature release of funds to

---

[20] The provisions in the First Purchase and Escrow Agreements, however, as laid out *supra*, are limited to the Seller (and Brokers).  In respect to whether Kirk Law's actions breached those provisions, which specifically prohibit premature release of funds to the Seller, the Court cannot determine if release of the funds to the two third-party accounts was a violation because it is disputed whether the third-party accounts were controlled by the Seller.  While the record evidence supports that Smith directed Lawrence to make such payments to those accounts, the record leaves it unclear if those accounts were actually controlled by the purported Seller.  Zaftr's motion for summary judgment shall therefore be denied as to premature release of funds with respect to the First Purchase and Escrow Agreements.  The Kirk Defendants' motion shall be denied in the same respect.

[21] Moreover, this reading of the prohibition on sending funds to third parties is consistent with the First Addendum's provision requiring BVFR (through Kirk Law) to return its Seller Mandate Fee to Zaftr in the event the Bitcoin was not delivered.  It is hard to see how BVFR could comply with that provision if Seller Mandate Fee funds could be directly distributed to third parties (even if at the direction of BVFR), from whom it might be difficult or impossible to retrieve such funds—which is precisely what occurred in this case.

third-party accounts in violation of the First Addendum.[22]  Further, for the reasons set forth

above, Zaftr's motion for summary judgment against the Lawrence Defendants shall be denied to

the extent it is predicated on the Lawrence Defendants' releasing purchase funds to third parties.

The Lawrence Defendants' motion for summary judgment shall be granted in its favor on the

same claim in respect to releasing purchase funds to third parties.

### iii.    Failure to Return Funds from the August and October Tranches

Zaftr's third breach of contract theory rests on two grounds: that the Defendants did not

return Zaftr's purchase funds after the failed August Tranche within the time following the

Default Period—one business day—required by the First Addendum; and, further, that they

failed to return funds related both to the August Tranche and October Tranche[23] claimed by

BVFR as its Seller Mandate Fee.[24]

The Kirk Defendants move for summary judgment on the grounds that they have returned

all of Zaftr's purchase funds in their possession except for funds that are disputed in this case and

that they were entitled and obligated to send BVFR's Seller Mandate Fee as directed by BVFR.

The Lawrence Defendants move for summary judgment on the grounds that the funds retained

constitute BVFR's Seller Mandate Fee and they are entitled to retain the funds under the parties'

---

[22] While summary judgment is granted against Kirk Law in this respect, the Court cannot make a determination at this time as to any individual liability for Kirk.  The provision in the First Addendum prohibiting release "to any parties" except for BVFR for its Seller Mandate Fee applies to "Mandate Counsel," defined as Kirk Law in the first paragraph of the First Addendum.  Zaftr, while referring broadly to "the Kirk Defendants," has not made any legal argument that Kirk, as an individual, can also be liable for release of funds to third parties.

[23] Any Seller Mandate Fee from the September Tranche does not appear to form the basis of Zaftr's claims regarding return of the Seller Mandate Fee Funds.

[24] Zaftr does not contend that Defendants failed to return purchase funds apart from the Seller Mandate Fee within one business day in respect to the October Tranche—this argument is limited to the August Tranche.  Thus the only issue raised in respect to the October Tranche is return of the amount claimed as BVFR's Seller Mandate Fee.

agreements.

        a.  <u>Sending BVFR's Seller Mandate Fee Before Delivery of Bitcoin</u>

In deciding the competing motions, the first question is whether the agreements provide that BVFR's Seller Mandate Fee could be delivered to BVFR before the delivery of Bitcoin to Zaftr.

The answer to that question is yes. The First Purchase Agreement provides that the Seller Mandate Fee is "separate and distinct" from the purchase funds that would go to the Seller and "shall be segregated and payable by Mandate Counsel upon receipt of said funds." The Second Purchase Agreement features the same language. This language is copied and repeated in the First Addendum, which also provides that "the funds being sent to [Kirk Law's] IOLTA— excepting the Mandate Fee—shall be held . . . and that none of the Mandate Counsel fee, broker fees, or any of Seller's funds shall be moved from the IOLTA until the BTC has been successfully sent . . . to Zaftr[]."

These provisions unambiguously provide that Kirk Law was entitled to send Seller Mandate Fee funds to BVFR before Zaftr's receipt of Bitcoin.

        b.  <u>Provisions Governing Return of Zaftr's Funds</u>

The next issue to be addressed is whether the contractual provisions governing return of Zaftr's funds were the same or different in respect to the August and October Tranches.

The First Addendum, governing the August Tranche, has three provisions bearing on the return of Zaftr's funds, which distinguish between general purchase funds and BVFR's Seller Mandate Fee. The first requires Kirk Law to return purchase funds separate from the Seller Mandate Fee in the event the transaction failed: "[Kirk Law] represents and warrants to Zaftr that should the BTC not be sent within 24 hours of Zaftr's funds being sent to the Firm's IOLTA . . .

31

all funds sent to the IOLTA—excepting the Mandate Fee—shall be returned to the account which Zaftr originated its funds from *within one business day*" (emphasis added).  The second provision requires BVFR to "return the Mandate Fee to [Kirk Law's] IOLTA, less the Breakup Fee. . . within one business day of the Default Period in the event the BTC is not sent as provided . . . in order to allow [Kirk Law] to separately return the balance of the Mandate Fee to Zaftr."  And the third provision—relevant here—of the First Addendum requires Kirk Law to return "all of BVFR's Mandate Fee funds returned to the IOLTA . . . promptly" to Zaftr "within one business day of [Kirk Law] receiving them back from BVFR in the event the Default Period occurs."

In short, with respect to purchase funds separate from the Seller Mandate Fee, the First Addendum requires that Kirk Law return such funds within one business day of the Default Period if the Bitcoin were not delivered.  With respect to the Seller Mandate Fee funds, the First Addendum first requires BVFR to return them to Kirk Law within one business day of the Default Period if default occurred, and then requires Kirk Law to return "all of [the Seller] Mandate Fee funds" to Zaftr within one business day of receipt from BVFR.

However, the Second Addendum, which governs the October Tranche, does not include any return provision for the Seller Mandate Fee, nor do the Second Purchase or Escrow Agreements, which are incorporated into the Second Addendum.  Rather the second set of agreements are silent on the issue of return of the Seller Mandate Fee.  Moreover, the second set of agreements do not address their relationship to the first set, are not expressly integrated by a merger clause, and do not expressly waive or rescind the return requirements of the First Addendum or have inconsistent provisions.

Despite this silence, Zaftr suggests that the return provisions of the First Addendum apply

with equal force to the October Tranche Seller Mandate Fee.  The Lawrence Defendants, on the other hand, argue that the silence confirms that Zaftr waived any return requirement after allowing BVFR to retain the claimed Seller Mandate Fee after the failed August Tranche. Neither party, however, in making their arguments complies with Rule 7.1 of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania, which provides that: "*Every motion* not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the *legal contentions and authorities relied upon* in support of the motion." E.D. Pa. R. Civ. P. 7.1(c) (emphases added).  Briefs that are not accompanied by citations to legal authority or adequate explanations of the bases for the party's arguments may be denied as being legally deficient.  *See Griffin-El v. Beard*, 2009 WL 678700, at * 4 (E.D. Pa. Mar. 16,  2009) (failure to cite to relevant case law warrants denial of motion under Local Rule 7.1(c)) (citing *Purcell v. Universal Bank, N.A.*, No. 01-CV-02678, 2003 U.S. Dist. LEXIS 547, at *9 (E.D. Pa. Jan. 3, 2003) (denying motion for summary judgment because, *inter alia*, the movant's brief did not "contain the basis for its legal contentions" under Local Rule 7.1(c)); *see also Moore v. Vangelo*, 2004 WL 292482 (E.D. Pa. Feb. 12, 2004) (denying defendants' motion to dismiss where defendants "failed to set forth a factual or legal basis in support of their contention," contrary to the requirements of Local Rule 7.1(c)).

The parties, having provided no legal argument—and *no* citations to any relevant case law—to support their respective provisions, leave the Court without any argument on any of the potential key issues presented by the silence of the second set of agreements on return of the October Tranche Seller Mandate Fee.  Without any legal argument on such issues, the Court cannot reach a determination as to whether the Seller Mandate Fee for the October Tranche was subject to any ongoing effect of the First Addendum's return provision.

In light of this deficiency in the briefing of all of the parties, the Court will deny summary judgment on the issue of whether Defendants' failure to return funds claimed as the October Tranche Seller Mandate Fee violates the parties' agreements.

c. <u>Kirk Law's Timely Return of the August Tranche Purchase Funds</u>

The next issue is whether Kirk Law failed to return Zaftr's purchase funds separate from the Seller Mandate Fee within one day of the Default Period after the failed August Tranche. Although—and this is not disputed—Kirk Law returned Zaftr's purchase funds ($1,886,977.60) from the August Tranche, Zaftr argues that it did not do so in a timely manner, *i.e.*, within one day of the Default Period. The Kirk Defendants respond that the one-day return requirement was modified by the parties.

There are two issues of fact that preclude summary judgment on the issue of whether Kirk Law failed to return the purchase funds within one day in breach of the First Addendum. First, *no party* clarifies when the Default Period began and started the clock on return of the August Tranche funds after the attempt failed. While it is undisputed that Zaftr sent the August Tranche purchase funds to Kirk Law on August 25, 2020, no party demonstrates when those funds "successfully cleared" such that the 24-hour countdown began. Without that piece of information, the question of when the Default Period of the August Tranche began remains open.

Additionally, while it is undisputed that Kirk Law did not return the purchase funds until September 4, 2020—10 days after Zaftr sent the August Tranche funds to Kirk Law on August 25—there is a live dispute as to whether the parties' course of dealing modified the return requirement. Specifically, Zaftr points to evidence that Montgomery requested return of the August Tranche funds by email on August 28, 2020 and the funds were not returned until September 4. But the Kirk Defendants highlight WhatsApp communications between the parties

34

between August 25 and September 4 that they say show Montgomery "effectively modifying the agreement" by his conduct "as to the expected timing of the return of funds."

The salient details of the WhatsApp communications are as follows: While Montgomery requested return of the funds on August 28 "as soon as possible today," he also sent these messages in the WhatsApp chat thread with Kirk and Lawrence:

- "I propose we suspend pricing out new tranches until we can close what we have outstanding." (August 27);

- "[A]s I haven't seen the BTC hit our wallet yet, I expect that the Seller will not be delivering the BTC today.  Is that a fair expectation?" (August 28);

- "Good morning gents, the 205 BTC has not been sent to our wallet yet and I understood the seller confirmed the transaction would be submitted . . . this morning. Is there any update on that?" (September 2);

- "Given that [Smith] hasn't provided any additional information . . . and he has had almost a week to deliver, it is reasonable to assume that he will not be able to deliver the coins based on the deal terms we agreed to.  If there is another hindrance in his ability to deliver that I'm not aware of, then (given what I've seen over the past week) I suspect it is not something that will be resolved in short order.  In either case, please prepare to return the funds and then we can regroup to figure out the best path forward for everyone's benefit.  I have hedges in place based on the pricing we locked in last week, so getting the funds returned to close those out would be helpful." (September 2); and

- "I spoke with [Kirk] and understand there still may be a path forward to successful transactions here.  I'm happy to play ball, so I'll continue to be patient as the elements are sorted out." (September 3).

It is hornbook law that an agreement may be subsequently modified by oral agreement or by conduct.  *See, e.g.*, *First Nat. Bank of Pennsylvania v. Lincoln Nat. Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir. 1987) (listing Pennsylvania cases on subsequent modification); *Consol. Tile & Slate Co. v. Fox*, 189 A.2d 228, 230 (Pa. 1963); 11 Williston on Contracts § 32:14 (4th ed.) ("Even when the terms of a contract are clear and unambiguous, the subsequent conduct of the parties may evidence a modification of their contract.").  But whether subsequent conduct of the

parties amounts to a modification of the contract is generally a matter to be decided by the factfinder—here, a jury.  *See, e.g.*, *Dora v. Dora*, 141 A.2d 587, 590 (Pa. 1958).  Thus whether the purchase funds for the August Tranche should have been returned at an earlier date is an issue that cannot be resolved at summary judgment.

          d.   <u>Kirk Law and BVFR's Return of BVFR's Seller Mandate Fee for the August Tranche</u>

The final issue is whether Kirk Law and/or BVFR have violated the parties' agreements by failing to return the amount claimed by BVFR as its Seller Mandate Fee for the August Tranche.

As a preliminary matter, it is unclear from the record and the parties' briefing if Kirk Law retains any amount of the funds claimed by BVFR as its Seller Mandate Fee for the August Tranche, or if all of those funds (apart from the $60,000 sent to third parties and never recovered) were transferred to BVFR and remain with BVFR.  On that basis, both possibilities are addressed below.

*1.  Kirk Law*

At the outset, Kirk Law's retention in its escrow account of disputed funds is consistent with the rules of professional conduct for attorneys (Kirk Law being BVFR's counsel) in Pennsylvania.  *See* Model Rules Prof'l Conduct r. 1.15; Pa. R.P.C. 1.15(f) ("When in possession of funds or property in which two or more persons, one of whom may be the lawyer, claim an interest, the funds or property shall be kept separate by the lawyer until the dispute is resolved.").[25]  Kirk Law therefore properly holds funds claimed by BVFR as part of its Seller

---

[25] Zaftr argues Kirk Law has no basis for retaining these funds but merely rests on its argument that BVFR is not

Mandate Fee as disputed in this litigation.

As for any amount of the August Tranche Seller Mandate Fee still in BVFR's possession, it has already been established, *see supra*, that Kirk Law was entitled to send BVFR's Seller Mandate Fee before Zaftr received any Bitcoin. The remaining question is whether Kirk Law had any responsibility to somehow return Seller Mandate Fee funds still in BVFR's possession to Zaftr in the event the transaction failed. The answer is no. Kirk Law was not required by the First Addendum to return Seller Mandate Fee funds in the event of a failed transaction until BVFR returned them first to Kirk Law:

> In regard to the [Seller] Mandate Fee, BVFR separately represents and warrants by way of this Addendum that it shall return the Mandate Fee to [Kirk Law's] IOLTA . . . within one business day of the Default Period in the event the BTC is not sent as provided in the Transaction Documents in order to allow [Kirk Law] to separately return the balance of the Mandate Fee to Zaftr. [Kirk Law] represents and warrants that all of BVFR's Mandate Fee funds ***returned to the IOLTA*** shall be promptly returned to the account which Zaftr originated its funds from within one business day of the Firm receiving them back from BVFR in the event the Default Period occurs. (emphasis added)

Under the First Addendum, Kirk Law was not obligated to return BVFR's Seller Mandate Fee funds that were not first returned to its IOLTA account. There is, on the face of the agreement, therefore no breach by Kirk Law on any account it failed to return Seller Mandate Fee funds that were not first returned to it by BVFR.

There is, however, one final issue to address in respect to Kirk Law—the $60,000 that is not in the possession of either Kirk Law or BVFR but rather in the possession of unknown third parties, the owners of the two third-party bank accounts. Although summary judgment will be

---

entitled to retain the Seller Mandate Fee funds. Zaftr's argument only serves to highlight that the funds in Kirk Law's possession are disputed in the current litigation.

granted in Zaftr's favor against Kirk Law to the extent it is premised on premature release of funds to third parties, *see supra*, there is a question regarding whether Kirk Law also breached the parties' agreements by failing to return amounts sent to third parties.

The issue turns on whether the $60,000 is part of BVFR's Seller Mandate Fee.  If the $60,000 constituted a portion of Zaftr's purchase funds separate from any Seller Mandate Fee, then Kirk Law had to return such amounts directly to Zaftr in the event of transaction failure and made it impossible for itself to do so here, amounting to a breach of the return requirement.  *See, e.g.*, *Thuemler v. Brown*, 18 Pa. Super. 117, 120-21 (1901) ("[W]here the party to the contract by his own act makes it impossible for him to perform his covenant, the plaintiff is entitled to compensation.").  If, on the other hand, the $60,000 constituted a portion of BVFR's Seller Mandate Fee, then, under the First Addendum, BVFR was obligated to return such amount to Kirk Law such that Kirk Law could then return it to Zaftr in the event of a failed transaction.

But whether the $60,000 constituted part of the Seller Mandate Fee or not is disputed. While Kirk and Lawrence both testified that the $80,000 sent to the third-party accounts constituted a portion of what would have been BVFR's Seller Mandate Fee, Montgomery testified he "never saw anything related to how the mandate fee was calculated. . . ."  The issue is thus disputed and cannot be resolved at summary judgment.

### 2.  BVFR

Turning now to BVFR, it is undisputed that BVFR kept[26] what it deems the Seller

---

[26] As discussed above, however, it is not clear from the record or briefing how the funds claimed by BVFR as the August Tranche Seller Mandate Fee are currently distributed between BVFR and Kirk Law.

Mandate Fee from the August Tranche.[27]  The parties dispute, however, whether any conditions were placed on BVFR's retention of the funds.

BVFR maintains that Zaftr let it keep the August Tranche Seller Mandate Fee following the failure of the August Tranche and, by failing to include a provision requiring return of such funds in the agreements governing the September and October Tranches, waived the return requirement in the First Addendum.  Zaftr counters that, while it let BVFR retain that amount after the failed August Tranche, those funds remained subject to a return requirement (*i.e.*, that of the First Addendum) in the event further attempts to complete the transaction failed.

Whether the $367,536.40 was subject to return in the event the transaction failed is disputed and cannot be determined at summary judgment.  As discussed *supra*, nothing in the second set of agreements describes the return of the Seller Mandate Fee in the event the transaction failed.  Moreover, the Second Addendum, as well as the Second Purchase and Escrow Agreements, do not describe their relationship to the prior set of agreements, are not integrated, do not expressly rescind the prior set of agreements, and do not address the issue of return of the Seller Mandate Fee in the event of non-performance.  There is no express waiver or rescission of the return provision appearing in the First Addendum.  Nevertheless, Montgomery testified that he allowed BVFR to retain the amount "subject to a future transaction."  Lawrence testified, on the other hand, "My fee was earned when that fee hit my . . . counsel's account, period."

---

[27] Montgomery testified as to the circumstances of BVFR's retaining the Seller Mandate Fee, stating that he "initially asked him [Lawrence] to return it," but that he was "met with resistance on that request."  He went on: "At the time, I still believed that this was—had a possibility, and it just got too complicated in terms of what they were trying to do.  So I made a—I made a decision of, okay, am I going to push to get that money back, or do I think it will be better for the business to let this continue to sit in the U.S. with a reputable lawyer and a successful investment banker who's holding onto it so that we can close out another deal."

In this light, given the silence in the second set of agreements regarding return of the Seller Mandate Fee and the dispute between the parties as to how the funds were to be treated, the Court cannot make a determination as to the return of the Seller Mandate Fee for the August Tranche, and summary judgment on this issue must be denied.

### B. Unjust Enrichment

Zaftr's contentions underpinning its unjust enrichment claim—that Defendants have the benefit of purchase funds paid by Zaftr with respect to the August, September, and October Tranches and have improperly maintained possession of those funds—essentially repeat those made in support of its breach of contract claims. Since there are valid contracts governing the parties' relationship, summary judgment is warranted on Zaftr's unjust enrichment claim. *See Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) ("[U]njust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract. . . .").

Zaftr responds that the Defendants have already, in their motion to dismiss, made the argument that its unjust enrichment claim must be dismissed as it is barred by its breach of contract claim and that the argument was rejected by the Court. In so doing, the Court balanced the Pennsylvania rule that an unjust enrichment claim cannot survive if the claim is premised on a written agreement against Federal Rule of Civil Procedure 8(d), which allows plaintiffs to plead inconsistent claims in the alternative. But, as the Court pointed out, the unjust enrichment claim could survive only if the plaintiff "fail[ed] to establish that the contract governs certain claims" in which case "unjust enrichment may yet provide a remedy." *Zaftr Inc. v. Lawrence*, 2021 WL 4989769, at *4 (E.D. Pa. Oct. 27, 2021).

Now, having determined there are valid contracts governing the parties' relationship, the

unjust enrichment claim, in accordance with long-standing Pennsylvania Supreme Court precedent, is not viable. *Benefit Tr. Life Ins. Co. v. Union Nat. Bank of Pittsburgh,* 776 F.2d 1174, 1177 (3d Cir. 1985) (listing Pennsylvania state cases concluding that unjust enrichment does not apply where the parties' relationship is based on a written agreement); *see also Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969) ("[W]e note that this Court has found the quasi-contractual doctrine of unjust enrichment inapplicable when the relationship between parties is founded on a written agreement or express contract."); *Third Nat. Bank & Tr. Co. of Scranton v. Lehigh Val. Coal Co.*, 44 A.2d 571, 574 (Pa. 1945) ("Nor . . . does any question of 'unjust enrichment' arise, for that principle of quasicontract is not applicable to agreements deliberately entered into by the parties however harsh the provisions of such contracts may seem in the light of subsequent happenings.").

Zaftr cites to *TZE Glob. Dis Ticaret A.S. v. Papers Unlimited*, *Inc.*, to argue that its unjust enrichment claim should, nevertheless, survive along with its breach of contract claims.  2021 WL 6066014 (E.D. Pa. Nov. 8, 2021).  Quite apart from *TZE Glob. Dis Ticaret A.S*'s non-precedential value—it is an unpublished footnote opinion from a sister court—it is distinguishable.  The plaintiff's claims were premised on what it alleged were oral contracts between the parties.  There appeared to be some question as to whether in fact the parties had entered into a contract and, even assuming so, the court determined that the terms of any such contracts were ambiguous and thus to be interpreted by the fact finder.  *Id.*  The circumstances were entirely different than those present here, where there is no question that the parties have in fact entered into the contracts and that such contracts were written rather than oral.  Accordingly, the Pennsylvania rule that an unjust enrichment claim cannot proceed "when the relationship between parties is founded upon a written agreement or express contract . . . " governs, *Wilson*

41

*Area Sch. Dist.*, 895 A.2d at 1254, and Zaftr's unjust enrichment claim shall be dismissed at summary judgment.

### C. Plaintiff's Tort Claims

Both the Kirk Defendants and the Lawrence Defendants move for summary judgment on all of Zaftr's tort claims: conversion, fraudulent misrepresentation and omission, negligent misrepresentation and nondisclosure, and civil conspiracy.  For the reasons that follow, Zaftr's claims for fraudulent misrepresentation (except in respect to its omission theory) and civil conspiracy survive summary judgment, but summary judgment shall be granted in favor of Defendants on its claims for conversion, for negligent misrepresentation, and for fraudulent misrepresentation (to the extent it relies on a theory of omission).

### i.    *Gist of the Action*

Defendants argue that Zaftr's claims for conversion, fraudulent and negligent misrepresentation, and civil conspiracy must be dismissed under the gist of the action doctrine. As explained below, Defendants are correct as to Zaftr's conversion claim, but Zaftr's other tort claims are not barred by the doctrine because they are not predicated on contractual duties.

Whether the gist of the action doctrine applies in any particular setting is a question of law. *Bohler-Uddeholm Am.*, 247 F.3d at 106.  "Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 216 (3d Cir. 2022) (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (Pa. 2014)).  "[T]he doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002).  Although "it is possible that a breach of contract also gives rise to an actionable tort," *id.*, a claim "should be limited to a contract claim when the parties' obligations

are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Bohler-Uddeholm Am.*, 247 F.3d at 104 (internal quotation omitted). The Pennsylvania Supreme Court addressed the doctrine in *Bruno*, where it reaffirmed a duty-based approach to determining the nature of a claim:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, *e.g.*, for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. . . . If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno*, 106 A.3d at 68 (citations omitted).

### a.  Gist of the Action re: Conversion

Zaftr's conversion claim is premised on the Defendants' wrongful exercise of control over Zaftr's property: to wit, Defendants' retention of the amount claimed as BVFR's Seller Mandate Fee.

"[W]here a tortious claim for conversion is based solely on the failure to perform under a contract, it is barred by the gist of the action doctrine." *Wen v. Willis*, 117 F. Supp.3d 673, 683 (E.D. Pa. 2015) (quoting *Vives v. Rodriguez*, 849 F. Supp.2d 507, 516 (E.D. Pa. 2012)); *see also Tray, Inc. v. Devon Int'l Grp., Inc.*, 2021 WL 1734845, at *9 (E.D. Pa. May 3, 2021) (finding gist of the action lay in contract rather than tort regarding a failure to deliver personal protective equipment under an agreement and consequently dismissing conversion claim). Because the

43

funds retained by Defendants are addressed by contractual provisions and turn solely on the resolution of Zaftr's contractual claims, Zaftr's claim for conversion (Count IV) is barred by the gist of the action doctrine and shall be dismissed on summary judgment.[28]

### b.   Gist of the Action re: Misrepresentation

Zaftr's fraudulent and negligent misrepresentation claims rely on a theory of inducement, namely that Defendants made multiple misrepresentations to induce Zaftr to enter into the parties' agreements and to continue to pursue the transaction after the initial failed attempt.

Claims for fraud in the inducement have proved thorny to resolve under the gist of the action doctrine, and there is no clear, single statement from the Pennsylvania Supreme Court outlining application of the doctrine to such claims.  *See Downs v. Andrews*, 639 F. App'x 816, 820 (3d Cir. 2016) (non-precedential) ("Pennsylvania state and federal courts have reached different conclusions about whether the gist of the action doctrine applies to fraudulent inducement claims.").  That being said, the principles adopted by the Pennsylvania Supreme Court in *Bruno* and the reasoning of lower state courts as well as federal courts in Pennsylvania are helpful here.

Under the duty-based approach of *Bruno*,[29] the issue is whether Zaftr's misrepresentation

---

[28] As with its unjust enrichment claim *supra*, Zaftr argues that its conversion claim should not be dismissed given this Court's motion to dismiss opinion in which it concluded that the conversion claim would not be dismissed because on the allegations alone, viewed through a motion to dismiss standard, it was plausible that the conversion claim was not merely duplicative of Zaftr's breach of contract claims. *Zaftr Inc.*, 2021 WL 4989769, at *5.  Since it has been determined here that BVFR and Kirk Law are both bound by the agreements governing the funds still in their possession, *see* discussion *supra*, the concerns set forth in this Court's opinion on the motions to dismiss are no longer applicable.

[29] The duty-based approach of *Bruno* can be understood to differ from the "inextricably intertwined" standard invoked by the Kirk Defendants, which is ultimately drawn from *eToll*, 811 A.2d at 21.  As the Third Circuit explained, "While the *Bruno* court did not explicitly overrule *eToll* or its progeny, it explained that *eToll* creates a

claims are predicated on broader duties created by society or duties created only by the parties' contractual obligations.

Fraudulent inducement claims are not necessarily based on duties separate from those created by the contract itself. *See, e.g.*, *Vives*, 849 F. Supp.2d at 520-21 (concluding that fraudulent inducement claims predicated on representations as to a party's intent to perform under an agreement were barred by the doctrine); *Integrated Waste Sols., Inc. v. Goverdhanam*, 2010 WL 4910176, at *13 (E.D. Pa. Nov. 30, 2010) (concluding misrepresentation claims were barred by gist of the action doctrine where they concerned precontractual representations specifically outlined in subsequent agreements and thus created contractual duties); *eToll*, 811 A.2d at 19 (fraud claims concerning only the performance of contractual duties are barred by the doctrine).

But such claims may also be based on broader duties imposed by society, in which case they are not barred by the doctrine. *eToll*, 811 A.2d at 14 ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." (quotation omitted)). Numerous cases following *Bruno* have affirmed that when the duty claimed to be breached is not one created by the terms of the contract, but rather broader social duties, then an action lies in tort, including as to fraudulent inducement claims. *See, e.g.*, *SodexoMAGIC*, 24 F.4th at 217 (concluding that fraudulent inducement claim could proceed in tort since it did not depend on the breach of a contractual duty but rather implicated a broader duty not to deceive through

---

divide in the gist of the action jurisprudence, did not rely on any of the *eToll* factors in reaffirming the duty-based standard from which *eToll* departs, and cabined reliance on *eToll*'s 'inextricably intertwined' language." *Dommel Properties LLC v. Jonestown Bank & Tr. Co.*, 626 F. App'x 361, 366 (3d Cir. 2015) (citations omitted) (non-precedential).

precontractual misrepresentation); *Dansko Holdings*, 991 F.3d at 501 (fraudulent inducement claim held to be "a true fraud claim" where party "lied about a side issue" and thus "violated not the contract, but (if anything) a social duty not to lie to business partners"); *Earl v. NVR, Inc.*, 990 F.3d 310, 315 (3d Cir. 2021) (false representations made prior to formation of contract were collateral to the contract itself and not barred by the doctrine); *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 256 (3d Cir. 2017) (concluding that fraudulent misrepresentations and omissions involved a "broader social duty" and were not barred by the doctrine); *Graham Packaging Co., L.P. v. Transplace Tex., L.P.*, 2015 WL 8012970, at *4 (M.D. Pa. Dec. 7, 2015) (fraudulent misrepresentation and negligent misrepresentation claims not barred where they breached "an independent social duty" rather than contractual obligation); *KMB Shamrock, Inc. v. LNR Transportation, Inc.*, 2015 WL 13779752, at *6-7 (Pa. Com. Pl. Sept. 25, 2015) ("KMB's claim . . . involves the breach of duties imposed by social policies embodied by the law of torts, rather than by specific executory promises contained in the parties' agreement.").

Here, Zaftr's fraudulent misrepresentation claims, based on alleged fraudulent inducement, are not based on duties set forth in the parties' agreements but rather duties imposed by society (*i.e.*, the duty not to lie to business partners, *Dansko Holdings*, 991 F.3d at 501, a duty of honesty, *Mendelsohn, Drucker & Assocs. v. Titan Atlas Manufacturing, Inc.*, 885 F. Supp.2d 767, 790 (E.D. Pa. 2012); *KMB Shamrock*, 2015 WL 13779752, at *7, and a duty not to affirmatively mislead, *Telwell Inc. v. Grandbridge Real Estate Capital*, 143 A.3d 421, 429 (Pa. Super. 2016)).  Accordingly, they are not barred by the gist of the action doctrine.

The same conclusion applies with respect to Zaftr's negligent misrepresentation claim in that negligent misrepresentation claims predicated on a theory of inducement are treated

similarly to fraudulent misrepresentation claims premised on inducement—*i.e.*, in that where the claim implicates broader social duties, it is not barred by the gist of the action doctrine. *See, e.g.*, *Howe v. LC Philly, LLC*, 2011 WL 1465446, at *4 (E.D. Pa. Apr. 15, 2011) (not barring fraudulent and negligent misrepresentation claims); *84 Lumber, L.P. v. Gregory Mortimer Builders*, 2012 WL 13029570, at *3 (W.D. Pa. Apr. 6, 2012) (concluding that fraudulent and negligent misrepresentation claims sounded in "fraud rather than performance of the []contracts" and the negligent misrepresentation claim was not barred by the gist of the action doctrine); *Victor Buyck Steel Const. v. Keystone Cement Co.*, 2010 WL 1223594, at *2 (E.D. Pa. Mar. 30, 2010) ("Courts discussing the gist of the action doctrine's applicability to fraud in the inducement claims, also discuss negligent misrepresentation claims."); *U.S. Claims, Inc. v. Saffren & Weinberg, LLP.*, 2007 WL 4225536, at *12 (E.D. Pa. Nov. 29, 2007) (declining to dismiss both fraud in the inducement and negligent misrepresentation claims).  Accordingly, Zaftr's negligent misrepresentation claims are also not barred by the gist of the action doctrine.

There is, however, a small wrinkle posed by representations in the ID Verification Agreement that requires further analysis.

    c.   <u>Gist of the Action re: ID Verification Agreement and Misrepresentations as to Purported Seller</u>

That wrinkle concerns Zaftr's claims that the Lawrence Defendants misrepresented various facts as to Smith's identity and prior dealings with Smith because such representations are *also* included in the terms of the ID Verification Agreement.  For the reasons below, however, these claims are not barred by the gist of the action doctrine because, while they are based on the alleged breach of contractual duties, they also arise from alleged transgressions of broader societal duties.

The ID Verification Agreement includes representations as to BVFR/Lawrence's prior

dealings with Smith and Smith's identity, not to mention a description of Smith's purported

passport.  As to such representations, the Agreement states that they are "true and accurate to the

best of [Lawrence's] knowledge" (Lawrence signing on behalf of BVFR).  The ID Verification

Agreement thus serves as an attestation by the Lawrence Defendants that they have not

misrepresented the identity of Smith to the best of their knowledge.  In this way, the statements

in the ID Verification Agreement, while bound up in a valid contract, also implicate broader

social duties, *i.e.*, duties not to lie to business partners or affirmatively mislead.  *Dansko*

*Holdings*, 991 F.3d at 501; *Telwell*, 143 A.3d at 429.  The issue thus posed by these

representations in the ID Verification Agreement is whether the gist of the action doctrine bars

claims that are based on *both* contractual terms and also broader social duties.

The Third Circuit recently encountered a similar situation in *SodexoMAGIC, LLC v.*

*Drexel University*, 24 F.4th 183 (3d Cir. 2022).  While the district court below concluded that a

fraudulent inducement claim was barred because there was a contract with terms addressing the

same matters as the precontractual representations at issue, the Third Circuit concluded that,

because the plaintiff's fraud claim would "exist with or without a later-in-time contract," the gist

of the action doctrine did not bar that claim.  *Id.* at 217.  In other words, "a precontractual duty

not to deceive through misrepresentation or concealment exists independently of a later-created

contract."  *Id.*

*SodexoMAGIC* specifically addressed how the gist of the action doctrine applies in an

instance where both contractual *and* broader societal duties are alleged to be breached: "When a

contractual duty duplicates an obligation generally owed to another in society, the gist of the

action doctrine does not bar a tort claim; it prevents only the contractual duty from serving as a

basis for a tort claim."  *Id.*  "Under the doctrine, it is still possible for the same act to breach both

a duty under tort law and a contractual duty." *Id.* (citing case examples).

Applying the reasoning of *SodexoMAGIC* here, the Lawrence Defendants' alleged misrepresentations in regards to Smith's identity and prior dealings with Smith, while they would constitute a breach of the ID Verification Agreement, could independently constitute a violation of a broader societal duty. For that reason, Zaftr's fraudulent and negligent misrepresentation claims are not barred by the gist of the action doctrine even to the extent they rely on representations that are included in the ID Verification Agreement.[30]

### ii.   *Misrepresentations and Omissions*

#### a.   Expert Testimony re: Negligence

A preliminary issue to be addressed before turning to the substance of the misrepresentation claims is the Kirk Defendants' argument that Zaftr *must* provide expert testimony to support its negligent misrepresentation claim against the Kirk Defendants. The Kirk Defendants argue that, because Zaftr has not and "likely could not" produce an expert opinion demonstrating that the Kirk Defendants were negligent in performing their duties as escrow counsel, Zaftr's negligence claim must be dismissed. They first argue that legal malpractice claims in Pennsylvania require expert testimony and this amounts to a legal malpractice claim. They then suggest, citing *Lentino v. Fringe Emp. Plans, Inc.*, 611 F.2d 474, 480-83 (3d Cir. 1979), that negligence claims against an attorney require expert testimony. And finally, they argue that expert testimony is proper "where formation of an opinion on a subject

---

[30] The Kirk Defendants argue that Zaftr's civil conspiracy claim is in effect barred by the gist of the action doctrine on the basis that the underlying torts should be dismissed under the doctrine. But because Zaftr's fraudulent misrepresentation claim is not dismissed under the gist of the action doctrine or any other theory, *see infra*, there is an underlying tort to support Zaftr's conspiracy claim, as discussed in more detail *infra*.

requires knowledge, information, or skill beyond what is possessed by the ordinary juror" and

such circumstances are present here, citing *Ovitsky v. Cap. City Econ. Dev. Corp.*, 846 A.2d 124,

126 (Pa. Super. 2004).

For the same reasons set forth in this Court's Order excluding the report and testimony of

Gavin Lentz, produced in part below, the Kirk Defendants' first argument has no traction

because Zaftr has not sued them for legal malpractice:

> The first issue with this argument is that it is at odds with a fundamental axiom of
> litigation—as defendants, Kirk and his law firm do not have the power to decide
> what claims Plaintiff asserts against them.  Indeed, Plaintiff repeatedly explains in
> its briefs that it has not: "(i) alleged any attorney-client relationship between
> Plaintiff and the Kirk Defendants; (ii) asserted any legal malpractice claims
> against the Kirk Defendants; or (iii) claimed that the Kirk Defendants failed to
> conduct any due diligence as escrow agents."  As Plaintiff is "the party who
> brings a suit," it "is master to decide what law [it] will rely upon" and what claims
> it will assert.  *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).
> The second problem is that though the Kirk Defendants maintain that any claims
> asserted against them when they were "acting as counsel in the applicable
> transactions" must be "viewed through that lens" of a legal malpractice claim,
> they cite no authority in support of this position. . . .  On top of this procedural
> faux pas, the Kirk Defendants' third issue is that their position does not sound in
> logic.  It cannot be the case that any and all claims brought against a lawyer or a
> law firm somehow transform into ones for legal malpractice.

Order, *Zaftr Inc. v. Lawrence et al.*, No. 21-2177 (August 26, 2022) (ECF No. 57).

The second argument also fails.  *Lentino*, the case cited in support, involved a *legal*

*malpractice* claim.  611 F.2d at 480-83.  The Kirk Defendants point to no authority stating that,

as they argue, "[e]xpert testimony is required when purporting to plead a negligence claim

against an attorney."  Indeed, in Pennsylvania, even in some cases involving professional legal

malpractice claims, expert testimony may not be necessary.  *See Rizzo v. Haines*, 555 A.2d 58,

67 (Pa. 1989) (listing cases).

The third argument also fails.  The Kirk Defendants misquote their primary authority,

*Ovitsky*, which actually states "expert opinion testimony is proper *only* where formation of an

opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror." *Ovitsky*, 846 A.2d at 126 (citation omitted and emphasis added for operative word omitted by the Kirk Defendants). Similarly, the two authorities cited for the Kirk Defendants' proposition that "expert testimony is required in claims against attorneys" "[u]nless the issue . . . be within the range of an ordinary layperson's experience," *Rizzo*, 555 A.2d at 67; and *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. 1988), are inapposite. Both cases were legal malpractice actions. *See Rizzo*, 555 A.2d at 65; *Storm*, 538 A.2d at 64. Further, the opinion in *Rizzo* merely applied the "general rule that expert testimony is essential where it would help the finder of fact understand an issue that is beyond the knowledge of the average person" and— unhelpful for the Kirk Defendants—concluded that, under the circumstances of that case, the issue of an attorney's "duty to investigate, and to inform one's client of, settlement offers" did not require expert testimony and also that "expert testimony was not needed to detail the fiduciary obligations of an attorney who engages in financial transactions with his client." 555 A.2d at 66-67.[31]

Zaftr's tort claims against the Kirk Defendants do not present issues beyond the capabilities of "the average person" to resolve but instead present simple issues where "the ordinary experience and comprehension of lay persons can establish the standard of care." *Rizzo*, 555 A.2d at 66. The claims are not predicated on the Kirk Defendants' duties as escrow counsel

---

[31] Other case citations in the Kirk Defendants' briefing are also out of place here. *See Schmidt v. Currie*, 217 F. App'x 153, 157 (3d Cir. 2007) (unpublished opinion) (involving claims under the Dragonetti Act, 42 Pa. Con. Stat. § 8351, which were treated as "analogous to a legal malpractice action," *id.* at 156); *Vadovsky v. Treat*, 2010 WL 3766810, at *1 n.5 (M.D. Pa. Sept. 21, 2010) (a legal malpractice action); *Kia v. Imaging Scis. Int'l, Inc.*, 2010 WL 3516850, at *5 (E.D. Pa. Sept. 2, 2010) (concluding that an expert could not testify as to factual issues involving whether an oral agreement was entered into or make credibility determinations, which were "within the purview of the jury").

or as counsel to BVFR.  Rather, they focus on run-of-the-mill misrepresentation and conspiracy claims well within the wheelhouse of a layperson.  A reasonable juror can determine, for instance, whether Kirk made alleged misrepresentations (explained in greater detail *infra*) to induce Zaftr to enter into or continue to pursue the contemplated transaction.  This is a case where "expert opinions are not necessary to determine whether the [Kirk Defendants] were negligent" because "lay persons may determine any negligence based upon their own common sense and experience."  *Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434, at *8 (E.D. Pa. Dec. 18, 2002); *see also Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 2010 WL 11550010, at *2 (E.D. Pa. Aug. 26, 2010) ("This Court has held that negligent misrepresentation involves an ordinary reasonable person standard, and does not require expert testimony or proof related to a professional standard of care.").[32]

Appearing to contend that Zaftr's *contract* claims also require expert testimony, the Kirk Defendants further argue that the "scope of an attorney's duty as defined by contract 'is a question of fact outside the normal range of the ordinary experience of laypersons,'" citing *Hemphill v. Siegel*, 2016 WL 266587, at *5 (Pa. Super. Jan. 21, 2016).  Unlike in *Hemphill*, however, where the court determined that "[w]hether an attorney failed to exercise a reasonable degree of care and skill related to common professional practice in handling a real estate transaction is a question of fact outside the normal range of the ordinary experience of laypersons," *id.* at *5, here, Zaftr's contract claims do not involve any issues that would be

---

[32] Whether Zaftr reasonably relied on the Kirk Defendants' "alleged due diligence" is also within the province of the jury.  Indeed, reasonable reliance is typically a question for a jury.  *Romeo v. Unumprovident Corp.*, 2008 WL 375161, at *7 (E.D. Pa. Feb. 11, 2008) ("Whether reliance on a representation is reasonable is generally a question of fact to be decided by a jury.").

outside of the ken of an ordinary juror.[33]

In sum, Zaftr has not alleged any attorney-client relationship between itself and the Kirk Defendants (as the Kirk Defendants themselves admit) and brings no legal malpractice claims in its Complaint. In these circumstances, expert testimony is not required to support Zaftr's negligence claims against the Kirk Defendants—a conclusion the Kirk Defendants even appear to concede at one point in their briefing: "While expert testimony is not *required* for these causes of action, it may still be admissible to help the trier of fact."

b.   Omissions[34]

Zaftr contends that Kirk and Lawrence made various omissions that induced it to enter the parties' agreements—to wit, that: (1) Defendants did not inform it that Lawrence, while held out by Defendants as an attorney, was administratively suspended from the practice of law; and (2) Defendants did not inform Zaftr that Lawrence was operating BVFR out of Maryland during

---

[33] While the Kirk Defendants specifically argue that whether the Kirk Defendants are "properly holding disputed funds" is an issue requiring expert testimony, whether an attorney properly holds funds disputed in litigation is merely an obligation established by the rules of professional conduct, and no expert testimony is required for that issue. *See Rizzo*, 555 A.2d at 67 ("We further believe that expert testimony was not needed to detail the fiduciary obligations of an attorney who engages in financial transactions with his client, since these obligations are established by law, the Code of Professional Responsibility, and the Model Rules of Professional Conduct.").

[34] Zaftr refers to both omission and nondisclosure in its Complaint. Each term appears to relate to the same theory in Zaftr's briefing (*i.e.*, a duty to disclose) and both will be treated under the term "omission" here. *See Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp.3d 849, 860 (E.D. Pa. 2015) (referring to "omission" claims in respect to both fraudulent and negligent conduct). As framed in the briefing, the claims that Zaftr has made do not include any allegations that any Defendant engaged in fraudulent concealment, which is treated distinctly under Pennsylvania law from mere nondisclosure. "Rather, the common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence." *Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 501 (Pa. Commw. 2013). For instance, Zaftr, while referring to Restatement (Second) of Torts Section 551 ("Liability for Nondisclosure"), fails to raise Section 550 ("Liability for Fraudulent Concealment"). *See Gnagey Gas & Oil Co.*, 82 A.3d at 500 (comparing the two sections).

the events at issue or that BVFR was not in good standing as a foreign LLC in Maryland.[35]  For

the reasons following, Zaftr's negligent and fraudulent misrepresentation claims must be

dismissed to the extent they rely on a theory of omission because Zaftr has failed to identify that

any Defendant owed it a duty.

     Misrepresentation claims based on omissions must be based on a duty to disclose the

omitted information.  *See N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp.3d

665, 701, 705 (E.D. Pa. 2021); *State Coll. Area Sch. Dist. v. Royal Bank of Canada*, 825 F.

Supp.2d 573, 589 (M.D. Pa. 2011); Restatement (Second) of Torts § 551 (1977) ("One who fails

to disclose to another a fact that he knows may justifiably induce the other to act or refrain from

acting in a business transaction is subject to the same liability to the other as though he had

represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is

under a duty to the other to exercise reasonable care to disclose the matter in question."); *see also*

*Gibbs v. Ernst*, 647 A.2d 882, 892 (Pa. 1994); *N. Penn Towns*, 554 F. Supp.3d. at 701;

Restatement (Second) of Torts § 551 (1977).

     To determine whether a duty to disclose arises, Pennsylvania state and federal courts

have often looked to the Restatement (Second) of Torts, which sets forth particular instances in

which the duty to disclose applies.  Restatement (Second) of Torts § 551(2) (1977); *see Hamilton*

*v. Speight*, 2019 WL 161731, at *2 (E.D. Pa. Jan. 10, 2019).  Section 551(2)(e) of the

Restatement provides that a "party to a business transaction is under a duty to exercise

reasonable care to disclose to the other before the transaction is consummated . . . facts basic to

---

[35] Zaftr does not specify which of the misrepresentations qualify as omissions in its briefing, but the two here appear to be the only ones phrased in terms of an omission.  Otherwise, Zaftr's alleged misrepresentations are framed as affirmative misrepresentations.

the transaction, if he knows that the other is about to enter into it under a mistake as to them, and

that the other, because of the relationship between them . . . would reasonably expect a disclosure

of those facts."  Restatement (Second) of Torts § 551(2)(e) (1977).[36]  "[F]acts basic to the

transaction" are limited:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction
> itself.  It is a fact that goes to the basis, or essence, of the transaction, and is an
> important part of the substance of what is bargained for or dealt with.  Other facts
> may serve as important and persuasive inducements to enter into the transaction,
> but not go to its essence.

Restatement (Second) of Torts § 551 cmt.j (1977).

As a preliminary matter, while Pennsylvania lower state courts and federal courts have

often relied on Restatement (Second) of Torts Section 551 to define the scope of a party's duty to

disclose, *Hamilton*, 2019 WL 161731, at *2; *Youndt v. First Nat. Bank of Port Allegany*, 868

A.2d 539, 550 (Pa. Super. 2005), whether the Pennsylvania Supreme Court has adopted Section

551 is unclear.  *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611-12 (3d

Cir. 1995) ("But while Pennsylvania courts have adopted the duty to speak requirement, the

cases leave us uncertain of the extent to which Pennsylvania law includes the Restatement's

discrete criteria for when a duty to speak arises."); *Nova Design Techs., Ltd. v. Walters*, 875 F.

Supp.2d 458, 471 (E.D. Pa. 2012), *as amended* (June 29, 2012) ("Pennsylvania appellate courts

have not explicitly identified the circumstances under which the duty to speak arises."); *see also*

*Gibbs*, 647 A.2d at 892 (merely citing Section 551).

Regardless, Pennsylvania cases have, on the whole, failed to find a duty to speak where

---

[36] Zaftr does not cite to or make argument regarding any other subsection of Section 551(2) in support of its omissions theory besides Section 551(2)(e).

the parties are sophisticated business entities with no fiduciary relationship to each other. *See N. Penn Towns*, 554 F. Supp.3d at 705 (listing cases); *Duquesne Light Co.*, 66 F.3d at 612 ("[T]here is virtually no Pennsylvania case in which a defendant has been held to have a duty to speak when both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts."). "Pennsylvania courts analyzing whether there was a duty to speak rely almost exclusively on the nature of the contract between the parties and the scope of one party's reliance on the other's representations." *Duquesne Light Co.*, 66 F.3d at 612.

Here, quite rightly, no party challenges that all involved are sophisticated business entities, nor maintains that any Defendant owes a fiduciary duty to Zaftr. Specifically, Zaftr is a Canadian company subject to financial regulation and engages in the business of buying and selling digital currency. Montgomery, the CEO, himself graduated from law school in Canada and is a practicing attorney. Kirk is a licensed attorney and founding shareholder of Kirk Law. Lawrence was a licensed attorney (now administratively suspended) and CEO and managing member of BVFR. Zaftr engaged in an arms-length transaction with Defendants. *See N. Penn Towns*, 554 F. Supp.3d at 705; *Marcum v. Columbia Gas Transmission, LLC.*, 423 F. Supp.3d 115, 121 (E.D. Pa. 2019) (a special relationship creating a fiduciary duty "generally does not arise in a typical, arms-length business transaction unless 'one party surrenders substantial control over some portion of its affairs to the other'" (citation omitted)).

Even if that were not the case, the two omissions identified in Zaftr's briefing are not "basic to the transaction" under Section 551(2)(e) because they do not go to the "basis, or essence," of the transaction and are not "an important part of the substance of what is bargained for." Restatement (Second) of Torts § 551 cmt.j (1977). First, while the record supports Zaftr's contention that neither Lawrence nor Kirk informed Zaftr that Lawrence, while held out as an

attorney, was administratively suspended from the practice of law, that omission is not a fact "basic to the transaction" because Lawrence was not serving in his capacity as a practicing attorney (only Kirk Law served as counsel to BVFR) and his attorney licensure status was not part of the "substance of what is bargained for." Similarly, the fact that Defendants did not inform Zaftr that Lawrence was operating out of Maryland and that BVFR was not in good standing in Maryland is not "basic to the transaction." While Zaftr argues that BVFR's business status in Maryland would have been relevant to its decision to engage with Defendants, the fact still does not go to the essence of the transaction or the substance of the bargain and instead is at most an "important [or] persuasive" fact, which Section 551 does not recognize as basic to the transaction.[37] Restatement (Second) of Torts § 551 cmt.j (1977).

In light of the uncertainty as to the scope of the duty to disclose doctrine under Pennsylvania law and Pennsylvania state courts' marked tendency to find no duty to disclose where parties are sophisticated business entities, the Court concludes that a Pennsylvania state court would not impose liability in respect to the two omissions above under a duty to disclose theory. *See Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2022 WL 1592444, at *5 (E.D. Pa. May 19, 2022) ("[W]here uncertainty in state law exists, this Court must choose 'the interpretation that restricts liability, rather than expands it, until the [Pennsylvania Supreme Court] decides differently.'" (citation omitted)). For that reason, summary judgment is granted

---

[37] Moreover, Zaftr did not "surrender[] substantial control" to Defendants in respect to information regarding Lawrence's attorney licensure status and BVFR's business location and status as facts within the unique possession of any Defendant. *Marcum*, 423 F. Supp.3d at 121. Rather, this information can be accessed through online public databases—exhibits in the Joint Appendix illustrate how BVFR's business location and status can be found through the Maryland governmental website and how Lawrence's status as an attorney status can be found on the Pennsylvania Supreme Court Disciplinary Board's website.

in respect to Zaftr's omission theory under its negligent and fraudulent misrepresentation claims.

### c.  Negligent Misrepresentation

Similarly, Zaftr's negligent misrepresentation claim fails because Zaftr has failed to identify a duty on which to rest the claim.

Pennsylvania common law requires that negligent misrepresentation claims—as with other negligence claims—be founded upon a duty between the alleged tortfeasor and the injured party.  *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 280 (Pa. 2005) ("The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." (quoting *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1168 (Pa. 2000))); *Gibbs*, 647 A.2d at 890 ("Any action in negligence is premised on the existence of a duty owed by one party to another.").  "There is no universal duty not to make a negligent misrepresentation."  *Sheridan v. Roberts L. Firm*, 2019 WL 6726469, at *4 (E.D. Pa. Dec. 11, 2019).

 The existence of a duty is a question of law to be decided by the court.  *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).  To determine whether to impose a duty, Pennsylvania law looks to a five-factor test: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."  *Bilt-Rite Contractors*, 866 A.2d at 281.

Typically, under these five factors, the relationship between parties who are engaged in arm's-length business relationships does not give rise to such a duty.  *See, e.g.*, *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp.2d 773, 783 (E.D. Pa. 2008) (surveying cases); *see also Abdul-Rahman v. Chase Home Fin. Co., LLC*, 2014 WL 3408564, at *5 (E.D. Pa. July 11, 2014);

*Tanksley v. Daniels*, 259 F. Supp.3d 271, 303 (E.D. Pa. 2017), *aff'd*, 902 F.3d 165 (3d Cir.

2018).  Here, the parties were engaged in arm's-length business transactions, and Zaftr has not

adduced evidence that it stood in any special relationship to Defendants that might otherwise

create such a duty.  *Cf. Gibbs*, 647 A.2d at 891 (holding that an adoption agency "assumed a duty

to tell the truth when it volunteer[ed] information to prospective parents").

      To the extent that Zaftr can be understood to root its negligent misrepresentation claim in

Restatement (Second) of Torts Section 552—adopted by the Pennsylvania Supreme Court, *see,*

*e.g.*, *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366 (Pa. 1977); *Bilt-Rite Contractors*, 866

A.2d at 285-86—which provides in relevant part:

> One who, in the course of his business, profession or employment, or in any other
> transaction in which he has a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon the information, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information.

Restatement (Second) of Torts § 552 (1977)—that theory fails as well.  Section 552 "sets forth

the parameters of a duty owed when one supplies information to others, for one's own pecuniary

gain, where one intends or knows that the information will be used by others in the course of

their own business activities."  *Bilt-Rite Contractors*, 866 A.2d at 285-86.  It does not "supplant[]

the common law tort of negligent misrepresentation" but merely "clarify[ies] the contours of the

tort as it applies to those in the business of providing information to others."  *Id.* at 287.  Section

552 is applied "narrowly," *i.e.* "only to those businesses which provide services and/or

information that they know will be relied upon by third parties in their business endeavors."  *Id.*

at 286.

      Zaftr fails to demonstrate that any Defendant fits within the narrow confines of Section

552.  *Bilt-Rite* limits its application to certain types of professionals (*i.e.*, "architects and other

design professionals," *id.* at 286).  Subsequently, its contours have been delineated to apply only

to cases involving "reliance on the advice of professionals," *Sovereign Bank v. BJ's Wholesale

Club, Inc.*, 533 F.3d 162, 178 (3d Cir. 2008), as being "typically limited to those who are 'hired

to advise'" such as "attorneys, surveyors, inspectors of goods, architects, designers, accountants,

and insurance agencies." *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Executives*, 2021

WL 1313108, at *10 (E.D. Pa. Apr. 8, 2021) (citations omitted); *see also Elliott-Lewis Corp. v.

Skanska USA Bldg., Inc.*, 2016 WL 2346737, at *4-*6 (E.D. Pa. May 4, 2016).  Zaftr has not

demonstrated that any Defendant functioned in such a role vis-à-vis the contemplated sale of

Bitcoin at the heart of this case.

      Moreover, because Section 552 does not supplant Pennsylvania common law on

negligent misrepresentation, it does not override the long-standing principle that arm's-length

transactions between business parties generally do not give rise to a duty between them in the

absence of a special relationship or other circumstance recognized by Pennsylvania law.  *See*

*Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, 2016 WL 6213035, at *22 (E.D. Pa. Oct.

24, 2016) (concluding that Section 552 did "not afford . . . relief" to the plaintiffs where the

defendants did not "accept the role of advisor and provide guidance" and where the "parties . . .

were merely parties to a contract" and the "deal was an arm's length transaction"); *see also*

*Battle Born Munitions, Inc. v. Dick's Sporting Goods, Inc.*, 2019 WL 1978429, at *8 (W.D. Pa.

May 3, 2019) ("[N]umerous courts have recognized that *Bilt-Rite* does not apply in a situation

involving the sale of goods or services between two sophisticated entities.") (listing cases).  In

short, Zaftr has not demonstrated that Section 552 is applicable to the circumstances of this case.

      In light of the foregoing, Zaftr has failed to demonstrate that any Defendant owed Zaftr a

duty.  In the absence of a duty, Zaftr cannot prove a necessary element of its negligent

misrepresentation claim, on which, accordingly, summary judgment must be granted in favor of Defendants.

d.   <u>Fraudulent Misrepresentation</u>

Both the Kirk Defendants and the Lawrence Defendants move for summary judgment on Zaftr's fraudulent misrepresentation claim.[38]

The elements of fraudulent misrepresentation in Pennsylvania are:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) (quoting *Gibbs*, 647 A.2d at 889).

Fraudulent misrepresentation must be proved by clear and convincing evidence, and determinations at summary judgment must be made in light of this higher evidentiary standard. *Browne v. Maxfield*, 663 F. Supp. 1193, 1206 (E.D. Pa. 1987); *Anderson*, 477 U.S. at 254-55.

*1.  Representation*

There is no genuine dispute that the following affirmative representations were made to Zaftr:

- Lawrence and Kirk represented Lawrence as an attorney although he was administratively suspended from the practice of law;

- Kirk referred to Lawrence as a medical doctor, former Marine, former federal prosecutor, and former Clinton administration member while none of these were true;

---

[38] As with Zaftr's contract claims, Zaftr often refers to the actions of "Defendants" without clearly distinguishing between the individual and corporate defendants or even between the two individual defendants.

- two of the parties' agreements represented that BVFR was located in Harrisburg, Pennsylvania, but Lawrence operated BVFR from his home in Maryland at the time, BVFR was not in good standing in Maryland, and Zaftr's service at the Pennsylvania address failed;

- BVFR/Lawrence and Kirk represented they were involved in prior transactions with Smith where he delivered Bitcoin;

- Lawrence provided a fraudulent passport to Kirk, who then passed it on to Zaftr, holding it out to be Smith's passport, and BVFR/Lawrence made representations as to the passport and Smith's identity in the ID Verification Agreement;

- Kirk represented that the reasons Smith did not provide Bitcoin on time in the August Tranche transaction was due to a "timing" issue with another party even as Kirk Law released funds to third-party bank accounts at Lawrence's direction; and

- Lawrence represented he had vetted the SOH bank account and that Gomes was a managing partner of SOH, whereas Gomes, or the person purporting to be Gomes, was not in fact managing partner of SOH.

*2.   Materiality*

A misrepresentation is material if the party would not have entered into the agreement but for the misrepresentation. *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1186 (Pa. Super. 2005); *see also Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. 1983).

Here, viewing all the record evidence, a reasonable juror could rationally find misrepresentations as to Lawrence's credentials material inasmuch they implicate Zaftr's understanding of Lawrence's credibility, experience, and trustworthiness.  While the Kirk Defendants argue Lawrence's status as an attorney is immaterial because Lawrence did not serve as an attorney in his role in the failed transaction, that is too cramped a view of materiality.  As Montgomery testified, "there were a number of areas where we relied on what BVFR was saying or doing . . . that was informed by my knowledge of him as an upstanding lawyer. . . [s]o the knowledge that he's a suspended lawyer would have been relevant to that."  Similarly, in respect to BVFR's location, Montgomery testified, had he known that BVFR was not at the Harrisburg

62

address but rather at a home address in Maryland, "then there would have been more questions about how BVFR was operating at the time."

A rational juror could also find that representations as to Lawrence's prior business dealings with Smith, Smith's passport, and Smith's identity were material: these were basic assumptions underlying the viability of the transaction, as demonstrated by the ID Verification Agreement—the first agreement of the contemplated transaction—where BVFR was obligated to make representations as to Smith's identity and passport.  As Montgomery testified, the representations as to prior business dealings impacted his decision to move forward with the transaction—"one thing that gives me great comfort is confirmation from someone that I trust that they have performed in the past."  As to the ID Verification Agreement, he testified "we were relying on the representations made within that contract for us to validate and verify that James Smith was a real person, and his passport was an accurate and valid passport."

A reasonable juror could also find that Kirk's representation that the August Tranche was delayed solely due to a "timing" issue is material because it concealed the fact that Kirk Law had sent Zaftr's purchase funds—in contravention of the parties' agreements, as discussed above—to two third-party accounts.  Montgomery testified that he would have ceased the transaction had he known that funds were sent prior to the receipt of Bitcoin ("I would have walked immediately.").

Similarly, Montgomery testified that representations as to Gomes's credentials were material to Zaftr's decision to engage with Gomes and SOH and enter agreements with them, stating "most of the representations around Gomes were provided by Lawrence . . . all of those things informed our decision."

### 3.  Knowledge of Falsity or Recklessness

"Summary judgment is inappropriate when a case will turn on credibility determinations .

. . and . . . on state of mind." *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d

144, 148 (3d Cir. 1993) (citing *Anderson*, 477 U.S. at 255; *Riehl v. Travelers Ins. Co.*, 772 F.2d

19, 24 (3d Cir. 1985)).  "[I]ssues of knowledge and intent are particularly inappropriate for

resolution by summary judgment, since such issues must often be resolved on the basis of

inferences drawn from the conduct of the parties." *Riehl*, 772 F.2d at 24.

Kirk and Lawrence's intent behind the misrepresentations is disputed and will turn

largely on the credibility of their testimony (*e.g.*, such as to their knowledge of Smith's identity,

past transactions with Smith, and the validity of Smith's passport), making the issue one for the

jury.

#### 4.   Intent to Mislead into Reliance

Under similar reasoning as set forth above, a juror could make a reasonable inference

based on the conduct of the parties and circumstances of the transaction that each representation

was made with the intent to induce Zaftr to enter into the parties' agreements.  Viewing the facts

in the light most favorable to Zaftr, the nonmoving party, there is sufficient evidence by which a

juror could conclude that the representations were intended to lead Zaftr to rely on Lawrence's

credibility and trustworthiness, BVFR's bona fide business status and credentials, Smith's

identity and experience in delivering Bitcoin, and Gomes's identity and credibility.  Especially

given the evidence that the Defendants provided a fraudulent passport to Zaftr—to kick off the

entire transaction—the "Court cannot conclude that no reasonable jury could find that the

[Defendants] had the intent to mislead [Zaftr]." *Paramount Fin. Commc'ns, Inc. v. Broadridge

Inv. Commc'n Sols., Inc.*, 2019 WL 3022346, at *17 (E.D. Pa. May 23, 2019).

#### 5.   Justifiable Reliance

Similar to issues of intent, whether a party reasonably relied on a representation is

typically a question of fact for the jury. *See, e.g.*, *EUSA-Allied Acquisition Corp. v. Teamsters Pension Tr. Fund of Philadelphia & Vicinity*, 2012 WL 1033012, at *5 (D.N.J. Mar. 26, 2012). The question of whether a party's reliance upon a representation was justifiable "is one that should be decided by a jury on the basis of all of the facts and permissible inferences which may be drawn from the evidence presented at trial." *Myers v. McHenry*, 580 A.2d 860, 865 (Pa. Super. 1990); *see also Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) ("[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction.").

There is sufficient evidence that Zaftr reasonably relied on the representations above to send the issue to the jury. While the Defendants argue that Zaftr's own due diligence in respect to Smith and Gomes vitiates any reliance on representations by the Defendants, the issue is disputed and the weighing of the evidence is a task for the jury.

### 6. Injury

No Defendant disputes that Zaftr could show injury caused by the alleged misrepresentations.

For the foregoing reasons, Defendants' motions for summary judgment shall not be granted as to Zaftr's claim for fraudulent misrepresentation.

### iii.    Civil Conspiracy

Zaftr's civil conspiracy claim is based on the theory that the Defendants acted intentionally and with a common purpose to induce Zaftr to enter into the series of agreements which they had neither the intention nor the ability to perform. Specifically, Zaftr contends that BVFR and Lawrence together provided false information about Lawrence's relationship with Smith and provided the fraudulent passport to Zaftr. Zaftr also alleges that Kirk, acting together

with Kirk Law, conspired to induce Zaftr to enter into the agreements when they agreed to act as "Mandate Counsel" for the Lawrence Defendants and when they retained Zaftr's funds for the benefit of the Lawrence Defendants.

In moving for summary judgment on the claim, the Defendants state quite correctly that to establish a civil conspiracy under Pennsylvania law the Plaintiff must prove: "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004). In addition, plaintiff must prove a separate, underlying tort as a predicate for civil conspiracy. *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000).

Here, a predicate underlying intentional tort (fraudulent misrepresentation) has survived summary judgment and Zaftr furthermore has provided evidence by which a reasonable juror could conclude that the Defendants acted with a common purpose to do an unlawful act, committed an overt act in pursuance of such, and caused actual damage. Thus, summary judgment shall not be granted on the civil conspiracy claim.

### D. Plaintiff's Declaratory Judgment Claim

Zaftr seeks declaratory judgment, asking the Court to declare the following:

(a) Defendants have breached their duties to Plaintiffs with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum; (b) Plaintiff is entitled to a return of all of the funds it paid to Defendants, pursuant to the parties' Agreements for the BTC that Defendants never delivered to Plaintiff; (c) As a direct and proximate result of Defendants' breaches of their duties to Plaintiff with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum, Plaintiff is entitled to the Non-Performance Fee for each of the August Tranche, September Tranche, and October Tranche, in the amount of 71 BTC; (d) As a

66

direct and proximate result of Defendants' breaches of their duties to Plaintiff with respect to the Purchase Agreement, Escrow Agreement, BVFR Side Letter, ID Verification Agreement, Second Escrow Agreement, and Addendum, Plaintiff has suffered direct and consequential damages in an amount in excess of $32,826,500.00; (e) Plaintiff is entitled to an award of its attorney's fees and costs incurred in connection with bringing this action pursuant to the Escrow Agreement and the Second Escrow Agreement; (f) Plaintiff is entitled to an award treble damages, punitive damages, prejudgment interest, and post-judgment interest; and (g) Plaintiff is entitled to such other and further relief that this Honorable Court deems proper.

"Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct." *Andela v. Admin. Off. of U.S. Cts.*, 569 F. App'x 80, 83 (3d Cir. 2014). They "are not meant simply to proclaim that one party is liable to another." *Id.* Here, Zaftr is simply asking the Court to find that Defendants were liable for the past conduct alleged against them in the other counts of Zaftr's Complaint and to calculate damages it believes it is due. *See, e.g.*, *LM Gen. Ins. Co. v. LeBrun*, 2020 WL 7640927, at *3 (E.D. Pa. Dec. 23, 2020).

Furthermore, it is duplicative of Zaftr's other claims, especially its breach of contract claims. *See Butta v. GEICO Casualty Co.*, 400 F. Supp.3d 225, 231 (E.D. Pa. 2019) (courts should "exercise their discretion to decline proceeding with declaratory judgments when they duplicate other claims."). While the "existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," declaratory judgments are generally inappropriate when they duplicate other claims. *Id.* Here, the declaratory relief sought by Zaftr is predicated on alleged breaches of the parties' agreements, essentially restating Zaftr's breach of contract claims.

Moreover, to the extent that Zaftr seeks a determination of attorney's fees and costs under the terms of the First and Second Escrow Agreements, any such determination would be premature since the agreements condition attorney's fees and costs on prevailing in the suit.

Similarly, the requests for a determination of treble damages, punitive damages, and pre- and post-judgment interest are either the province of the jury or are premature.

For these reasons, summary judgment on Zaftr's declaratory judgment claim shall be granted in favor of the Kirk Defendants.

An appropriate order follows.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

**WENDY BEETLESTONE, J.**